UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **TRACIE HUNTER,** | : | Case No. 1:10-cv-820 |
| | : | |
| **Plaintiff,** | : | Judge Susan J. Dlott |
| | : | |
| vs. | : | |
| | : | **MOTION FOR TEMPORARY** |
| **HAMILTON COUNTY BOARD OF** | : | **RESTRAINING ORDER AND** |
| **ELECTIONS, ET AL.** | : | **PRELIMINARY INJUNCTION** |
| | : | |
| **Defendants.** | : | |

Pursuant to Fed. R. Civ. Pro. 65, Plaintiff hereby moves for a temporary restraining order prohibiting Defendants from certifying the election results for Hamilton County Juvenile Court Judge and ordering Defendants to contact provisional voters whose ballots were rejected, ordering Defendants to investigate from Board materials whether poll worker error contributed to the rejection of these provisional ballots and ordering Defendants to count all provisional ballots where poll worker error caused the voter to vote in the wrong precinct.  Plaintiff seeks this TRO before 9:00 a.m. on Tuesday, November 23, 2010, at which time Defendants are scheduled to certify the election results of the all races in the November 2010 general election, including that race for Juvenile Court Judge.

## MEMORANDUM OF LAW

### I.  INTRODUCTION

This civil rights action seeks an order requiring Defendants, among other things, to count the provisional votes of citizens who voted at the wrong precinct solely due to poll worker error.  Plaintiff Tracie Hunter is only 23 votes behind her opponent in the race for Hamilton County Juvenile Court Judge.  Hundreds of provisional votes have

been rejected by Defendants because the voters allegedly voted in the wrong precinct. A single polling place often is the site for voting for numerous precincts. A citizen must not only locate the right polling place but also the right table within the voting place in order to vote in the correct precinct. Poll workers employed by the Defendant Board of Election have a duty to direct the voter to the correct table so the voter can vote in the correct precinct. On November 2, 2010 some poll workers in Hamilton County did not direct the voter to the correct precinct table and instead simply handed the voter a provisional ballot. A provisional ballot cast in the wrong precinct due to such poll worker error will not be counted by the Defendant Board even though the voter did everything the Defendants employees asked of the voter. Plaintiff Hunter challenges this decision as a denial of due process and equal protection..

This action seeks to maintain the *status quo* and enjoin the certification of the vote for Hamilton County Juvenile Court Judge until the Court can determine the rights of provisional voters whose ballots have been rejected by Defendants even though the reason for the rejection may be due solely to poll worker error. Principles of Due Process and Equal Protection require that demonstrated poll worker error should not deny to citizens their right to have their vote counted.

The 23 vote gap in this case makes the Plaintiff eligible for an automatic recount. But a recount reviews only the votes determined eligible before the official count is certified. Thus a recount will not address the problem in this case – the failure to count the ballots of voters who voted in the wrong precinct due solely to poll worker error. An injunction to maintain the status quo while the problem is solved is needed in this case.

## II. ARGUMENT

A. **Standard for Granting Preliminary Relief**

The standard for evaluating a request for preliminary injunctive relief under Rule 65 is well established in this Circuit. Though, there is no rigid and comprehensive test for determining the appropriateness of preliminary injunctive relief, *Tate v. Frey*, 735 F.2d 986, 990 (6th Cir. 1984) (citations omitted), the court should consider the following four factors:

1. Whether the party seeking the injunction has shown a substantial likelihood of success on the merits;

2. Whether the party seeking the injunction will suffer irreparable harm absent the injunction;

3. Whether the injunction will cause others to suffer substantial harm;

4. Whether the public interest would be served by the preliminary injunction.

*Leary v. Daeschner*, 228 F. 3d 729, 276 (6th Cir. 2000); *Memphis Planned Parenthood, Inc. v. Sunquist*, 175 F.3d 456, 460 (6th Cir. 1999). These factors are "to be balanced and [are] not prerequisites that must be satisfied . . . they are not meant to be rigid and unbending requirements." *McPherson v. Michigan High School Athletic Association*, 119 F.3d 453, 459 (6th Cir. 1997) (en banc); *In re DeLorean Motor Co.,* 755 F.2d 1223, 1229 (6th Cir. 1985). A finding of irreparable injury "is the single most important prerequisite that the Court must examine when ruling upon a motion for preliminary injunction." *Metrobanc v. Federal Home Loan Bank Bd.*, 666 F. Supp. 981, 984 (E.D. Mich. 1987). "The probability of success that must be shown is inversely proportional to the degree of irreparable injury the plaintiffs will suffer absent an injunction." *State of*

*Ohio Ex Rel Celebrezze v. N.R.C.,* 812 F.2d 288, 290 (6th Cir. 1987); *accord Shell v. R.W. Sturge Ltd.*, 850 F. Supp. 620, 632 (S.D. Ohio 1993).

