UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **TRACIE HUNTER,** | : | Case No. 1:10-cv-820 |
| | : | |
| Plaintiff, | : | Chief Judge Dlott |
| v. | : | |
| | : | |
| **HAMILTON COUNTY BOARD OF** | : | **POST-HEARING BRIEF OF** |
| **ELECTIONS,** *et al.,* | : | **INTERVENING PARTY** |
| | : | **DEFENDANT JOHN WILLIAMS** |
| Defendants. | | |

The Constitution does not guarantee error free elections. But despite this principle, Plaintiffs spent the majority of their case presenting the testimony of selected poll workers and voters that established, at the most, that some poll workers (and voters) may have made mistakes during the November 2 Election. But innocent, isolated mistakes are not constitutional violations, even where voting is concerned.

Put simply, Plaintiffs failed to meet their burden as to the threshold issue in this case: whether the Board violated the Fourteenth Amendment. The Fourteenth Amendment guarantees due process and equal protection. And here, the evidence demonstrated that the Board afforded both to all provisional voters in the processing and counting of their provisional ballots. Accordingly, this Court should render a judgment in favor of the Board.

**I.      The Board did not violate Equal Protection in its review of the provisional ballots**.

Plaintiffs failed to prove the critical elements necessary to prevail on an equal protection violation. As set forth more fully below, Plaintiffs failed to demonstrate that the Board acted with the requisite mental state, used non-uniform standards in their review of the provisional ballots, or that the 850 provisional ballots were similarly situated to the 31 provisional ballots cast at the Board such that the provisional ballots were entitled to be treated the same in the first

instance.  The Court should render a judgment in favor of the Board for the equal protection

claim.

> **A.    The Board did not act invidiously when it, acting on legal advice, made the innocent mistake of counting the 31  wrong precinct ballots cast at the Board and rejecting the 850 wrong precinct provisional ballots cast at the polling locations.**

Plaintiffs argued that "[i]ntent is not required in this case."  Plaintiffs Proposed Findings

of Fact and Conclusions of Law (Doc. No. 114) at 34.  This is not a strict liability case.  It is a

§ 1983 case and the law is clear: when litigating under § 1983, the "the plaintiff must prove the

culpable mental state applicable to the underlying constitutional right." *League of Women Voters*

*of Ohio v. Brunner*, 548 F.3d 463, 476 (6th Cir. 2008) (citing *Daniels v. Williams*, 474 U.S. 327,

328 (1986)).  To establish an equal protection violation, Plaintiffs had to demonstrate that the

Board acted "invidiously." *Williams v. Rhodes*, 393 U.S. 23, 39 (1968) (holding that equal

protection clause does not require states to treat groups uniformly, but bans "invidious

discrimination.").  As recently as 2009, the Supreme Court held in *Ashcroft v. Iqbal*,  --U.S.--,

129 S. Ct. 1937, 1948 (2009), that in order to prove invidious discrimination a plaintiff must

demonstrate more than "intent as volition or intent as awareness of consequence" and must

demonstrate that a decisionmaker undertook "a course of action 'because of,' not merely 'in spite

of' [the actions] adverse effects upon an identifiable group."  *Id.  See also Black's Law*

*Dictionary* 500 (8th ed. 2004) (defining invidious discrimination as "discrimination that is

offensive or objectionable, esp. because it involves prejudice or stereotyping.").

Plaintiffs presented no evidence demonstrating that the Board voted to count or reject any

ballots because of the adverse effects upon an identifiable group.  Instead, the undisputed

evidence is that the Board voted to reject the 850 ballots because Ohio law required those ballots

to be rejected.  Trial Testimony of Tim Burke, July 19, 2011 (hereinafter "Burke July 19 Tr."), at

2-70 - 2-71; Trial Testimony of Caleb Faux, August 3, 2011 (hereinafter "Faux August 3 Tr."), at 11-10 - 11-11. The Board voted to count the 31 provisional ballots based on legal advice that turned out to be erroneous. Jt. Ex. 28 Transcript of BOE Meeting (November 16, 2010), at 41: 21-25.

Prior to the vote of the Board on November 16 to count the 27 ballots cast in the wrong precinct at the Board, the Board staff "deferred to the prosecutor to determine legally how [to] handle this."[1] *Id.* In response, the prosecutor advised that the recommendation of a democrat staff member, Mr. Mallory, to count 27 votes was "appropriate." *Id.* at 000042:5-7. The Board similarly sought a legal opinion on whether to reject the 849 ballots. *Id.* at 000034-40. The Board again followed the advice of counsel. *Id.* at 000040.

The recommendation to count the 27 ballots turned out to be an erroneous interpretation of Ohio law. *State ex rel. Painter v. Brunner*, 128 Ohio St.3d 17, 941 N.E.2d 782 (Ohio 2011). Prior to the November 2 election, Ohio law provided that a provisional ballot must be cast in the correct precinct in order to be counted. *State ex rel. Painter*, 128 Ohio St.3d at ¶34. There was not an exception under Ohio law that allows the counting of provisional ballots cast in the wrong precinct due to poll worker error. *Id.* at ¶35.

A mistaken application of law, without more, is not a violation of equal protection. In *Snowden v. Hughes*, 321 U.S. 1 (1944), the Supreme Court addressed this issue and held "[t]he unlawful administration by state officers of a state statute fair on its face, resulting in unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of **intentional or purposeful discrimination**." 321 U.S. 1. (emphasis added).

---

[1] Four additional ballots cast at the Board were later discovered bringing the total wrong precinct ballots cast at the Board to 31.

Numerous federal courts have addressed erroneous application of laws in the voting context. *See Roe v. Alabama*, 68 F.3d 404 (11th Cir. 1995) and *Gamza v. Aguirre*, 619 F.2d 449 (5th Cir. 1980). In *Roe*, the court held that the fact local election officials had erroneously counted a small number of ballots, in conflict with the statewide practice to exclude such ballots, was not an equal protection violation. *See* 68 F.3d at 407-08. And in *Gamza*, the court held that the miscounting of votes in a local election as the result of alleged maladministration did not give rise to an equal protection violation. *Gamza*, 619 F.2d at 453 ("isolated events that adversely affect individuals are not presumed to be a violation of the equal protection clause"); *see also Gelb v. Bd. of Elections of City of N.Y.*, 155 Fed. Appx. 12, 14-15 (2d Cir. 2005) ("[u]neven or erroneous application" of state law by local board of elections, without more, does not violate equal protection); *E & T Realty v. Strickland*, 830 F.2d 1107, 1114 (11th Cir. 1987) ("The problem with the district court's standard is that *any* departure from state law would give rise to a constitutional claim. . . . [I]f local government decisionmakers correctly applied a facially neutral resolution in hundreds of cases and erroneously applied it in a single case, they could never again apply it correctly without violating equal protection.").