Even if the Court is not certain that a plaintiff is likely to succeed on the merits, a preliminary injunction is still appropriate where the plaintiff shows "'serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant,'" *DeLorean*, 755 F.2d at 1229 (quoting *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982)), or if "the merits present a sufficiently serious question to justify further investigation," *DeLorean*, 755 F.2d at 1230. A district court is not required to make specific findings concerning each of the four factors used in determining a motion for preliminary injunction if fewer factors are determinative of the issue. *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 717 (6th Cir. 2002).

In this case, as set out below and in the verified Complaint, Plaintiff meets the test for preliminary relief. Her likelihood of success on the merits, her irreparable harm, the balance of hardships and the public interest all strongly favor the issuance of an injunction.

**B.      Plaintiff Has a Likelihood of Success on the Merits: Defendants' arbitrary actions violate the Equal Protection Clause and the Due Process Clause.**

This case challenges the BOE's arbitrary process for counting provisional ballots. The BOE investigates some provisional ballots that do not satisfy the statutory standards to determine whether poll worker error contributed to the problem. The BOE does not bother to investigate other problematic provisional ballots. Neither candidates, interested parties, the press, nor the public can help the BOE with the task of uncovering poll

4

worker error because the Hamilton County BOE has taken a position that all information about a provisional ballot is not public. Not until after the BOE certifies the election results can the public learn the names of provisional voters or even see the poll books where notes from election day are maintained. (Exhibit C to Complaint letter from Joe Deters November 19, 2010). Therefore, the Board must conduct this investigation on its own.

Furthermore, it should be noted that the Ohio Supreme Court has held that the statutory scheme for casting and counting provisional ballots is ambiguous and has asked the Ohio legislature to clarify the statutes, to no avail.

> The General Assembly's statutory procedure for the casting, processing, and counting of provisional ballots in Ohio is far from lucid. At best, R.C. 3505.181, 3505.182, and 3505.183 ambiguously set forth the requirements for election officials to determine whether a provisional vote is to be counted as a valid ballot. The secretary of state's change in position in this case concerning at least one category of disputed provisional ballots is but one example of the statutes being read in differing yet defensible ways. As a result, the General Assembly should re-examine R.C. 3505.181, 3505.182, and 3505.183 to determine whether they accurately express its legislative intent in light of the fundamental constitutional importance of the right to vote and to have that vote counted. See Section 1, Article V, Ohio Constitution, which states, "Every citizen of the United States, of the age of eighteen years, who has been a resident of the state, county, township, or ward, such time as may be provided by law, and has been registered to vote for thirty days, has the qualifications of an elector, and is entitled to vote at all elections."

*State ex rel. Skaggs v. Brunner*, 120 Ohio St.3d 506, 526-527 (2008). The Ohio General Assembly has not taken up this challenge. Given this backdrop, it is imperative that this Court order the BOE to conduct investigations of whether poll worker error contributed to the reason why hundreds of provisional ballots were rejected and order that they be counted.

5

1.      Equal Protection

In 2000 the United States Supreme Court reiterated the core Equal Protection principles with respect to elections in *Bush v. Gore,* 531 U.S. 98, 104-05, 121 S.Ct. 525, (2000) ( *per curiam* ).  "Having once granted the right to vote on equal terms, the State may not, by later *arbitrary and disparate* treatment, value one person's vote over that of another." *Id*. (emphasis added).  *Bush v. Gore* held that to comply with the Equal Protection Clause, a state must employ adequate and uniform standards when conducting a recount of ballots.  The same standard applies to the counting of ballots, including provisional ballots.

> The right to vote includes the right to have one's vote counted on equal terms with others.  *Bush v. Gore,,* 531 U.S. at 104, 121 S.Ct. 525 ("[T]he right to vote as the legislature has prescribed is fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter."); *Dunn v. Blumstein,* 405 U.S. 330, 336, 92 S.Ct. 995 (1972) ("[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction."); *Reynolds,* 377 U.S. at 567-68, 84 S.Ct. 1362; *Wesberry v. Sanders,* 376 U.S. 1, 7, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964); *Gray v. Sanders,* 372 U.S. 368, 380, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963) ("The idea that every voter is equal to every other voter in his State, when he casts his ballot in favor of one of several competing candidates, underlies many of our decisions."); *United States v. Classic,* 313 U.S. 299, 315, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941); *United States v. Mosley,* 238 U.S. 383, 386, 35 S.Ct. 904, 59 L.Ed. 1355 (1915); *see also* \*477 U.S. Const. amends. XV, XIX, XXIV, XXVI.