Contrary to Plaintiffs' assertion, *Bush v. Gore*, 531 U.S. 98 (2000), does not displace any of this. First, *Bush* was not a §1983 case, therefore, it could not have overturned any of the § 1983 requirements. Second, *Bush* was a statewide challenge to Florida's voting system akin to cases like *Harper v. Virginia Bd. of Elections*, 383 U.S. 663 (1966) (statewide poll tax) and *Reynolds v. Sims*, 377 U.S. 533 (1964) (statewide apportionment plan). Plaintiffs here have specifically disclaimed any statewide challenge in this case. Indeed, they have sued only local officials. Third, it was the lack of any standard, not the mistaken application of the statewide standard that constituted the equal protection violation in *Bush*. "The problem inheres in the

absence of specific standards to ensure its equal application." *Bush*, 531 U.S. at 106.

Accordingly, *Bush* does not speak to whether an isolated, innocent misapplication of a valid state

election statute constitutes a violation of equal protection, and therefore, does not control this

controversy.

Instead, the *Snowden*, *Roe*, and *Gamza* line of cases that involve isolated errors by local

officials control this dispute. Indeed, *Gamza* explicitly recognized this key difference:

> We must, therefore, recognize a distinction between state laws and patterns of
> state action that systematically deny equality in voting, and episodic events that,
> despite non-discriminatory laws, may result in the dilution of an individual's
> vote. Unlike systematically discriminatory laws, isolated events that adversely
> affect individuals are not presumed to be a violation of the equal protection
> clause. The unlawful administration by state officers of a non-discriminatory
> state law, "resulting in its unequal application to those who are entitled to be
> treated alike, is not a denial of equal protection unless there is shown to be
> present in it an element of intentional or purposeful discrimination." *Snowden v.
> Hughes*, 321 U.S. 1, 8, 64 S.Ct. 397, 401, 88 L.Ed. 497 (1944).

*Gamza*, 619 F.2d at 453 (internal citation omitted). Nothing in *Bush v. Gore* changes this logic.

Indeed, *Gelb*, *supra*, was decided post-*Bush v. Gore*.

Plaintiffs only proved that the Board mistakenly applied Ohio law when it voted to count

the 31 ballots. Plaintiffs failed to prove the "more" namely that the Board acted invidiously

when it voted to accept the 31 and reject the 850. Without the "more" Plaintiffs equal protection

claim fails.

### B.   The Board applied specific and uniform standards in their review of the provisional ballots.

> "In its review of the provisional ballots, the Board must apply specific and
> uniform standards to avoid" the arbitrary treatment of voters.

*Hunter*, 635 F.3 at 236.

The benchmark of Plaintiff's entire case is that the Board "has created a practice of

investigating if there is poll worker error and if poll worker error is found, of accepting

provisional ballots cast due to poll worker error." Doc. 114 at 5. This statement is not supported by the evidence. Sherry Poland, the Board staff member in charge of verifying the provisional ballots stated "[w]e do not have a practice of looking for poll worker error." Trial Testimony of Sherry Poland, July 27, 2011, (hereinafter "Poland July 27 Tr." ) at 7-224: 6. Instead, the Board is required to verify the provisional ballots. Jt. Ex. 34, Directive 2010-74 Guidelines for Determining Eligibility of Provisional Ballots. What Plaintiffs ask this Court to do is transform the uniform verification process into a non-uniform investigation into poll worker error. The evidence does not support this argument.

A provisional voter is someone whose eligibility to vote is in question at the time the voter casts his/her ballot. Poland July 27 Tr., at 7-277: 23-24. As a result, the Board is required to conduct a verification process to determine whether the provisional ballots were eligible to be counted. Jt. Ex. 34. The evidence demonstrated that the Board staff used the exact same specific and uniform procedures when verifying all provisional ballots.

Pursuant to Directive 2010-74, the Board delegated the responsibility of verifying the provisional ballots to Board staff. *Id.* at 000002; Poland July 27 Tr., at 7-260. The Board staff, guided by the specific criteria set forth in Directive 2010-74, checked for the following during the verification process:

1) Did the voter need to provide any additional information to the Board?

2) Was the person registered to vote?

3) Did the person vote in the precinct in which he/she resides?

4) Did the voter complete the affirmation?

5) Did the person vote in another county?

6) Did the person vote an absentee ballot?

Poland July 27 Tr., at 7-260-289: Jt. Ex. 34; Jt. Ex. 5 Provisional Envelop Verification Form.

12322089.1                                         6

**Step One** (determining whether any additional information was required to be provided by the voter): Directive 2010-74 makes clear that it is the Board that determines whether additional information needs to be provided by the voter, not the poll worker.  Jt. Ex. 34, 000003-4 ("The determination of a presiding judge or poll worker is insufficient for the purposes of determining whether a provisional voter must provide additional information to the board of elections to ensure that the provisional ballot is counted.").  One of the things that the Board staff examined was whether the "ID PROVIDED" box located under the signature of the witnessing election official was checked "yes."  Poland July 27 Tr., at 7-263.  If that box was checked "yes", the Board did not require the voter to provide any additional information in order for the ballot to be eligible to be counted.  *Id.*  The Board staff applied the exact same standard to all 10,500 provisional ballots when making this determination.  Poland July 27 Tr., at 7-263.

**Step Two** (determining if the voter is registered): the Board staff checked the Board's voter registration system to make sure the voter was actually registered to vote.  The Board staff also checked the information, such as Social Security number, date of birth, address, provided on the envelope to make sure it matched the information contained in the voter registration system. Poland July 27 Tr., at 7-285.

**Step Three** (determining whether the voter voted in the precinct in which he/she resides): the Board staff looked up the voter's old precinct based on the previous address that the Board had on file, and then looked up the voter's new precinct based on the new address written on the provisional ballot envelope.  Poland July 27 Tr., at 7-269.  The old precinct and new precinct were then recorded in the box labeled "Official Use Only" located on the bottom left hand corner of the front of the provisional ballot envelope.  *Id.*  The Board staff verified that the precinct

lable in the box directly above the "Office Use Only" box matched the precinct listed under

"New" in the Office Use Only box.  *Id.*

Step Four (did the voter complete the affirmation): the Board staff looked to see if the

voter printed his/her full name on the box labeled "Step 1" of the provisional envelope.  Poland

July 27 Tr., at 7-271 – 7-272.  The Board staff also looked to see if the voter signed the

provisional envelope.  If the envelope was not signed, the Board staff looked to see if the poll

worked noted that the voter declined to execute the affirmation.  Poland July 27 Tr., at 7-271.