*League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 476-477 (6th Cir. 2008).  This cornerstone principle of election law shows Plaintiff will succeed on her equal protection claim because the Hamilton County Board of Elections has treated one provisional voter differently from another with no basis at all.

First of all the Secretary of State ("SOS") has told local boards of election when they can count a faulty provisional ballot if the fault was due to poll worker error.  Ex. A to Complaint, SOS Directive 2010-74.  The SOS ordered local boards to count a

6

provisional ballot, even though it was cast in the wrong precinct, under the following circumstance: the voter was in the correct polling location, but voted in the wrong precinct; the voter used as identification the last four digits of his social security number as identification;[1] and there was poll worker error:

> "In determining the eligibility of a provisional ballot cast by a voter who uses only the last four digits of his or her Social Security number as identification, the board staff must attempt to determine whether a potentially disqualifying flaw in the ballot is attributable to poll worker error. An otherwise qualifying provisional ballot may not be rejected for reasons that are attributable to poll worker errors."

Directive 2010-74 p. 7.  The Directive goes on to provide some examples where provisional ballots shall not be rejected due to poll worker error at pp. 11-12.  For example, if a voter declines to sign the provisional ballot affirmation, the poll worker must indicate the voter's declination on the poll worker verification form.  However, when the voter fails to sign the provisional ballot affirmation statement but the poll worker signs the verification statement that the voter has completed the affirmation and fails to verify that the voter declined to complete the affirmation, the Board has a duty to further investigate and question the poll worker.

> "If this occurs, the board of elections should, either in writing, with written response from the poll worker, or at a public meeting of the board, question the poll workers in that precinct to determine whether they followed the board's instructions for completing the verification statement, both as to the specific ballot in question and in general on Election Day.  Where a poll worker's response indicates that he or she did not properly complete the verification statement, that response and the completed poll worker verification statement provide objective evidence that the poll worker did not ensure that the voter had completed the affirmation before the poll worker filled out the verification statement portion of SOS Form 12-B."

---

[1] This directive comes from a Court Order following a consent decree in the case *Northeast Coalition for the Homeless v. Brunner*, S.D. Ohio No. 2:06-cv-896 (Marbley, J.).  That case focused on homeless voter's right to cast provisional ballots.  The prohibition on rejecting provisional ballots cast in the right location, wrong precinct, applies only to voters using the last four digits of their social security numbers as identification.

7

Directive 2010-74 p. 11. Another example of poll worker error is when there are notations in the poll book indicating that a poll worker directed the voter to the wrong precinct at a polling location containing multiple precincts (sometimes referred to as "right location, wrong table" or "right church, wrong pew"). The SOS directed Boards of election to investigate these provisional ballots.

> "Because it is a poll worker's duty to ensure that the voter is directed to the correct precinct" the Board can use the notations as evidence that the poll worker did not properly carry out her duties. In that case the board should "either in writing, with written responses from the poll workers, or at a public meeting of the board, question the poll workers in that polling location to determine whether they followed the board's instructions for ensuring that voters were directed to the correct precinct."

Directive 2010-74 p. 12. Likewise, the Board should make the same inquiry if there are multiple provisional ballots cast in the correct location but wrong precinct. *Id*.

Additionally Defendant BOE has created its own practice of examining some, but not all, faulty provisional ballots for poll worker error and if such error is found, counting the ballot even though the ballot did not comply with the law. For example, at the Board meeting on November 16, 2010, the Board spent three hours carefully scrutinizing the provisional ballots to determine whether they should be counted. About 8,260 provisional ballots were approved for counting without any significant discussion. The remaining provisional ballots were investigated, discussed, examined, and voted on by the Board to determine if they should be counted.

The BOE carefully examined the provisional ballot envelopes to determine whether the provisional ballot was correct or should be rejected. In many cases the board members asked questions of the board staff, read the notes on the provisional envelopes, read the notes in the pollbooks, and inquired if there was a call on the BOE help line on Election Day regarding this voter. In all cases where the provisional ballot had a mistake

and the BOE found poll worker error, the BOE voted to approve the provisional ballot to be counted.

For example, 26 provisional ballots had been cast in the wrong precinct. The ballots had been cast at the Board of Elections downtown. The Board members asked their staff how could a voter come down to the Board to vote and be handed the wrong ballot. The answer was poll worker error. The staff recommended the votes be counted. Legal Counsel to the BOE opined that the recommendation was appropriate. The Board unanimously voted to approve these provisional ballots, even though the ballots were cast in the wrong precinct. Exhibit B attached to Complaint (transcript of 11-16-10 Board meeting) pp. 40-46.