Step Five (did the person vote in another county): the Board staff reviewed all the

provisional ballots to make sure the voter was not registered in another county.  If the voter was

previously registered in another county, that county was contacted to verify that the voter did not

also vote in that county.  Poland July 27 Tr., at 7-278.

Step Six (did the person vote an absentee ballot): the Board staff checked the voter

registration records to determine if the voter requested and returned an absentee ballot.  Jt. Ex. 5;

Poland July 27 Tr., at 7-289.  If so, the provisional ballot was rejected because the law in Ohio is

that if a person votes twice, the first ballot voted is to be counted.  Poland July 27 Tr., at 7-287.

After the bipartisan teams completed the six step verification process, they made a

recommendation to accept or reject a ballot by checking the box on the back of the provisional

envelope.  Jt. Ex. 12.  Those ballot envelopes were then placed in bins with titles such as count,

not registered, wrong precinct, no signature, no printed name, and needs further review.  Poland

July 27 Tr., at 7-293 - 7-94; Jt. Ex. 5.   After all the ballot envelopes were placed in the bins that

corresponded to the staff's findings, the Board staff placed the P number on the ballot envelopes,

and the provisional ballots were presented to the Board by categories.[2]  Poland July 27 Tr., at 7-298.  The Board then voted to accept or reject the provisional ballots by category.  Jt. Ex. 28.

The Board followed the exact same six step verification process for all 10,500 ballots. The 31 ballots cast at the Board were reviewed in the same manner as the 850 ballots cast at polling places.  Poland July 27 Tr., at 7-295.  The fact that the 31 ballots were accepted and the 850 ballots were rejected results not from a different investigation but instead from the different circumstances surrounding the casting of those two classes of ballots.

    **C.**    **The 31 provisional ballots cast at the Board are different from the 850 provisional ballots cast at the polling locations on Election Day.**

The decision to count the 31 ballots cast at the Board and reject the 849 ballots cast at various polling locations throughout the county does not violate equal protection.  Equal protection does not guarantee equality of results.  If that were the case, then no ballot could ever be rejected for any reason.  Instead, equal protection guarantees that similarly situated persons be treated the same.  Plaintiffs took for granted that the 850 ballots are similar to the 31 ballots because all provisional ballots are cast on the same precinct ballot forms and placed in the same provisional envelopes.  Doc. 114 at 29.  This simplistic analysis is not supported by the evidence.

The evidence demonstrated that there are three significant differences between voting provisionally at the Board and voting provisionally at a polling location.  First, the process to vote provisionally at the Board is different from that at a polling location.  Second, the reasons that a person can vote provisionally at the Board are different than at a polling location.  Third, there is no opportunity for voter error at the Board, while the opportunities for voter error on Election Day are many.  The situations under which the ballots were cast are simply not similar

---

[2] For instance, provisional envelopes with P numbers 1-8256, were recommended for counting.  Jt. Ex. 28 at 000023.

such that the provisional ballots were required to be treated the same. *See Hunter*, 635 F.3d at 248 (Rogers, J., concurring in the judgment) ("The situations were sufficiently different that a bipartisan elections board unanimously counted the votes in the former situation, but did not count the votes in the latter situation.")

**The Process:** the Court heard extensive testimony from every poll worker regarding the provisional process at the polling locations on Election Day. The testimony regarding the process was consistent. The first step when voting at a polling location is for the voter to show an ID. The poll worker then checks to see if their name is listed in the poll book along with the address listed on the ID. If the voter's name is not listed in the poll book, the address does not match because the voter has moved, or if there is a notation indicating that a person must vote provisionally, the voter is then referred to another poll worker. The next poll worker then looks up the voter's current address to see if he/she is at the correct precinct to vote. Jt. Ex. 6, Poll Worker Comprehensive Manual, at 000006.

To look up the address, the poll worker has three books of street listings: (1) a precinct street lists that lists all the streets in the individual precinct, (2) a ward and township listing that lists all the streets in the ward and/or township, (3) the county listing book (referred to as the green book) that lists all the streets and corresponding precincts for the entire county. Trial Testimony of Linda Claborn, July 19, 2011, at 2-157. If the voter is at the incorrect precinct, the poll worker is to direct the voter to the correct precinct. Jt. Ex. 6, at 000006. If the voter is at the correct precinct, he/she was handed a provisional ballot envelope to complete, given a provisional ballot, and then permitted to vote. Jt. Ex. 6, at 000006.

The process to vote provisionally at the Board is vastly different. First, there are no precincts at the Board. Instead, a voter just waits in line for the next available worker similar to

waiting in line at a bank. Faux August 3 Tr., at 11-6. The first step at the Board is not to look up the voter's name in a poll book because there are no poll books at the Board. *Id.* at 11-6 - 11-7. Rather, the voter is looked up in the county's voter registration system to verify that the voter is registered to vote and is registered at the address where the voter currently resides. *Id.* If the voter has moved but has not updated his/her registration, the voter is handed a provisional ballot envelope to fill-out. Poland July 27 Tr., 7-277. The employee of the Board then determines which ballot from the 680 ballots available to be cast at the Board that the voter should be given. This determination is made by looking up the voter's precinct based on the information written on the provisional ballot envelope. Poland July 27 Tr., 7-280. Unlike the poll workers that look up the addresses in the green book, the Board staff uses a computer-based system. Krisel August 5 Tr., at 12-62 – 12-63.

Unlike at a polling location, a voter voting at the Board will never be told that they need to go somewhere else to vote. The voter has presented themselves at the correct location—the Board. R.C. 3503.16 (B)(2)(a) (stating a voter who has changed his/her address can vote provisionally by appearing in person at the "office of the board of elections").

Another important difference is that for only those ballots cast at the Board, the Board employee that processes the provisional voter writes the voter's old precinct and new precinct in the "Office Use Only" box located on the bottom of the front of the provisional ballot envelope after the provisional envelope is filled out by the voter. Poland July 27 Tr., at 7-280 – 7-281. The Board employee's selection is then confirmed during the verification process meaning that this box is filled-in twice for voters that vote at the Board. Pl. Ex. 2011; Krisel August 3 Tr. at 11-71. Poll workers working in the various polling locations throughout the county do not fill-in

this box.  *Id*.   It is this key difference that allowed the Board to determine that the voter received the wrong ballot at the Board due to staff error.