Additionally, there were 685 provisional ballot envelopes where the poll worker filled in contradictory information stating both that the voter did provide identification and stating the voter was required to provide additional information to the Board. The Board staff investigated the voters to make sure they were registered voters and recommended the votes be counted even though the voters did not bring identification to the Board. BOE Legal counsel agreed that this circumstance fell within the Secretary of State's directive on poll worker error. The Board agreed to unanimously approve these ballots. Exhibit B pp. 29-33.

The Board staff investigated ten ballots where the voter had not signed the envelope and found that the voter should not have been required to vote a provisional ballot. Because the poll worker must have erred in making the voter vote a provisional ballot, the ballot was accepted by the Board even though the envelope was not signed. Exhibit B pp. 71-72.

At the November 19, 2010 board meeting the staff found additional ballots where poll worker error was found.  The staff opened several provisional envelopes where the envelope listed the correct precinct but when the envelope was opened the ballot inside was for the wrong precinct.  The BOE unanimously agreed to count the ballots even though they were cast in the wrong precinct because of poll worker error.

However, there were hundreds of provisional ballots that were rejected by the BOE without any inquiry of it staff, its notes, the envelopes, the poll books, the poll workers, or the help line notes from Election Day to determine if poll worker error was the cause of the provisional ballot being faulty.  Critical to this case are the 849 provisional ballots rejected by the Board because the voter voted in the wrong precinct.  Some of the voters in this group voted in the correct polling location but voted at the wrong table (wrong precinct).  Board member Faux stated that he was concerned that the reason somebody would end up voting at the wrong table "had more to do with directions they were given by the inside poll workers than it did with their own ineptitude." Nevertheless the Board did not separate out of the 849 provisionals those ballots cast in the right location but at the wrong table.  Nor did the Board investigate whether there was poll worker error.  In other situations the Board asked staff questions, checked the pollbook, and inquired if there were calls to the help line.  In this situation the Board did none of that.  Nor did the Board follow the Secretary of State's directive in the situation of the right location, wrong precinct, where the Board is directed to contact the poll workers to determine whether they followed the board's instructions for ensuring voters were directed to the correct precinct.  The Board unanimously voted to reject all 849 ballots.  Exhibit B pp. 24- 40.

Counsel for Ms. Hunter asked the Board to reconsider the 849 votes it rejected and consider poll worker error, as it had with other provisional ballots. The Board declined. Exhibit B pp. 46-49. Counsel raised the issue again at the Board meeting on November 19, 2010 and the Board again declined. Plaintiff and her counsel also sought access to the provisional ballot envelopes, poll books, names of provisional voters and precincts where they voted but were denied access by Defendants on the grounds that the information sought was not a public record before the Board certifies the results. Exhibit C attached to Complaint (letter from Joe Deters November 19, 2010).

Furthermore, the BOE also rejected a number of provisional ballots where the voter either did not print their name on the affirmation on the envelope but signed the envelope or printed their name but did not sign the envelope. The BOE rejected these ballots without determining whether the poll worker error was involved. Finally, the BOE rejected a number of additional provisional ballots for various reasons without determining whether there was poll worker error.

Given the Board's arbitrary and disparate treatment of reviewing some faulty provisional ballots for poll worker error but not others; and given the Board's consistent unanimous approval of faulty provisional ballots that were faulty due to poll worker error, this Court can come to only one conclusion: the Board treated similarly situated provisional ballots differently. For this reason, Plaintiff has shown a strong likelihood of success on this claim.

2. <u>Due Process</u>

The concept of "liberty" assured by the Due Process Clause of the Fourteenth Amendment embraces those rights and freedoms that are "so rooted in the traditions and

11

conscience of our people as to be ranked as fundamental." *Palko v. Connecticut*, 302 U.S. 319, 325 (1937) (Cardozo, J.). Since 1886 the right to vote has been a fundamental right, "preservative of all rights." *Yick Wo v. Hopkins,* 118 U.S. 356, 370, 6 S.Ct. 1064 (1886). *See also, United States v. Classic,* 313 U.S. 299, 315, 61 S.Ct. 1031(1941) (recognizing the right of qualified voters to cast ballots and have them counted). Ordinarily, state laws which impinge upon such fundamental liberties are automatically subject to strict judicial scrutiny. *Shapiro v. Thompson*, 394 U.S. 618, 658 (1969). The Supreme Court has recognized, however, that "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974). For this reason, the Court has adopted a special balancing test for evaluating due process claims against state election laws, all of which inevitably affect the fundamental rights of political parties, candidates, and voters:

> [A court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.

*Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

Under this test, the level of scrutiny varies on a sliding scale with the extent of the asserted injury. When, at the low end of that scale, the law "imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson*, 460 U.S.

12

at 788-89 n.9). But when the law places "severe" burdens on the rights of political parties, candidates or voters, "the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Id.* at 434 (quoting *Norman v. Reed*, 502 U.S. at 289).

The BOE's provisional balloting process places a heavy burden on a voter's right to have her vote count. It also places a heavy burden on Plaintiff Hunter's right to have all votes counted in this close election.

The BOE's interests are not narrowly tailored. The Board of Elections can articulate two interests: an interest in counting provisional ballots that would otherwise be rejected due to some fault caused by poll worker error (e.g., giving voter ballot from wrong precinct, sending some voters in the right polling location to the wrong table, indicating contrary information that a voter presented identification but still needed to bring identification to the Board, etc.). At the same time, the BOE wants to prohibit voter fraud (e.g., voter not providing identification, voter not registered to vote in precinct). The BOE may also argue it has an interest in complying with state law that prohibits counting a provisional ballot cast in the wrong precinct. However, that interest, even if compelling, is not narrowly tailored in this case to allow all provisional ballots cast in the right location, wrong precinct *due to poll worker error* to count. The BOE investigated ballots cast in the wrong precinct at BOE headquarters downtown and determined there was poll worker error and counted those votes. The BOE investigated the ballots where the voter gave the last four digits of his social security number as identification, voted in the right location but wrong table, and investigated for poll worker error and found error. In these cases the BOE counted the ballots. This shows that the BOE is capable of

13

narrowly tailoring its interests by investigating its sources of information for poll worker error. The Board did not do this in all cases where it rejected provisional ballots. Thus, Plaintiff is able to show likelihood of success on her due process claim.

**C.    Plaintiff Will Experience Irreparable Harm**

There is no adequate remedy at law that would enjoin the Defendants from certifying the election results or that would order Defendants to include certain rejected provisional votes in the certification before a recount. The BOE is scheduled to meet Tuesday November 23, 2010 at 9:00 a.m. to certify the election results. Because the margin of victory in the Juvenile Court race is less than one half of one percent of the votes cast, the BOE must order a recount of the race. If the BOE certifies the results and orders a recount, without including the additional provisional ballots that were rejected due to poll worker error, Plaintiff Tracie Hunter will suffer irreparable harm in that all the votes cast in the race will not be counted. Moreover, the public deserves a system where provisional ballots are not rejected solely due to poll worker error. The need is urgent for court action on this pressing problem. Only prompt action by this federal court ordering declaratory and injunctive relief will serve the public interest

**D.    The Balance of Hardships and the Public Interest Favor Issuance of an Injunction**

The Defendants will not be harmed by the issuance of an injunction. Indeed the BOE will be aided in their duty to foster and establish a fair election. Defendants plan to conduct the recount on November 29, 2010. There is adequate time between now and the 29th for the Board to review the rejected provisional ballots for poll worker error and vote to count those ballots before the recount starts. The Plaintiff, on the other hand, will be severely harmed if the election is certified and a recount is ordered without including the

provisional ballots that were rejected due to poll worker error. The public interest is surely benefited by a ruling that will make the judicial election comport with the Constitution.

## IV. CONCLUSION

This Court should enjoin the Board from certifying the results of the election to the office of Juvenile Court Judge; declare Defendant's rejection of provisional votes due to poll worker error to be unconstitutional; order Defendants to contact provisional voters to determine if there was poll worker error; order Defendants to review their records (notes, envelopes, poll books, help like) and contact poll workers to determine if the rejected provisional ballots were due to poll worker error, and order Defendants to count rejected provisional ballots if the rejection was due to poll worker error.

Respectfully submitted,

/s/ Jennifer L. Branch
Jennifer L. Branch #0038893
Trial Attorney for the Plaintiff
GERHARDSTEIN & BRANCH CO. LPA
Alphonse A. Gerhardstein #0032053
Attorney for the Plaintiff
432 Walnut Street, Suite 400
Cincinnati, Ohio 45202
(513) 621-9100
(513) 345-5543 fax
jbranch@gbfirm.com
agerhardstein@gbfirm.com

**CERTIFICATE OF SERVICE**

I hereby certify all Defendants were served with a copy of this Motion by email service on November 21, 2010 and putative counsel for Defendants, David Stevenson, was served by email on November 21, 2010.

/s/ Jennifer L. Branch

15