**The Reasons**: At the Board, a person may cast a provisional ballot for only reason—a change of address.   In contrast, there are eight different reasons a person may vote provisionally at a polling location.  Poland July 27 Tr., at, 7-227.  Those nine reasons are as follows:

1)  Change of Address

2)  Name not in Signature Poll Book

3)  Change of Name

4)  Requested, but did not receive absent voter's ballot

5)  Signature Poll Book states "must vote provisionally"

6)  Voter lacks required identification

7)  Challenged voter

8)  Signature does not match signature in Poll Book

Jt. Ex. 12; Jt. Ex. 6, at 000004.

**Opportunity for Error:** there is no opportunity for voter error at the Board.  The voter has presented himself/herself at the correct location. R.C. 3503.16 (B)(2)(a) (requiring the voter to appear at the "board of elections"). The voted filled out the provisional envelope and then the Board staff provided the voter a ballot based on the information written on the envelope.  Poland July 27 Tr., at 7-281.  There is nothing that the voter should have done differently to ensure that his/her vote should be counted.

In contrast, every single voter that voted in the wrong precinct on Election Day made an error in that they all presented themselves in the wrong precinct to vote.  R.C. 3599.12(A)(1). Several voters moved well in advance of the elections, often time years before the election and

never bothered to update their registration. Trial Testimony of Wendell Walker, July 22, 2011, 6-6:45 ("So since October 2008 through November 2, 210, did you ever contact the Board of Elections and tell them that you moved to Freeman Avenue? A. No, I didn't."); Trial Testimony of Maggie Niestheide, July 29, 2011, 9-259 (stating that she had moved in August but had not alerted the Board); Trial Testimony of Susan Schluster, August 1, 2011, at 10-184 (stating that she had moved in 2009 but had not notified the Board). Had the voters bothered to update their registration, they would have received a new card listing the voter's new precinct. Testimony of Diane Goldsmith, August 1, 2011, at 10-23.

A number of voters also testified that they moved and then returned to their old precinct to vote even though it was the wrong precinct. Trial Testimony of Eric Joiner, July 22, 2011, at 6-30 ("I went there because that was my former voting place from—Q. When you say "former place," had you moved since you had last voted? A. Yes."); Trial Testimony of Wendell Walker, July 22, 2011, 6-41 (Q. And why did you go there to vote? A. That's where I voted the last 20 years . . . ."); Trial Testimony of Wanda Turk, August 3, 2011, at 11-100 (stating that she went to that location because that is where she had always voted but acknowledged moving since the last time she had voted).

The evidence also revealed that at least two poll workers voted provisionally in the wrong precinct Election Day. *See* Trial Testimony of Caretta Hayes, July 28, 2011 ("Hayes Tr."), at 8-178; Trial Testimony of Tiffany Evans, July 22, 2011 ("Evans Tr."), at 5-35 - 5 -36. The first poll worker, Caretta Hayes, worked at Cincinnati 4-H. Hayes Tr. at 8-163. Ms. Hayes voted provisionally in the wrong precinct because she did not have time to get to the proper precinct to vote on election day. *Id.* at 8-175. When she cast her provisional ballot, she did not think her ballot would be counted. *Id.* Similarly, Tiffany Evans, a poll worker at Norwood 1-C testified

that one of her fellow poll workers, Jill Kirscher, cast a provisional ballot in Norwood 1-C on Election Day even though Ms. Kirscher knew the ballot would not count. Evans Tr. at 5-35 - 5-36; Jt. Ex. 81.

Numerous poll workers also testified that voters insisted on voting in a particular precinct even after being informed that he/she should vote in a different precinct. Trial Testimony of Oceania Bradley, July 29, 2011, at 9-11 - 9-12; Jt. Ex. 101, page 24; Trial Testimony of Linda Claborn, July 19, 2011, at 2-166; Trial Testimony of Sharon Rankin-Moon, July 20, 2011, at 3-152; Trial Testimony of Cecilia Johnson Hall-Muhammad, July 21, 2011, at 4-61, Trial Testimony of James Crabtree, July 20, 2011 at 3-186.

There was simply no way for the Board to determine based on a review of the provisional ballot envelope that poll worker error—not voter error—caused the 850 ballots to be cast in the wrong precinct as they did with the 31 ballots cast at the Board.

**D. The 850 ballots are not similar to the 686 ballots.**

Plaintiffs also rely on the 686 ballots that the Board voted to count after the Board staff determined that the voter did not need to provide any additional information in order for the ballot to be counted despite the fact that the poll worker checked the box on the back of the provisional envelope that requires the voter to provide additional information. Doc. 114 at 28. These ballots are not substantially similar to the 850 because these ballots were cast by qualified voters. The 850 ballots were not cast by qualified voters. R.C. 35003.01 ("voter may vote at all elections in the precinct in which the citizen resides"). Moreover, Directive 2010-74 makes clear that the determination of whether a voter is required to provide additional information to the Board is to be made by the Board, not a poll worker. Poland July 27 Tr., at 7-263 -7-264; Jt. Ex. 34, pg. 000003. Therefore, there was no consideration of whether a poll worker erred or not— the poll worker's opinion was completely irrelevant in the analysis.

**E.      The 10 ballots are not substantially similar to the 850.**

The last class of ballots that Plaintiffs rely on for their equal protection claim is the 10 ballots that the Board voted to count even though the voter did not sign the provisional envelope. Doc. 114 at 28.  The Board voted to count these ballots—which like the 686 were cast by qualified electors—only after it was determined that the voter should not have been made to vote provisionally in the first instance.  Jt. Ex. 28, Transcript of the November 16 Board of Elections Meeting, pg. 71.  The fact that the voter should not have had to vote provisionally was apparent from the face of the envelope.  Poland July 27 Tr., at 7-296.  Again, there was no investigation into poll worker error.  *Id.*

**F.      The investigation undertaken and completed by the Board cured any alleged Constitutional violation.  This Court should not redo the investigation**.

Plaintiffs argued that the Court needed to conduct its own investigation into poll worker error because the Board conducted a "partial investigation" that was "arbitrarily" stopped on December 28.  Doc. 114 at 30.  Setting aside the fact that Plaintiffs did not bother to complete the investigation either,[3] this argument grossly misstates the investigation undertaken by the Board, including the reason it was completed on December 28, and ignores the language set forth in the Sixth Circuit Opinion.  *See Hunter*, 635 F.3d at 240, fn. 3.

The Board voted on December 11, in accordance with Directive 2010-80, to issue subpoenas and interview all 2000+ poll workers that worked at a location where a wrong precinct ballot was cast.  Jt. Ex. 30, December 11 Transcript, at 000055; Jt. Ex. 30, Directive 2010-80.  Those interviews began on Thursday, December 16 and continued on Friday,

---

[3] Plaintiffs only called 50 poll workers to testify and some of these poll workers had already testified before the Board.

December 17 and resulted in 71 poll workers being interviewed.  Jt. Exs. 22-36, Transcripts of

Board of Election Meetings on December 16 and 17.

    At the end of the day on Friday, December 17, then-Secretary of State Brunner issued

Directive 2010-87, which required the Board to take the following investigation:

1)    Identify all poll workers in the precincts in which the 850 wrong
      precinct ballots were cast and issue a subpoena to each of them to give
      testimony.  The subpoenas were to be issued by December 20 and the
      testimony of the remaining 2000+ workers was to be completed by
      December 23.

2)    Issue a questionnaire no later than the close of business on December
      20 to all poll workers who served in any precinct in which the 850
      wrong precinct ballots were cast that had not yet appeared in person to
      give testimony.  The questionnaires should contain questions similar to
      those asked during the Board interviews.  The poll workers were to be
      given two days to complete the questionnaires.

3)    Review all documents from the precincts in which the 849 ballots were
      cast by December 27.

4)    Schedule a public meeting by no later than December 28 to vote on the
      result of the investigation.

Jt. Ex. 37, Directive 2010-87.

    The undisputed evidence is that the Board complied with each of these steps, except for

the interviewing of the 2000+ poll workers in 3 days.  Trial Testimony of Alex Triantafilou,

August 5, 2011, at 12-239 - 12-244.  Instead, the Board sought, and received, a waiver from

then-Secretary Brunner for this requirement.  *Id.* at 12-240.

    The Board did not "arbitrarily" stop the investigation.  It completed it. *Id.* at 12-239-12-

244.  The investigation resulted in the Board voting to accept 16 ballots and rejecting the

remaining ballots.[4]  What Plaintiffs are really complaining about is the fact that some, but not all

---

[4] The Board tied 2-2 on whether to accept all wrong precinct ballots cast in the correct location.  The republican
members voted to reject these ballots and then-Secretary Brunner sided with the republicans. Jt. Ex. 46 January 7
Letter to Sally Krisel, at 000004 ("I vote with Chairperson Triantafilou and Board member Gerhardt against the

poll workers were interviewed, and some but not poll workers returned questionnaires. This argument has already been made and rejected by the Sixth Circuit.

John Williams specifically argued to the Sixth Circuit that the investigation ordered by the Court was "not uniformly applied." *Hunter*, 635 F.3d at 240. The Sixth Circuit rejected this argument stating:

> Although the Board stopped interviewing poll workers after its December 16 and 17 meetings, it did so with the permission of Secretary Brunner, and it substituted mailed questionnaires for interviews as an effective means of gathering information expeditiously from poll workers. Furthermore, the fact that only some questionnaires were returned speaks to the results of their review, and not to inconsistent application of the review standards in the first instance.
>
> *Hunter*, 635 F.3d at 240, fn 23.

The Sixth Circuit went on to state:

> **. . . the Board has implemented appropriate procedures to remedy its initial unequal treatment**. . . . [T]he Board followed the objective guidelines in conducting its review when it implemented the directives of then-Secretary Brunner, which provided criteria for determining poll worker error and the steps to follow to complete the investigation . . . .We conclude that the Board's review has met the requirements of *Bush v. Gore*.
>
> *Hunter v. Hamilton Cty. Bd. of Elections*,
> 635 F.3d 219, 240 (6th Cir. 2011) (emphasis added).

What Plaintiffs asked this Court to do—become a Board of Elections and determine which provisional ballots to count—is unprecedented and directly contrary to binding authority. The Sixth Circuit has specifically held that "federal courts should not be asked to count and validate ballots and enter into the details of the administration of the election." *League of Women Voters v. Brunner*, 548 F.3d 463, 478 (6th Cir. 2008) (citation and internal quotation marks omitted). And that "[t]he Constitution … leaves the conduct of state elections to the

---

motion to proceed to authorize those ballots which are only defective to the extent that they were cast in the right location, but in the wrong precinct . . . .").

states." *Warf v. Board of Elections of Green County, Kentucky*, 619 F.3d 553, 559 (6th Cir. 2010) (citations and internal quotations omitted)); *see also Warf*, 619 F.3d at 559 ("The principles of federalism, therefore, limit the power of federal courts to intervene in state elections" (citations and internal quotations omitted)).

This sentiment is echoed in the Sixth Circuit's decision in *Ohio ex rel. Skaggs v. Brunner*, 549 F.3d 468, 477 (6th Cir. 2008), where the Court again stated, "the Help America Vote Act of 2002 … leaves no doubt which lawmaking body – the federal or state governments – has plenary authority over the counting of provisional ballots. It 'conspicuously leaves . . . to the States' the determination of 'whether a provisional ballot will be counted as a valid ballot.'" *Id.* (quoting *Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565, 577 (6th Cir. 2004)). The Board conducted and completed the investigation that this Court ordered on November 22. That investigation remedied any equal protection violation. This Court does not have the authority to substitute its judgment for that of the Board and order specific ballots to be counted. *League of Women Voters*, 548 F.3d 478; *Warf*, 619 F.3d at 559.

### G. The proper remedy for any alleged equal protection violation is to "uncount" the 31 ballots cast at the Board.

If this Court were to find an equal protection violation, the proper remedy is not to order additional illegal ballots be counted. Such a decision calls into question the integrity of either candidate's ultimately being determined the winner. Instead, the proper remedy is to order the 31 ballots cast at the Board, illegally counted under Ohio law, be uncounted. *See* 119 Harv. L.Rev. 115, 1157-1162, *Developments in Law: Voting and Democracy* (2006) (discussing how courts typically deal with illegal counted votes by uncounting ballots). One legal scholar has proposed uncounting the illegal ballots in this case as a means of rectifying the alleged

constitutional violations. *See* Josh Douglas, *Ohio Provisional Ballots: Do Two Wrongs Make a Right?* available at http://moritzlaw.osu.edu/electionlaw/comments/index.php?ID=8057.

The wrong precinct ballots cast at the Board can be easily identified and "uncounted." Trial Testimony of Sally Krisel, August 5, 2011 (hereinafter "Krisel August 5 Tr.") at 12-116; Def. Ex. 1054. Because the ballots were cast in the wrong precinct, the ballots had to be "remade." The Board kept a "remake log" which allows the 31 ballots cast at the Board to be identified and uncounted. *Id.*

## II. There is no Due Process violation.

Plaintiffs have failed to demonstrate a violation of due process. The Sixth Circuit has stated that § 1983 relief under the Due Process Clause is appropriate only in the "exceptional case **where a state's voting system is fundamentally unfair**." *Warf*, 619 F.3d at 559 (quoting *League of Women Voters*, 548 F.3d at 478) (emphasis added). Plaintiffs have not presented a challenge to Ohio's system nor have they met the threshold procedural requirements to challenge a state statute. Rule 5.1 of the Federal Rules of Civil Procedure requires that a party presenting a constitutional challenge to a state statute file a notice of constitutional question and serve notice on the state attorney general. *See* Fed. R. Civ. P. 5.1. As it stands, Plaintiffs here have not even identified the state statute in question. Nor has the Court certified that question to the state attorney general. The Court, therefore, "may not enter a final judgment holding a statute unconstitutional before the attorney general has responded or the intervention period has expired without response." Comments to Fed. R. Civ. P. 5.1; 28 U.S.C. § 2403.

Instead, Plaintiffs have only challenged the Board's correct application of R.C. 3505.181 (stating that provisional ballots cast in the wrong precinct are not eligible to be counted). But federal courts do not have the ability to direct state officers on how to comply with a valid state statute. *See Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 106 (1984) ("it is

difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law"); *State ex rel. Skaggs v. Brunner*, 549 F.3d 468, 479 (6th Cir. 2008) (citing *Pennhurst*, 465 U.S. at 106). Therefore, Plaintiffs substantive due process claim automatically fails.

> **A. Even if a state statute (and, by implication, Ohio's voting system) is at issue, there is no substantive due process violation.**

Even if Plaintiffs had followed the proper procedure to bring a statewide constitutional challenge, Plaintiffs cannot establish a due process violation related to Ohio's provisional voting statute or any other state statute at issue here. What Plaintiffs are challenging is Ohio's precinct based system, a system employed by the majority of states. That challenge fails.

Plaintiffs argue that Ohio's requirement that a person vote in the precinct which he/she resides should be subject to strict scrutiny because it places a "severe" burden on a select group of voters—those who cast provisional ballots in the wrong precinct due to poll worker error. Plaintiffs' analysis is wrong.

Not every statute that places a burden on a voter's right to cast a provisional ballot is subject to strict scrutiny. *See Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (stating that applying strict scrutiny to every election regulation "would tie the hands of States seeking to assure that elections are operated equitably and efficiently.") Instead, the Supreme Court has held that "[w]hen a state election law imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the state's regulatory interests are generally sufficient to justify the restrictions." *Burdick*, 504 U.S. at 434 (citation and internal quotation marks omitted).

"To date, the Supreme Court has subjected only two types of voting regulations to strict scrutiny." *Lemons v. Bradbury*, 538 F.3d 1098, 1104 (9th Cir. 2008). The first situation involves poll taxes and/or the requirement that voters own property. *Id.* (quoting *Green v. City of Tucson*, 340 F.3d 891, 899-900 (9th Cir. 2003)). The second situation deals with apportionment issues in which a persons right to vote is diluted. *Id.* The Supreme Court has never held that reasonable restrictions related to the place in which a person can vote is subject to strict scrutiny. Instead, the Supreme Court has held the opposite. *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (holding that there is no constitutional right to vote in any manner that a person chooses, instead, a state may proscribe the time, place, and manner in which a person may vote).

Ohio's precinct based system and the requirement that a person must vote in the precinct in which they reside is a reasonable restriction on the right to vote. The Sixth Circuit has already recognized the validity of Ohio's precinct based system and the numerous regulatory interests of the State including, capping the number of voters who vote at a particular place on election day, allowing precinct ballots to list only the races and issues for which the voter may cast a ballot, and making it easier to monitor votes and prevent election fraud. *See Sandusky*, 387 F.3d at 568.

Plaintiffs' argument that Ohio's statutes are subject to strict scrutiny also improperly evaluates the statute based on the results of the burden, not on the actual burden itself. But every election law "whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individuals right to vote . . . ." *Burdick*, 540 U.S. at 439 (prohibition on write-in candidates constitutional despite the fact that it prevented a number of "voters from participating in a meaningful manner"). Given that the precinct voting system is a reasonable,

nondiscriminatory restriction, the state's regulatory interests are sufficient to satisfy constitutional scrutiny.

Plaintiffs also allege that a voter may lose the right to have his or her vote counted through "no fault of their own" and argue that this somehow triggers a due process violation. Voters are not helpless individuals that are totally at the mercy of poll workers on Election Day. There are numerous ways that voters can determine their correct precinct prior to Election Day including: (1) looking up their precinct on-line, (2) calling the Board of Elections, (3) reviewing the information the Board sends to every voter prior to the election that lists the voter's correct precinct.  Faux August 3 Tr. at 11-5; Trial Testimony of Tim Burke, July 19, 2011, at 2-49 – 2-50.

Setting aside the fact that the voters did not avail themselves of any of these resources to determine their correct precinct, the evidence produced at trial revealed that most of the voters made a series of errors that ultimately resulted in their ballots being miscast.  For instance, most of the voters testified that they had moved months before the election but failed to update their registration with the Board.  Trial Testimony of  Wendell Walker, July 22, 2011, 6-6:45 ("So since October 2008 through November 2, 210, did you ever contact the Board of Elections and tell them that you moved to Freeman Avenue? A. No, I didn't."); Trial Testimony of Maggie Niestheide, July 29, 2011, 9-259 (stating that she had moved in August but had not alerted the Board); Trial Testimony of Susan Schluster, August 1, 2011, at 10-184 (stating that she had moved in 2009 but had notified the Board).  Had the voters updated their registration, they would have received a new card listing the voter's correct precinct.  Trial Testimony of Diane Goldsmith, August 1, 2011, at 10-23.

Many voters went to their old polling place to vote knowing it was the wrong precinct. Trial Testimony of Eric Joiner, July 22, 2011, at 6-30 ("I went there because that was my former voting place from—Q. When you say "former place," had you moved since you had last voted? A. Yes."); Trial Testimony of Wendell Walker, July 22, 2011, 6-41 (Q. And why did you go there to vote? A. That's where I voted the last 20 years . . . ."); Trial Testimony of Wanda Turk, August 3, 2011, at 11-100 (stating that she went to that location because that is where she had always voted but acknowledged moving since the last time she had voted).

### B. Human errors are garden variety election irregularities which do not rise to a constitutional violation.

In the voting context, federal courts have "uniformly declined to endorse actions under §1983 with respect to garden variety election regularities." *Warf*, 619 F.3d 553. At best, human errors are garden variety election regularities. *See Gold v. Feinberg*, 101 F.3d 796, 801 (2d Cir. 1996) (holding that human error resulting in the miscounting of votes is not a violation of due process); *Bodine v. Elkhart County Elec. Bd.*, 788 F.2d 1302, 1316 (7th Cir. 1986) (human errors in counting votes).

The recent *Warf* decision is particularly instructive. In *Warf*, the court affirmed the trial court's decision that invalidated 11% of the election votes on the basis of improper actions by the county clerk. The voters lost their right to have their vote counted through no fault of their own and none of those voters were provided any notice or hearing. Yet, the Sixth Circuit held that there was no due process violation of the voter's rights. *Warf*, 619 F.3d at 563 ("We therefore cannot conclude that [the trial court]'s decision to void the absentee ballots in this case rises to a level of fundamental unfairness in violation of Due Process"). In the present case, less than one half of one percent of all ballots (850 out of than 290,000 ballots) were not counted because they

were cast in the wrong precinct and are invalid under Ohio law.  This case is simply not one of the "exceptional cases" in which the voting system is fundamentally unfair.

Plaintiffs argue this case is not a garden variety election because Ohio's entire voting system is flawed.  Setting aside the obvious flaw that Plaintiffs have only challenged Hamilton County's processing of the provisional ballots and not the entire state's process, Plaintiffs acknowledge that such a flawed system arises only when "a state employs 'non-uniform rules, standards, and procedures that result in significant disenfranchisement of voters." Doc. 114 at 42 (citing *Warf*, 619 F.3d at 559).  There is no allegation that the state employed non-uniform standards, rules and procedures.  Instead, the undisputed evidence is that all Boards of Elections are required to follow directives issued by the Secretary of State.  Directive 2010-74 requires boards of elections to reject ballots cast in the wrong precinct due to poll worker error.  Jt. Ex. 34.  Secretary Husted even went so far as to remove members of Boards of Elections when those members failed to follow Directive 2010-74.  Def. Ex. 1039.

Plaintiffs simply have not met their burden.  Every innocent election error by poll workers on Election Day cannot be converted into a due process violation.  The case law does not support such an argument.  *Warf*, 619 F.3d 553; *Gold v. Feinberg*, 101 F.3d 796, 801 (2d Cir. 1996); *Bodine v. Elkhart County Elec. Bd.*, 788 F.2d 1302, 1316 (7th Cir. 1986).  The Court should render a judgment in favor of the Board on the due process claim.

**C.    No state actor's actions in this case are sufficient to establish a Due Process violation.**

To the extent Plaintiffs are bringing a challenge to specific actions of some state actor here and not to the state statutory system, that challenge also fails.  Indeed, a challenge to an individual actor's actions in a voting context makes no sense under the Due Process Clause because it necessarily cannot involve a challenge to the state's election system.  And as a

threshold matter, Plaintiffs cannot challenge the failure of a state actor to carry out his or her duties under state law.  It is well-established that a federal court cannot enjoin a state actor to follow state law.  *See Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 106 (1984) ("it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law"); *Skaggs*, 549 F.3d at 479 (citing *Pennhurst*, 465 U.S. at 106).  So if the Board or a poll worker failed to conform their actions to state law (by, for example, not directing a voter correctly at a polling place), that challenge cannot be brought in federal court.[5]

But even if there were some claim cognizable here, Plaintiffs would have to satisfy the two-prong test to establish a due process violation: show entitlement to a specific property or liberty interest and show that the state's procedures that took away that entitlement were so insufficient as to be fundamentally unfair.  *See Miller v. Lorain County Bd. of Elections*, 141 F.3d 252, 259 (6th Cir. 1998) ("Due process claims are to be handled in two steps: first, this court asks whether a liberty or property interest exists that has been interfered with by the state; second, it determines whether the procedures attendant upon that deprivation were constitutionally sufficient." (citations omitted)).  But Plaintiffs cannot show that they had an entitlement to have otherwise invalid provisional ballots counted and that they were not given sufficient procedure when such invalid provisional ballots were not counted.

Plaintiffs have failed to identify what specific property or liberty interest exists that has been interfered with by the state.  *Miller*, 141 F.3d at 259 ("An individual claiming a protected interest must have a legitimate claim of entitlement to it" (citations omitted)).  Plaintiffs are not

---

[5] Indeed, Plaintiffs' entire suit raises serious Eleventh Amendment questions because it is essentially backward-looking and not attempting to enjoin the enforcement of a state statute in the future.  *See League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 474-75 (6th Cir. 2008) (a plaintiff can only avoid an Eleventh Amendment problem when suing an arm of the state in a suit that questions an ongoing violation of federal law and seeks prospective relief only).

entitled to have a provisional ballot counted that is invalid under Ohio law.  Indeed, in response to similar Due Process allegations, the Sixth Circuit expressly said that federal law leaves the determination of "whether a provisional ballot will be counted as a valid ballot … to the States." *Sandusky*, 387 F.3d at 576.  It cannot be concluded, therefore, that the state interfered with the right to vote where Plaintiffs failed to meet certain eligibility requirements for provisional voters (including the requirement that the voter be a resident in the precinct in which he or she votes).

Plaintiffs' entitlements arise—if at all—only after he or she has met the requirements set forth by the state.  It is axiomatic that "a liberty interest created by state law is by definition circumscribed by the law creating it." *Dobrovolny v. Moore*  126 F.3d 1111, 1113 (8th Cir. 1997) (citing *Montero v. Meyer*, 13 F.3d 1444, 1450 (10th Cir.)).  The Ohio Supreme Court confirmed in *Painter* that an eligibility requirement to have one's provisional ballot counted in Ohio is that the voter cast a ballot in the precinct in which he or she resides.  *Painter*, 941 N.E.2d 782, ¶¶ 34-35.  In this case, the statutory laws directed to provisional voting required the voted to meet certain eligibility requirements.  Those state law requirements having not been met, therefore, no interest arises.

Further, "[N]ot every deprivation of a liberty or property right requires a pre-deprivation hearing or a federal remedy."  *See Ramsey v. Bd. of Educ.*, 844 F.2d 1268, 1273 (6th Cir. 1988). Indeed, "due process is flexible and calls for procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976).  To determine what process is due, a court is to consider: (1) the private interest that will be affected by state action; (2) risk of erroneous deprivation of such interest and the probable value if any on the additional safeguards or substitute procedural safeguards; and (3) the government's interest including the administrative burdens that the additional requirement would entail.  *Id.* at 335.

Given these considerations and the flexibility of this test, Plaintiffs are not entitled to any additional process.  Plaintiffs request interviewing every poll worker in whose precinct a wrong-precinct ballot was cast and every provisional voter who cast a wrong-precinct ballot and having a "meaningful hearing" on each invalid ballot.  It would be an enormous and unrealistic administrative burden to undertake such a process—particularly if this is to take place every election cycle in every county in the state that does not count wrong-precinct ballots.  This conclusion has been reached by other circuit courts faced with similar constitutional due process challenges on election-related issues.  *See Lemons v. Bradbury*, 538 F.3d 1098, 1105 (9th Cir. 2008) (holding that due process did not require the state to provide voters with notice and an opportunity to be heard when their signatures were rejected on referendum petitions even though the right to vote was implicated because providing thousands of voters with the an individual hearing within the short period of time in which the signatures must be validated is a significant burden on the state); *Protect Marriage Ill. v. Orr*, 463 F.3d 604, 608 (7th Cir. 2006) ("the cost of allowing tens of thousands of people to demand a hearing on the validity of their signatures would be disproportionate to the benefits" ).  The additional process requested by Plaintiffs is not warranted—nor even permissible—under the circumstances.

## III.    The Board did not violate the NEOCH Consent Decree.

The NEOCH consent decree provides that a Board:

> may not reject a provisional ballot cast by a voter, who uses only the last four digits of his or her social security number as identification, for any of the following reasons:

> iv.    The voter casts his or her provisional ballot in the wrong precinct but in the correct polling place, for reasons attributable to poll worker error;

> v.    The voter did not complete and/or sign the provisional ballot application for reasons attributable to poll worker error; or . . . .

Pl. Ex. 2008, pg. 4.

In order to show a violation of the consent decree, Plaintiffs had to demonstrate that the Board rejected ballots that were miscast due to poll worker error. It is not enough to merely show that the Board did not conduct an investigation. Plaintiffs did not meet their burden.

Plaintiffs allege that 26 ballots that were rejected by the Board are covered by the NEOCH consent decree. But with respect to these ballots, Plaintiffs only presented the testimony of three poll workers pertaining solely to three of the 26 ballots. So Plaintiffs did not even attempt to prove poll worker error with regard to 23 ballots and, importantly, the testimony of these three witnesses failed to establish poll worker error even with regard to these three ballots. *See* Plaintiffs List of Ballots (Doc 182-1), Table A; Trial Testimony of Michael Nichols, July 28, 2011, at 8-57 (testifying that the voter's address was looked up to determine the correct precinct before the voter reached him); Trial Testimony of William Singer, July 18, 2011, at 2-214 (testifying that he did not recall processing any provisional voters); Trial Testimony of Earlie Thrash, July 26, 2011, at 6-174 (testifying that she looked up the voter's addresses to make sure he/she was voting in the correct precinct). Plaintiffs had plenty of opportunity to offer evidence to establish a violation of the consent decree, they failed to do so.

### A. Failure to follow Directive 2010-74 does not establish a violation of the consent decree.

The consent decree does not set forth how the Board is to determine poll worker error and it certainly does not require that Board of Elections interview poll workers or voters to determine poll worker error. Pl. Ex. 2008. Nonetheless, Plaintiffs suggest that the Board's failure to interview poll workers as outlined in Directive 2010-74 establishes a violation of the consent decree. This argument ignores the fact that Directive 2010-74 is not part of the consent decree,

therefore, the failure to follow the Directive cannot be converted into a violation of the consent decree. [6]

The language in Directive 2010-74 that Plaintiffs rely on states that the Board "should" question poll workers. Jt. Ex. 34 Directive 2010-74, at 0000011-12.  The term "should" is permissive.  The Secretary consistently uses the term "must" when action has to be taken by the Board.  *Id.* at 000002 (Board "must determine the validity of all votes cast . . . .it must adopt a policy setting forth procedures"); 000003 ("The board staff . . . must completely process all provisional ballots . . . .ballots "must be handled by bipartisan teams"); 000004 ("The reviewing of this statement by an election official must be the first step).  Interpreting "should" as permissive is reasonable given the strict time frames in which the Board has to process provisional ballots.  There was simply no time to conduct such an investigation.  Plaintiffs cannot simply convert the word "should" into "must" simply because it suits their case.

### B.      The Board investigated the NEOCH Ballots.

Sherry Poland testified that the Board staff, in reviewing the provisional envelopes November 5 through November 16 complied with the NEOCH consent decree.  Specifically, Ms. Poland testified:

> Of the 849 [wrong precinct provisionals], staff separated the ones that that provided only the last four digits of their Social Security number.  Then they looked to see if they voted in the correct location.  If they did, then that became a smaller subset.  Then they looked for any notations in our records about provisionals.  If there was anything, my instructions to staff were to make a copy of that, attach it to the envelope and place in the further review tray to be presented to the board."

> Poland July 27 Tr., at 7-301.

---

[6] The proper remedy for a failure to follow a Directive of the Secretary of State is to file a mandamus action in state court.

Plaintiffs did not and cannot present any testimony to refute this evidence.  Merely saying that a review was not done does not cut it.  A review was done.  The consent decree was not violated.

## IV.    Conclusion

The Court conducted a nearly-three week trial in which Plaintiffs failed to demonstrate a violation of equal protection, due process, or the NEOCH consent decree.  At best, Plaintiffs may have demonstrated that some poll workers may have made some innocent errors on Election Day.  Those errors are not constitutional violations.  The Court should render a judgment in favor of the Board for all claims.

Respectfully submitted,

/s/ R. Joseph Parker
R. Joseph Parker
Beth A. Bryan
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957

## CERTIFICATE OF SERVICE

I certify that this Post-Hearing Brief was filed on August 26, 2011 using the Court's CM/ECF system, which will transmit notice of the filing to all counsel of record in this case.

/s/ Beth A. Bryan
Beth A. Bryan
(513 381-2838/ (513) 381-0205 (fax)