## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **TRACIE HUNTER, et al.** | : | **CASE NO. 1:10-cv-820** |
| **Plaintiffs** | : | **Judge Susan J. Dlott** |
| **vs.** | : | |
| | | **POST TRIAL BRIEF OF DEFENDANTS** |
| **HAMILTON COUNTY BOARD OF** | : | **HAMILTON COUNTY BOARD OF** |
| **ELECTIONS, et al.** | | **ELECTIONS AND BOARD MEMBERS** |
| | : | **TRIANTIFILOU, BURKE, GERHARDT** |
| **Defendants** | | **AND FAUX** |

## I.    INTRODUCTION

The predicate for the initial order issued by this Court on November 22, 2010 was its holding

that Plaintiff Hunter was "likely enough to succeed on the merits of her equal protection claim" to

grant a preliminary injunction. (11/22/10 Order, Doc 13 at 7.) This Court appeared to find two

potential equal protection concerns. First, that the staff of the Defendant Hamilton County Board of

Elections (the "Board") "applied differing levels of scrutiny" to provisional ballots. (Id. at 5) Second,

that the Board carved out an exception to Ohio law by counting certain provisional ballots cast at the

Board's offices prior to election day because of "poll worker error" while it did not apply the same

exception to ballots cast on election day at voters' precincts.   These preliminary findings of the Court

were based upon a limited and incomplete exposition of the facts.

During the hearings held on this case from July 18 to August 5, 2011, it is now proven that

the equal protection claims of the Plaintiffs are wholly without merit for a variety of reasons.  First,

the Board and its staff applied precisely the same level of scrutiny to all provisional ballots.  Only the

provisional ballot envelopes were examined by the Board's staff to determine whether the ballots

should be counted.  With regard to the 849 provisional ballots, they were not counted because they

were cast in the wrong precinct contrary to Ohio law.  There was no evidence on the face of those

849 provisional ballot envelopes themselves that there was any "poll worker error," much less that "poll worker error" was the "sole cause" for why those ballots were cast in the wrong precinct. On the other hand, the envelopes for the 27 provisional ballots cast at the Board's offices prior to Election Day on their face demonstrated that Board staff had made an error in selecting and giving the correct ballot to the voter. On those envelopes the voter's "current address," which the voter wrote down, did not match the precinct designation written down by the Board staff for the ballot given by the staff to the voter. Thus, the examination of those 27 envelopes themselves revealed staff error. This was not true of the 849 ballots which were given the exact same level of scrutiny.

Because of the Directives of the Ohio Secretary of State ("SOS"), the Board staff gave further scrutiny to certain NEOCH ballots to determine whether there was any evident "poll worker error." While the Court is correct that this level of scrutiny was different than that given to the 849 ballots and the 27 ballots (*id.* at 5-6) as of November 16, 2010, it is not true that this differing level scrutiny gives rise to an equal protection claim. First, this differing level of scrutiny was created by the consent decree in the NEOCH case. Complying with an SOS directive that was following a federal court consent decree as a matter of law does cause an equal protection issue. But even if it did, subsequent to the Court's 11/22/10 order, the Board and its staff gave the same level of scrutiny to all 849 wrong precinct provisional ballots as was given to NEOCH correct location/wrong precinct ballots and there was no evident "poll worker error" found for the 849 ballots based upon that review.

The Board also did not, by counting the 27 ballots, treat them in a more favorable fashion for equal protection purposes than the 849 ballots. It is not true that the Board "carved out an exception" where it will count some ballots cast in the wrong precinct. All provisional ballots cast in the wrong precinct, the 849, were not counted. It is now clear that the 27 ballots cast at the Board's offices were not cast at the wrong precinct. Even if these really are "wrong precinct" ballots, the same as the 849, then they may be uncounted. The *Painter* court ruled that it was incorrect to count

2

the 27 ballots. Voters have an obligation to vote at the correct precinct on Election Day under Ohio law regardless of any poll worker error.  Voting at the Board's offices is different because the voter is where he or she should be and they are not in a specific precinct. On Election Day the voter takes herself or himself to a particular precinct to vote and the ballot they receive is based upon the location they vote in. On the other hand, when voting provisionally at the Board's offices the ballot received by the voter has noting to do with where they are, but is solely based upon what ballot the staff member selects to give to the voter based upon the address that the voter has provided to Board staff. And we now know from the face of the 27 provisional ballot envelopes that the voter gave the Board staff his or her correct current address, but the staff by mistake selected and gave the voter the wrong ballot.

This is very different than what happened with provisional voters on Election Day.  Those voters were obligated to go to their correct precinct and even if they may have been given incorrect advice by a poll worker on the day of the election about the identity of the voter's precinct, this does not obviate the voter's primary responsibility to know their precinct and to only vote in that precinct as mandated by Ohio law. The 27 voters at the Board did not have that same obligation under Ohio law as they were in the correct location and were not voting in a precinct. Treating voters who are differently situated, with different obligations and different knowledge about where to vote is not an equal protection problem.

This Court in its November 22, 2010 ruling found that the Board voted to count the 27 ballots because "the only explanation" for the wrong ballots being given to the provisional voters was staff error. (11/22/10 Order, Doc 13 at 3.)  The evidence elicited during the July/August 2011 hearings confirmed this initial finding. At the same time, the evidence at the July/August 2011 hearing proves that this was not true of what the Board knew about the 849 ballots as of November 16, 2010; what the Board could have learned had those 849 ballots been given the same level of

3

scrutiny given to NEOCH right location/wrong precinct ballots as of November 16, 2010; or what was actually shown as to any of the 849 wrong precinct provisional ballots during the hearings in this case.

Unlike the 27 ballots, there has been no showing that "the only explanation" for the 849 wrong precinct ballots was "poll worker error." Indeed, the Court and the SOS did not order an investigation that would have elicited this information as the Board was only ordered to investigate whether "poll worker error contributed" to the rejection of the 849 ballots, not whether it was the "only explanation." (*Id.* at 9.) Thus, the investigation ordered for the 849 wrong precinct provisional ballots was skewed from the start to find something different from what was true of the 27 ballots— any contributing poll worker error as opposed to poll worker error being the "only explanation." This is a crucial distinction in this case as equal protection at best only requires equal treatment of equally situated provisional voters. The evidence showed, however, that the 27 were in fact for many reasons very different than the 849 and even as to the error that was or could have been found, they are different.

The due process claims of the Plaintiffs are equally unavailing. In considering the rights of the parties in this case, it is important to recognize that it is fundamentally unfair to voters who properly cast ballots to include ballots improperly cast in the recount. The Ohio Supreme Court stated:

> We acknowledge that we are bound to "liberally construe election laws in favor of the right to vote." *State ex rel. Colvin,* 120 Ohio St.3d 110, 2008-Ohio-5041, 896 N.E.2d 979. However, this rule does not allow us to simply ignore facts and make unreasonable assumptions if doing so favors the right to vote. We are mindful of the interest of those voters who cast their votes pursuant to the law in not having the value of their votes diminished by the injudicious application of an accepted principle of law.

*Id.* at 514-15.

Because there is no violation of the US Constitution by the Board, Plaintiffs' case must be dismissed and judgment must be granted to the Board. If Plaintiffs have any issues with this state

4

judicial election, they should proceed in state court where Plaintiff Hunter should have brought this matter from the very beginning.

## II.     THIS COURT LACKS JURISDICTION

This Court lacks subject matter jurisdiction over this Ohio election case for the reasons set forth in Defendants' Trial Brief, Defendants' Response to Plaintiffs' Trial Brief, and Defendants' Motion for Summary Judgment and Reply in support thereof. This Court further lacks jurisdiction to enforce a void consent decree for the reasons set forth in Defendants' Response to Plaintiffs' Trial Brief, Defendants' Motion for Summary Judgment and Reply in support thereof, and Defendants' Motion to Dismiss the Amended Complaint[1]. The Board incorporates such motions herein by reference.

## III.    HAMILTON COUNTY BOARD OF ELECTIONS AND ITS MEMBERS HAVE IMMUNITY

Hamilton County Board of Elections and its Members have Eleventh Amendment Immunity for all of the reasons set forth in Defendants' Motion for Summary Judgment and Reply in support thereof and Defendants' Response to Plaintiffs' Trial Brief. The Board incorporates such motions herein by reference.

## IV.    PLAINTIFFS LACK STANDING

Plaintiff Hunter lacks standing for all of the reasons set forth in Defendants' Trial Brief Defendants' Response to Plaintiffs' Trial Brief, and Defendants' Motion for Summary Judgment and Reply in support thereof. The Board incorporates such motions herein by reference.

Plaintiffs/Intervenors NEOCH and ODP lack standing for the reasons set forth in Defendants' Trial Brief, Defendants' Response to Plaintiffs' Trial Brief, Defendants' Motion for

---

[1] Defendants' Motion to Dismiss Plaintiffs NEOCH and ODP's Amended Complaint will be filed on August 30, 2011 pursuant to Fed. R. Civ. Pro. 15.

Summary Judgment and Reply in support thereof, and Defendants' Motion to Dismiss the Amended Complaint[2]. The Board incorporates such motions herein by reference.

## V. HAMILTON COUNTY BOARD AND ITS MEMBERS ARE NOT LIABLE FOR ACTIONS OF THE POLL WORKERS

Hamilton County Board of Elections and its Members are not liable for the actions of its poll workers under 42 U.S.C. § 1983 for all of the reasons set forth in Defendants' Motion for Summary Judgment and Reply in support thereof, Defendants' Response to Plaintiffs' Trial Brief, and Section VIII.C infra. The Board incorporates such motions herein by reference.

## VI. STANDARD OF PROOF

### A. Poll Worker Error May Not be Presumed

Fed. R. Evid. 302 provides: "In civil actions and proceedings, the effect of a presumption respecting a fact which is an element of a claim or defense as to which State law supplies the rule of decision is determined in accordance with State law." State law is clear that poll worker error must not be presumed and must be demonstrated through evidence. See *State ex. rel Skaggs v. Brunner*, 120 Ohio St.3d 506, 2008-Ohio-6333. The Ohio Supreme Court in *Skaggs* further held that election officials err in presuming poll-worker error because "[i]n the absence of evidence to the contrary, public officers, administration officers and public authorities, within the limits of jurisdiction conferred upon them by law, will be presumed to have properly performed their duties in a regular and lawful manner and not to have acted illegally or unlawfully." *Painter* at 22 citing *Skaggs* at ¶ 51. The NEOCH Consent Decree and Secretary Brunner's related Directives also confirm the law in Ohio that "poll worker error may not be presumed." Doc. 8-1, p. 9; Directives 2010-73, 2010-74, 2010-79.

---

[2] Defendants' Motion to Dismiss Plaintiffs NEOCH and ODP's Amended Complaint will be filed on August 30, 2011 pursuant to Fed. R. Civ. Pro. 15.

This Court heard evidence from a limited number of poll workers and even fewer voters and is asked to infer from such testimony that the Board should be ordered to count certain ballots. In this case, the circumstances for each voter are unique and should be treated as such. It is for this reason that the Board staff reviewed each provisional ballot envelope individually. Moreover, poll workers processed over 9,000 provisional ballots correctly on Election Day. The presumption is, and the facts support this conclusion, that poll workers performed their duties in a regular and lawful manner. A mistake by one poll worker does not justify the inference that poll worker error proximately caused some or all other wrong precinct provisional ballots to be miscast. This theory ignores, for example, situations in which the provisional voter knew he or she was in the wrong precinct and insisted upon casting a ballot anyway. The Ohio Supreme Court faced a similar situation with regard to invalid affirmations. The *Skaggs* Court explained:

> Without such evidence, the secretary and the dissent ask too much. They ask that we apply no presumption of regularity, that we assume systematic poll-worker error so as to change an invalid affirmation to a valid one, and that we assume no other reason than poll-worker error for a voter failing to affix a signature to the ballot envelope. This interpretation allows the exception in R.C. 3505.183 for individuals who decline to execute an affirmation to swallow the rule. By presuming that any incomplete affirmation should be treated as an unnoticed declination, the secretary eliminates the statutory procedures for declinations altogether and encourages voter dilution. Such a presumption is unreasonable.

*Skaggs* at 515. Here, Plaintiffs ask this Court to "swallow" the Ohio provisional ballot laws and, without evidence, rely on an unreasonable presumption that poll worker error was sole reason for a wrong precinct ballot being cast. This argument flips the presumption that poll workers acted lawfully on its head and is directly contrary to established Ohio election law.

**B.      There Must be Clear and Convincing Evidence of Poll Worker Error**

Plaintiffs conclude, without any support, that the Court should use a preponderance of the evidence standard. Plaintiff's Trial Brief (Doc.92, p.18). To the contrary, in Ohio, the standard of proof with respect to evidence of election irregularities is "clear and convincing." *McMillan v. Astabula*

*County Board of Elections* (1993), 68 Ohio St.3d 31; *In re Election of November 6, 1990 for the Office of Attorney General of Ohio* (1991), 58 Ohio St.3d 103. Clear and convincing evidence is defined as "[t]hat measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *In re Election of November 6* at 106.

Plaintiffs have not met the burden of proof in this case. Testimony was heard in Court from 50 poll workers and 17 voters and at the Board from 72 poll workers. Either the Court or the Board heard testimony with regard to only 262 out of 844 provisional ballots[3]. Absent direct evidence of poll worker error, Plaintiffs rely on statistical analyses of voters' addresses that do not prove anything about poll worker error. Plaintiffs are guessing about why a voter cast a ballot in the wrong precinct and are only really arguing that where a voter lives, and not whether the ballot was validly cast, should determine whether their vote should count. A review of Plaintiffs' Table A shows that 90 of the even-odd ballots are also right location ballots; 64 of the pass-through ballots are also right location ballots; and 15 of the old precinct ballots are also right location ballots. Five of the 15 right location/old precinct ballots also fit into the even-odd or pass-through categories. Therefore, according to the Plaintiffs, 169 of the 296 right location ballots could have been cast due to more than one type of poll worker error. Did the voter go to the wrong table, insist upon voting in their old precinct, or did a poll worker misuse the green book? Plaintiffs have not established with clear and convincing evidence that any one of these scenarios occurred. Without a clear indication of whether a poll worker erred, the voter erred, or whether either type of error was the reason the ballot was miscast, this Court should not order the Board to count any ballot.

---

[3] Plaintiffs' List of Ballots that Should Be Counted or Subject to Procedural Due Process Relief (Doc.182).

Plaintiffs' "right location", "even-odd", and "pass-through" analyses present the same type of statistical analysis rejected as evidence of poll worker error in the case of *State ex rel. Yiamouyiannis v. Taft,* 65 Ohio St.3d 205, 602 N.E.2d 644 (1992). The Ohio Supreme Court held that, while a local board of elections was shown to have abused its discretion in rejecting certain petition signatures, such error cannot be extrapolated to prove that a larger number of signatures were improperly invalidated since there are a number of reasons why petition signatures may be properly disqualified. See also *Hunter* at 27. This Court is left to speculate as to which type of error caused the ballot to be cast in the wrong precinct; but, the law demands more. Statistical analysis is not enough to overcome the presumption that poll workers performed their duties in a lawful manner nor it is enough to meet the Plaintiffs' burden of proof.

## VII.    EQUAL PROTECTION

### A.    There is No Equal Protection Violation as to the Board's Review and Counting of Provisional Ballots

The Board's pre-November 16 investigation did not violate equal protection. The Board afforded the same level of review to all provisional ballots cast, with the exception of NEOCH ballots pursuant to Directive 2010-74. Therefore, "any equal-protection claim did not require an investigation – it merely required the same inquiry that the board had engaged in for its initial determination of the validity of provisional ballots." *Painter* at ¶40.

The 31 approved ballots cast at the Board[4] and the rejected wrong precinct provisional ballots are not the same for equal protection purposes. As Judge Rogers explained: "[t]he two wrong precinct groups of ballots are sufficiently different that Ohio law could permit counting the 27

---

[4] Twenty-seven provisional ballots cast at the Board of Elections contained a ballot for the wrong precinct as evidenced by the provisional ballot envelope. Four additional provisional ballots cast at the Board of Elections contained a ballot for the wrong precinct even though the correct precinct was indicated on the face of the provisional envelope. There were a total of 31 "wrong precinct" ballots cast at the Board as opposed to the 27 referred to by the 6th Circuit.

votes on the ground that the error was much more clearly and ascertainably not attributable to the voter than in the election-day polling place situations." *Hunter,* J. Rogers concurrence at 42.

Thirty-one provisional voters at the Board of Elections, 824 Broadway, went to the correct location, but they were given the wrong ballot by Board staff. This mistake could only occur at 824 Broadway where the Board staff has access to ballots for all 680 precincts. The 31 voters did everything right and there is nothing the voter could have done to prevent this error. How the Board staff discovered the mistakes made at 824 Broadway is also relevant. The Board staff at 824 Broadway wrote the voter's precinct number on the provisional ballot envelope (as opposed to the ballots at each precinct which have the precinct identifier pre-labeled on the envelope). This notation by the staff provides *objective* evidence on the face of the envelope that error occurred in the case of the 31 ballots. The Board staff's review of the envelope alone discovered the error because the wrong precinct number was on the ballots as compared to the precinct number which corresponded to the name and address written by the voter upon the ballot envelope. No investigation for poll worker error was needed and none was conducted by the Board to find these mistakes.

In contrast, the 849 provisional voters went to the wrong precinct. Even if some poll worker error is related to those ballots, the voter had to have been involved in the error as well. The voter went to the wrong precinct and is at least equally culpable in not knowing his or her correct precinct number and location. This error is wholly or partially attributable to the voter. Voters, after all, have the responsibility to know their correct precinct and location. And, unlike busy poll workers who have little time to process ballots on Election Day, voters have ample time prior to Election Day to find out where his or her poll location and precinct is. This information is publically available at the Board and on the Board's website.  Even if a poll worker gives a voter information as to his or her precinct location, this does not absolve the responsibility of the voter to know in which precinct he

10

or she is entitled to vote. While it would be regrettable if a poll worker made an unintentional error in this regard, this would not change the fact that the voter was negligent and this is a crucial distinction between the 849 and the 31 ballots.

Nor is there any equal protection issue with respect to the individual provisional voters.[5] Rejecting some ballots and approving others does not give rise to an equal protection claim on behalf of persons casting provisional ballots as run-of-the-mill election irregularities are not of constitutional dimension.  See, e.g., *Roe v. State of Alabama*, 68 F.3d 404, 407-09 (111th Cir. 1995) (finding ballots which were defective under state law could not be counted under the Equal Protection Clause because others had been originally counted in the first instance); *Vallejo v. City of Tucson*, 2009 WL 1835115, (D. Ariz.) (No equal protection violation when voter improperly denied a provisional ballot); *Burke v. Paquotank County Board of Elections*, 2010 WL 883017 (E.D. N.C.) (No equal protection violation when voter mistakenly told his provisional ballot would be counted); *Hutchison v. Miller*, 797 F.2d 1279, 1283 (4th Cir. 1986) (Circuit Courts have as a rule declined to endorse actions under §1983 with regard to "garden variety election irregularities."); *Powell v. Power*, 436 F.2d 84, 88 (2d Cir. 1970) (state officials permitting voting by persons not qualified under state law); *Pettingill v. Putnam County R-1 School Dist.*, 472 F.2d 121(8th Cir.1973) (same); *Gamza v. Aguirre*, 619 F.2d 449, 453 (5th Cir. 1980) (Isolated events that adversely affect individuals are not presumed to be a violation of the Equal Protection Clause.). The reasons for this rule are obvious. As stated 30 years ago in *Gamza*: "If every state election irregularity were considered a federal constitutional deprivation, federal courts would adjudicate every state election dispute, and the elaborate state election contest procedures, designed to assure speedy and orderly disposition of the multitudinous questions that may arise in the

---

[5] To date, no voter has asserted a claim. R.C. 3505.181(B)(5) established a free access system that voters can use to find out if their vote was counted, and, if not, why it was not counted. Plaintiffs have not shown that any voter in this case took advantage of this information.

11

electoral process, would be superseded by a section 1983 gloss." Id. at 453. Plaintiffs presented no evidence that this election was not unlike any other nor that the magnitude of error was unusual. In fact, Dr. Tuchfarber opined that "[t]he November 2010 Hamilton County, Ohio elections were not unusual in any major procedural way and produced only garden variety errors common to elections in Ohio and other states." DX 1005, p.31; Testimony of Dr. Tuchfarber, 8/1/11, TR 10-71-73.

Finally, assuming for purposes of argument only that this Court finds some evidence that the Board made a mistake, there is absolutely no evidence that the Board intended to violate the Equal Protection Clause. The Supreme Court held:

> . . . where the official action purports to be in conformity to the statutory classification, an erroneous or mistaken performance of the statutory duty, although a violation of the statute, is not without more a denial of the equal protection of the laws. The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination.

*Snowden v. Hughes*, 321 U.S. 1, 8, 64 S. Ct. 397, 401, 88 L. Ed. 497 (1944); *Combs v. State of Tenn.*, 530 F.2d 695, 698 (6th Cir. 1976) (The violation of a state statute or rule of practice does not, by itself, constitute deprivation of a right guaranteed by the Constitution of the United States).   An unintentional mistake by a poll worker is not of constitutional import. In the January 12, 2011 Order, this Court's stated ". . . there is no allegation that any error on the part of poll workers or Board staff was intentional." Doc.39, p.6. Plaintiffs did not even attempt to prove that any error was intentional. And, with the possible exception of Derek Moore, the evidence showed that no poll worker intentionally caused a wrong precinct ballot to be cast.

### B.    Disparate Impact

The argument that the equal protection clause prohibits "invidious" or "arbitrary" discrimination does not apply in this context since the Plaintiffs have not alleged that the Ohio

election laws, on their face, disproportionately burden a particular group.[6] See *Williams v. Rhodes*, 393 U.S. 23, 30, 89 S. Ct. 5, 10 (1968). "[T]he Equal Protection Clause does not make every minor difference in the application of laws to different groups a violation of our Constitution." *Id.* The Board's processing of provisional voters was not invidious or arbitrary and disparate. Instead, the evidence has shown that the Board reviewed all provisional ballots the same way before voting on November 16, 2010.

### C. An Equal Protection Violation, if any, has been Remedied

The 6th Circuit acknowledged that the Board conducted the investigation required of it and, more importantly, did so in accordance with federal law. The panel held: "We conclude that the Board's review has met the requirements of *Bush v. Gore*." *Hunter* at 30. The November 22 Order did not specify how the Board was to conduct its investigation, instead it was left to the Board and the Secretary. The 6th Circuit upheld the sufficiency and propriety of the Board's review. See *Hunter* at 30 ("[t]he Board's review of the wrong-precinct provisional ballots was guided by objective criteria provided by Secretary Brunner to effectuate the district court's order.").

Plaintiffs claim that they strove to finish the investigation conducted by the Board. To the contrary, Plaintiffs were not even close to finishing the investigation. The Court only heard testimony from approximately 2% of the poll workers who worked on Election Day. It is true that the Board was ordered by the Secretary of State to conclude its investigation and that some questionnaires where not received until after the established deadline. However, the Board contacted *every* poll worker and considered all the information it could prior to voting on December 28, 2010. In this respect the Board treated all voters equally. More importantly, the 6th Circuit found that the Board's review met the requirements of *Bush v. Gore* and remedied any unequal treatment. *Hunter* at 29 (Although there are time and resource limitations to the review that may be undertaken, the Board

---

[6] Plaintiffs have not alleged such a claim and Defendants objected to such evidence during the trial.

has implemented appropriate procedures to remedy its initial unequal treatment.). Irrespective of the rulings of the 6th Circuit and despite the fact that Plaintiffs were given a wide berth to present their case, Plaintiffs "investigation" was not the completion of the Board's investigation they claim was required in this case, but a selective review of poll workers and voters intended to find ballots cast for Plaintiff Hunter.

As opposed to dealing with any alleged equal protection violation, the case presented by the Plaintiffs is replete with further unequal treatment. Plaintiffs only contacted less than one third of the 849 voters by letter asking them appear and tell their story to the Court. No subpoenas were issued to voters. Therefore, only the voters who were available and able to appear during the hearing were afforded with a greater level of review that those who either were unable to attend or, worse, were not contacted by Plaintiffs at all. Plaintiffs also only subpoenaed some of the poll workers to testify in Court and only some of the poll workers from each precinct. As a result, only the voters who ballots were processed by the subpoenaed poll workers received a greater level of review than the remaining voters.

After all the evidence has been presented, it is evident that similar election procedures which were held unconstitutional by the Supreme Court in *Bush v. Gore,* 531 U.S. 98, 121 S. Ct. 525 (2000) are being advanced by the Plaintiffs here. The Board used the same procedures to review all provisional ballots prior to November 16, 2010. Plaintiffs, however, purportedly attempted to redo the Board's December investigation in this Court. Yet, this time not all voters were afforded the same treatment. Only 50 out of over 3,000 poll workers testified. Only 17 out of 849 voters testified. For the remaining voters, Plaintiffs ask that this Court disregard the results of the Board's investigation and instead order the Board to count additional ballots without having any direct evidence of poll worker error. In other words, the remedy sought by Plaintiffs fails to include ". . . at least some assurance that the rudimentary requirements of equal treatment and fundamental fairness are

14

satisfied." *Id.* at 98. Any remedy ordered by this Court to count ballots based upon the Plaintiffs'

investigation will result in further unequal treatment of voters because the Plaintiffs employed

different standards than those used by the Board and, further, did not employ the same standards for

all voters during the hearing. The Supreme Court in *Bush v. Gore* admonished the Florida Supreme

Court for changing the rules after the election, which is exactly what Plaintiffs attempt here.

## VIII.   DUE PROCESS

Plaintiffs argue that Ohio's provisional voting system is fundamentally unfair. Federal courts

have uniformly declined to endorse actions under §1983 with respect to garden variety election

irregularities. *Griffin v. Burns,* 570 F.2d 1065, 1076 (1st Cir.1978). Instead the 6th Circuit held that:

> "[t]he Due Process clause is implicated, and § 1983 relief is appropriate, in the
> exceptional case where a state's voting system is fundamentally unfair." *Brunner,* 548 F.3d
> at 478 (citing *Griffin v. Burns,* 570 F.2d 1065, 1078-79 (1st Cir.1978)). "[D]ue process is
> implicated where the entire election process including as part thereof the state's
> administrative and judicial corrective process fails on its face to afford fundamental
> fairness." *Griffin,* 570 F.2d at 1078. Such an exceptional case may arise, for example, if a
> state employs "non-uniform rules, standards and procedures," that result in significant
> disenfranchisement and vote dilution, *Brunner,* 548 F.3d at 478, or significantly departs
> from previous state election practice, *see Roe v. Alabama,* 43 F.3d 574, 580-81 (11th
> Cir.1995) (intervening where failure to exclude contested absentee ballots constituted a
> post-election departure from previous state practice); *Griffin,* 570 F.2d at 1079
> (intervening where state court disrupted seven-year practice of voting by absentee and
> shut-in ballot). Federal courts, however, "have uniformly declined to endorse action[s]
> under [§] 1983 with respect to garden variety election irregularities." *Griffin,* 570 F.2d at
> 1076; *see also Brunner,* 548 F.3d at 478 ("[T]he federal courts should not be asked to count
> and validate ballots and enter into the details of the administration of the election."
> (citation and internal quotation marks omitted)).

*Warf v. Bd. of Elections of Green County, Ky.,* 619 F.3d 553, 559 (6th Cir. 2010). At issue in this case are a

small number of provisional ballots rejected pursuant to state law because such ballots were cast in

the incorrect precinct. These ballots are exactly the type of "garden variety" issues that arise in each

election. In following state law and election procedures, the Board takes steps to prevent such issues

by (1) providing clear notices to voters at each polling place that one must vote in the precinct in

which one lives, (2) attempting to contact voters to update their registration, and (3) providing

training to poll workers. Despite the Board's preparation for each election, irregularities occur, but the November 2010 election irregularities do not rise to the level of a constitutional violation.

### A.    Substantive Due Process

The substantive due process rights of the 849 provisional voters were not violated when the Board voted to count the 31 ballots cast at the Board of Elections. As discussed above, the review process in determining whether to count was the same for all provisional ballots. Counting the 31 ballots did not afford those voters any additional rights.

The State of Ohio is not a party in this case. Nevertheless, Plaintiffs challenge whether Ohio provisional ballot laws, R.C. 3505.181 and R.C. 3505.183, comport with due process. "When a state promulgates a regulation which imposes a 'severe' burden on individuals' rights, that regulation will only be upheld if it is 'narrowly drawn to advance a state interest of compelling importance." *Burdick,* 504 U.S. at 434, 112 S.Ct. 2059; *Norman v. Reed,* 502 U.S. 279, 289, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992). However, 'the state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions.' *Anderson,* 460 U.S. at 788, 103 S.Ct. 1564. Therefore, the court must first examine whether the challenged Ohio statute imposes a severe burden or is a reasonable and nondiscriminatory restriction. Next the court must examine Ohio's asserted state interests and determine if they are sufficiently weighty to justify the restriction imposed. *Lawrence v. Blackwell*, 430 F.3d 368, 373 (6th Cir. 2005).

The burden placed on provisional voters is no greater than that placed on other voters during an election. All voters must vote in the precinct in which they live. Ohio law does not require more of provisional voters than regular voters – everyone must get to the correct location in order to properly cast a ballot so that they may vote for only the races and issues for which they are entitled to vote. The burden placed on provisional voters is no greater than that placed on other voters. "The Supreme Court has clearly stated that states may, and inevitably must, enact reasonable regulations of

16

parties, elections, and ballots to reduce election- and campaign-related disorder." *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 585 (6th Cir. 2006), citing *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 358, 117 S.Ct. 1364 (1997). The requirements that provisional voters complete a provisional envelope and sign an affirmation statement as set forth in R.C. 3505.182 are reasonable and necessary for boards of elections to determine whether a voter is registered and eligible to vote and to prevent fraud. See R.C. 3505.183(B).

The Board, like the Secretary of State, has a substantial interest in conducting elections in a timely, consistent and efficient manner. See *Hunter* at 36. The State timeline for each election cycle is brief and narrowly tailored. Official canvasses of election returns must begin eleven to fifteen days after the election, and be complete within twenty-one days. R.C. 3505.32(A). If the race is subject to an automatic recount, the recount must begin within ten days after the official certification. R.C. 3515.03. An election contest must be filed in court within ten days of the recount. R.C. 3515.09. The court must fix the time for trial no less than fifteen days or more than thirty days after the petition is filed. R.C. 3515.10. Only one continuance of no more than thirty days can be granted. R.C. 3515.11. Any appeal of legal questions to the Ohio Supreme Court must be filed within twenty days after the judgment of the court of appeals. R.C. 3515.15. This schedule allows boards of elections to conclude the most recent election and provides time to prepare for the next. Litigation of the nature presented in this case prevents the Board from complying with State mandates, which would have even greater consequences if a state-wide or federal election contest was challenged.

Plaintiffs state that this Court should apply a balancing test for due process challenges to state election laws. This is despite the fact that Plaintiffs insist they are not challenging the state election laws themselves and only challenge the application of the laws. So if Plaintiffs are not challenging the law – and they admit they are not – the Board's actions that comply with the law cannot be unconstitutional as the Board applied the statute in a reasonable, nondiscriminatory way. *Burdick v.*

17

*Takushi*, 504 U.S. 428, 434 (1992) ("[w]hen a state election law imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the state's regulatory interests are generally sufficient to justify the restrictions" (citation and internal quotation marks omitted)).

In any event, Plaintiffs apply the wrong test to determine whether substantive due process requires that the wrong precinct ballots be counted. Plaintiffs reason that the Board's rejection of wrong precinct ballots was "invidious" because it was unrelated to the voters' qualifications and, therefore, this Court should use a strict scrutiny test. This is not true. It is well established that the Board rejected the wrong-precinct ballots precisely because of voter qualification issues.  Residency in the precinct in which they cast a ballot is a qualification that voters must meet.  Ohio voters are only qualified if they are registered to vote in the precinct in which they live. When voting a provisional ballot, the voter signs an affirmation statement on the provisional envelope affirming that they are eligible to vote in that precinct and, if they are not eligible, they acknowledge that their vote will not count. A voter's residency also determines their eligibility to vote for certain contests. To suggest otherwise, undermines the entire provisional voting system in Ohio.

Plaintiffs' substantive due process claim that the government is required to count ballots which are defective because of poll worker error is inherently contradictory. On one hand, Plaintiffs argue that, under federal law, it would be fundamentally unfair not to count votes where poll worker error was a cause for a ballot being cast in the wrong precinct. On the other hand, Plaintiffs admit that, under Ohio law, the Board is not permitted to count wrong precinct ballots. Plaintiffs first attempt to reconcile these arguments by advocating that since the Board remade the 31 ballots cast at 824 Broadway into the correct precinct it can remake the other wrong precinct ballots. The Ohio Supreme Court rejected this notion in *Painter* when it found that wrong precinct ballots must be rejected under Ohio law. Plaintiffs conclude that since the Board already violated Ohio law when it

18

remade the 31 ballots, it should continue to do so for all 849. There is no basis in law, federal or state, to apply such a remedy.

What Plaintiffs are really saying is that the Board should remake wrong precinct ballots and count every vote cast by the voter. This ends Ohio's precinct system and is precisely the argument rejected by the 6th Circuit in *Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565 (6th Cir. 2004). Plaintiffs next attempt to reconcile these arguments by citing the supremacy of federal law and essentially conclude that it is unfair for the Board to follow Ohio law. This argument specifically ignores that federal law has already determined that provisional ballots are to be counted in accordance with *state* law.  42 U.S.C. 15482(a)(4).

### B.    Procedural Due Process

Plaintiffs claim they are not challenging whether Ohio law is constitutional. Rather, Plaintiffs assert an as applied challenge to Ohio provisional voting laws. This Court is being asked to determine whether voters' rights were violated by the Board by not counting wrong precinct provisional ballots. Plaintiffs would have to satisfy the two-prong test to establish a due process violation: show entitlement to a specific property or liberty interest and show that the state's procedures that took away that entitlement were so insufficient as to be fundamentally unfair.  *See Miller v. Lorain County Bd. of Elections*, 141 F.3d 252, 259 (6th Cir. 1998).  Plaintiffs cannot show that they had an entitlement to have otherwise invalid provisional ballots counted; as noted above, the votes were invalid under Ohio law.  And even so, Plaintiffs were given sufficient procedure.

Plaintiffs' right to have a ballot counted arises only after he or she has met the voter qualification requirements set forth by the state.  Those requirements were not met here.  Even if it can be determined that the voter did not know where to vote and a poll worker failed to properly direct the voter, what is the effect of that mistake?  This Court has already noted "that there is no allegation that any error on the part of poll workers or Board staff was intentional." January 12 Order

(Doc. 39, p. 6). Mere negligence is not enough to support a claim under 42 U.S.C. § 1983. *Snowden v. Hughes*, 321 U.S. 1, 8, 64 S. Ct. 397 (1944).

Plaintiffs also argue that the poll workers violated voters' procedural due process rights when the poll workers failed to follow the statutory pre-deprivation process of R.C. 3505.181(C). This is inaccurate for two reasons. First, it has not been proven that poll workers intentionally deprived voters of their right to vote. See *Snowden* at 8 (mere negligence is insufficient for §1983 liability). Second, Plaintiffs have failed to allege how the Board Members, in their official capacities, have violated voters' procedural due process rights. See Defendant's Motion for Summary Judgment and Reply.

Even if Plaintiffs could impute the poll workers' negligence to the Board members, Plaintiffs arguments would still fail to establish a due process violation. The Supreme Court held:

> "(D)ue process is flexible and calls for such procedural protections as the particular situation demands," *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed .2d 484. Resolution of the issue here involving the constitutional sufficiency of administrative procedures . . . requires consideration of three factors: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and probable value, if any, of additional procedural safeguards; and (3) the Government's interest, including the fiscal and administrative burdens that the additional or substitute procedures would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 321, 96 S. Ct. 893, 896 (1976). The right to vote is fundamental, but it is not without limits. See *Burdick v. Takushi*, 504 U.S. 428, 433, 112 S. Ct. 2059 (1992). Poll workers should direct voters to the correct precinct, but the voter has an obligation to comply with state law as well. "At some point the benefit of an additional safeguard to the individual affected by the administrative action and to society in terms of increased assurance that the action is just, may be outweighed by the cost." *Matthews* at 348. This case illustrates the burden suggested by Plaintiffs is so great it will preclude the Board from conducting elections in an efficient manner and in compliance with the statutory deadlines.

20

Plaintiffs suggest that provisional voters are entitled to a post-deprivation remedy of a "meaningful hearing" regarding the validity of their ballots. Plaintiffs explicitly state that they are not challenging the constitutionality of any Ohio statutes. Yet, Plaintiffs are not satisfied with the remedy set forth by Ohio law. Plaintiffs ignore that Ohio law already provides a post-deprivation remedy to provisional voters. Provisional voters are told that their vote may not count and that they may call the Hot Line established by law to find out whether their vote was counted and, if not, why it was not counted. R.C. 3505.181(B)(5)(b). In certain circumstances, a provisional voter can appear at the Board in the 10 days after the election to provide additional information for determining the validity of their ballots. R.C. 3505.181(B)(8). Finally, provisional voters may file an election contest action pursuant to R.C. 3515.08 et seq. An election contest action is an adequate remedy for all of the constitutional violations alleged in this case. Because Plaintiffs do not anticipate a favorable result of the election contest action does not negate the fact that it exists and is available to them as a state law remedy.

Plaintiffs argue that provisional voters are afforded less process than absentee voters. It is accurate that the process afforded these distinct classes of voters is different under Ohio law. There is a rational basis for this distinction. Under Ohio law, the eligibility of an absentee voter is not in question. The absentee voter's eligibility is determined before he or she receives an absentee ballot so any additional information that the Board is permitted to ascertain is solely to complete the voting process. In contrast, a provisional voter is presumed to be ineligible to vote because they are by definition not properly registered to vote in the precinct in which they live. R.C. 3505.183. The Board relies on the information that the provisional voter swears to be true in order to determine the voters' eligibility. The process for absentee voters is inapplicable to provisional voters.

**C.**     **Due Process Claims are not Cognizable**

1.     The Board is Immune for Violations of State Law

Fundamentally, Plaintiffs' due process claims are that the poll workers failed to comply with R.C. 3505.181 when they did not inform voters that a ballot was being cast in the wrong precinct. There is no exception to the Board's Eleventh Amendment immunity for this allegation. Federal supremacy is not implicated when a state official is acting contrary to state law only. *Papasan v. Allain*, 478 U.S. 265, 277, 106 S. Ct. 2932, 2940 (1986). The Supreme Court has held that when a state official has violated *state law*:

> "the entire basis for the doctrine of *Young* and *Edelman* disappears. A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment. We conclude that *Young* and *Edelman* are inapplicable in a suit against state officials on the basis of state law."

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106, 104 S. Ct. 900, 911 (1984). See also *S & M Brands* at 511 (sovereign immunity serves to avoid the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties and emphasizes the integrity retained by each State in our federal system). Accordingly, the Board is entitled to Eleventh Amendment immunity for all allegations that it violated state law during the November 2010 election.

2.     The Board is Not Liable under Section 1983 for Actions of Poll Workers

Moreover, the actions of poll workers cannot support a § 1983 claim against the Board. The poll workers are not named defendants. There is no respondeat superior liability in actions under § 1983, and there is no evidence that a government custom or policy led to any adverse action against Plaintiffs. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Scarbrough v. Morgan County Bd. of Educ.,* 470 F.3d 250, 261 (6th Cir.2006). In fact, the determination of whether a provisional voter is eligible to vote can only be made by the Board, not by the poll

workers, and poll workers cannot refuse to allow a provisional voter to cast a ballot. See R.C. 3505.183(B). Therefore, the Board cannot be held liable for the actions of poll workers on Election Day.

>    3.    The Board is Not Liable under Section 1983 for Failure to Train or Supervise
>          Poll Workers

Recognizing perhaps that the Board is not liable under respondeat superior, Plaintiffs switched their due process claim once again during the trial to argue that the Board is liable under § 1983 for failure to train or supervise poll workers.

> Because § 1983 liability can only attach where the state's policies are the "moving force [behind] the constitutional violation," *Monell,* 436 U.S. at 694, 98 S.Ct. 2018, plaintiffs must show: 1) that "the failure to train amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact," and 2) that the "deficiency in a [state's] training program [is] closely related to the ultimate injury."

*League of Women Voters of Ohio v. Blackwell*, 432 F. Supp. 2d 723, 729 (N.D. Ohio 2005) aff'd in part, rev'd in part sub nom. *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463 (6th Cir. 2008), citing *City of Canton v. Harris,* 489 U.S. 378, 391, 109 S.Ct. 1197 (1989).

Plaintiffs elicited testimony from the poll workers regarding their training by the Board. The *League of Women Voters* court held:

> [t]he threshold issue is whether "the deficiency in training actually caused" the constitutional wrongs. [*Harris*] at 391, 109 S.Ct. 1197. Courts distinguish between inadequate training programs resulting in constitutional wrongs, for which states may be liable, and situations in which more training for a particular individual might have prevented a constitutional violation, for which states are not liable. *Id.*

*League of Women Voters* at 729; See also *City of Canton v. Harris*, 489 U.S. 378, 390-91 (1989) (a plaintiff cannot maintain a failure to train or supervise case under Section 1983 without first establishing that some state actor committed a constitutional tort); *Harbin v. City of Detroit*, 2005 WL 2108326 at **6 (6th Cir. 2005) (a claimed failure to train "is constitutionally irrelevant if the plaintiff failed to demonstrate a resulting injury"). As discussed throughout, Plaintiffs have not met their burden of

proof to show that the constitutional rights of voters were violated because of the actions of the Board.

If this Court were to find that constitutional wrongs occurred in this case, Plaintiffs' failure to train/supervise claims still fail on the merits. "[W]hile claims such as respondent's-alleging that the city's failure to provide training to municipal employees resulted in the constitutional deprivation she suffered-are cognizable under § 1983, they can only yield liability against a municipality where that city's failure to train reflects deliberate indifference to the constitutional rights of its inhabitants." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 392, 109 S. Ct. 1197, 1206, 103 L. Ed. 2d 412 (1989) "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 410, 117 S. Ct. 1382, 1391 (1997). "A less stringent standard of fault for a failure-to-train claim would result in *de facto respondeat superior* liability on municipalities ..... Municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by [the relevant] officials ...." *Connick v. Thompson*, 131 S. Ct. 1350, 1359-60, 179 L. Ed. 2d 417 (2011) (internal quotations and citations omitted).

The fact that wrong precinct ballots were cast in previous elections is not enough to show that the Board was deliberately indifferent to problems with provisional voting. Plaintiffs have not met this strict burden and the evidence supports the opposite conclusion. The Director of the Board testified that the Board continually updated and improved its training program each year. DX 1043. In this case, every poll worker who testified was trained. DX 1004; DX 1053. Every poll worker indicated he or she understood the training provided to him or her. There is no evidence that the training program is inadequate or insufficient. In fact, Dr. Tuchfarber found that "[p]oll-workers were well trained in good procedures to assist voters in the provisional voting process and handled themselves professionally with few exceptions and with a very high overall success rate of getting

24

voters to the correct precinct." DX 1005, p. 31; Testimony of Dr. Tuchfarber, 8/1/11, TR 10-84. The Board contracts with professional trainers to conduct training sessions for poll workers. The training was provided in a uniform manner to all poll workers as required by Ohio law.

The evidence showed that poll workers are supervised. The Board evaluates poll workers based upon information received from voters and judges on Election Day, Testimony of Sally Krisel, TR 12-33 ln 16-22; letters following Election Day, id. at ln 22-23; known mistakes made by poll workers, id. at ln 24 -12-34 ln 3; information received from board troubleshooters in the field, id. at 12-35 ln 8 – 12-36, DX 1057 Precinct Observation Checklist; and information received from trainers following the training classes. TR 12-37 ln 20 – 12-38 ln 10, DX 1056 Poll Worker Recommendation and Evaluation Report. Based upon the information it receives and the evaluations performed, the Board will discharge workers, Testimony of Sally Krisel, TR 12-34 ln 2-5; and may be told that they are not needed on Election Day, or that they are only permitted to do specific jobs on Election Day, id. at 12-37 6-10.  If fact, usually following each General Election, 30 – 50 poll workers are replaced due to firing and resignation.  Testimony of Sally Krisel, TR 12-38 ln 12-20.

Plaintiffs incorrectly conclude that the problems with wrong precinct ballots are systemic, not garden variety, and, therefore, due process principles apply. This argument fails because Plaintiffs have not shown that any of the poll workers involved in the November 2010 election had anything to do with wrong precinct ballots cast in previous elections. Plaintiffs only rely on total numbers of wrong precinct ballots and have not proven that the same poll workers or the same type of poll worker error led to ballots being miscast in previous elections. Therefore, Plaintiffs characterization of this issue as "systemic" is merely hyperbole and does not support their due process claims.

Even though it recognized that such a goal is unachievable in such a human endeavor, the Board strove to attain an error-free election and enfranchise as many voters as possible. The Supreme Court has recognized that ". . . adequately trained officers occasionally make mistakes; the fact that

25

they do says little about the training program or the legal basis for holding the city liable." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391, 109 S. Ct. 1197, 1206, 103 L. Ed. 2d 412 (1989).

## IX.    NECOH

Assuming arguendo that the Board is required to comply with the NEOCH consent decree, the Board established that it did comply with the instructions of Secretary Brunner in its review of provisional ballots cast in November 2010. A voter is considered a NEOCH voter if the voter "lacks the identification required by the Ohio ID laws, including indigent and homeless voters . . . who do not have a current address and cannot readily purchase a State of Ohio ID Card." NEOCH Consent Decree, PX 2008 at p.2. Accordingly, the Board determined that the provisional voter had provided proper and acceptable identification when voting if the poll worker processing the provisional ballot checked one of the two "ID provided" boxes on the provisional envelope.  All provisional ballots were reviewed under this standard.  Testimony of Sherry Poland, TR 6-221 ln 19 – 6-222 ln 7, 7-263 – 7-265 ln 12.

The Board's review of provisional ballots subject to the NEOCH consent decree began following the initial verification by the bi-partisan teams.  The teams separated the wrong precinct envelopes that used the last four digits of the voter's Social Security Number as identification and determined which envelopes were cast in the correct location. Testimony of Sherry Poland, TR 5-108 ln 16- 5-109 ln 4. The bi-partisan teams were instructed to review the notes pages from both signature poll books to determine whether there were any indications from the poll workers regarding ballots subject to the NEOCH consent decree.  If there were indications, they were to make copies and place the envelope in the "further review required" tray to present to the Board for decision. Testimony of Sherry Poland, TR 5-111 ln 7-21. Prior to the Board vote on November 16, 2010, the bi-partisan teams had not identified any NEOCH provisional ballot that warranted further review.

Testimony of Sherry Poland, TR 5-111. The Board complied with Directive 2010-74 in reviewing the wrong precinct, correct location NEOCH ballots.

The Board, with guidance from the Secretary of State, established a procedure for conducting the investigation ordered by this Court on November 22. The investigation procedure afforded each of the ballots the same type of review. The Board reviewed all available documentation for each of the 850 ballots; reviewed the testimony heard on December 16 and 17; and reviewed the questionnaires received prior to Secretary Brunner's December 28 deadline. Testimony of Alex Triantifilou, TR 12-165. Thus, NEOCH ballots were reviewed with the same procedures that were used for all 850 ballots.

## X.      EVIDENCE WITH REGARD TO SPECIFIC BALLOTS

Plaintiffs incorrectly conclude that the Board concedes that 19 ballots listed in Table A should be counted. (Doc. 182-1, Table A.) The Board only concedes that 12 of the 19 ballots should be counted: P2204, P9395, P9771, P9823, P9935, P9940, P10175, P10035, P10036, P9635, P10548, and P10549, as they were all cast in the correct precinct.  The Board has not conceded in counting the 7 ballots the Board voted to count on December 28, 2010.[7] The Ohio Supreme Court in *Painter* ordered the Board to rescind its decisions made pursuit to SOS direction in conducting the investigation. Poll worker error was determined regarding those 7 ballots based on such investigation and, therefore, those ballots may not be counted. The Board objects to the remaining ballots identified by Plaintiffs to be counted for the reasons discussed below and for the reasons set forth in Joint Brief of Defendants in Opposition to Plaintiffs List of Ballots that Should Be Counted or Subject to Procedural Due Process Relief.

---

[7] P9398, P9399, P9580, P9738, P9764, P9769, and P10154.

27

**A.      Table A - Evidence Does Not Support an Order to Count the 689 Ballots**

Dr. Tuchfarber concluded that "[t]here are no scientifically valid and reliable methods known to me at this late date to resolve the question of exactly which of the 849 wrong precinct provisional votes to count or not to count other than the records contemporaneous with the election."  DX 1005, p. 31; Testimony of Dr. Tuchfarber, 8/1/11, TR 10-94. The Board reviewed all provisional ballots the same way prior to voting on November 16, 2010 using the only its records. Even if the Board's review is found to have equal protection issues, the Board's investigation in December 2010 did not. Upon the conclusion of such investigation, the Board voted to count a total of 16 ballots, 9 of which were actually correct precinct ballots. The Board voted to count two additional correct precinct ballots in July 2011. The Board did not find objective evidence of poll worker error for the remaining ballots. The results of the Board's investigation should control.

**B.      Table B – 295 Wrong Precinct Right Location Ballots**

Several envelopes listed in Table B have other fatal flaws under Ohio Law in addition to the ballots being cast in the wrong precinct and should not be counted. For example:

- P-9550 – Voter failed to sign affirmation
- P–9578 - Voter failed to provide printed name in affirmation
- P-9736 – Voter failed to provide identification
- P-10052 – Voter failed to provide identification
- P-10053 – Voter failed to provide identification
- P-10054 – Voter failed to provide identification
- P-10508 – Voter failed to provide a valid current address.  BOE has no means of determining voter's correct precinct.  If court order's BOE to count ballot, BOE will not be able to count ballot in the correct precinct.

There is no evidence to support Plaintiffs' contention that because someone arrived at the correct location their ballot should count. Dr. Tuchfarber proved otherwise. He concluded that "[m]ultiple precinct polling locations were not a significant or important cause of wrong precinct voting because such voting was equally prevalent in single precinct polling places." DX 1005, p. 31; Testimony of Dr. Tuchfarber, 8/1/11, TR 10-87 – 10-91. The data in this case showed that the

28

occurrence of wrong precinct errors was virtually the same for single and multiple precinct polling locations.

### C.    Table C – 183 Wrong Precinct and Even-Odd

Plaintiffs present a list of ballots to be counted that is classified by the physical location of the voter's current address. Plaintiffs failed to prove that any ballot properly fits into the even-odd category. Plaintiffs have not cited to any testimony to establish that: a) the ballot does in fact present an even-odd situation; b) the even-odd list is accurate and admissible; and c) the even-odd distinction caused poll worker error on Election Day. Some of the envelopes listed in Table C are, in fact, *not* even-odd situations. For example:

- P9464 – the voter's current address is 825 Dayton Street.  Both sides of Dayton Street (even and odd) of the address range 400 – 899 fall within precinct Cinti 18-C.  The voter voted in Cinti 18-A.
- P9709 – the voter's current address is 627 Main Street.  Both sides of Main Street (even and odd) from 600 – 799 fall within Cinti 6-E.  The voter voted in Cinti 6-F.
- P9890 – the voter's current address is 1204 West Rookwood.  Both sides of West Rookwood (even and odd) fall within Cinti 5-I.  The voter voted in Cinti 5-H.
- P9921 – the voter's current address is 6501 Stewart.  No part of Stewart is in the precinct the voter voted in (Silverton C).
- P9775- the voter's current address is 7056 Glenmeadow Ln.  No part of Glenmeadow Ln is in the precinct the voter voted in (Silverton C).

See "BOE Notes" column in Table A. Plaintiffs asked several poll workers to look up addresses in the green book despite the fact that none of the poll workers affirmatively stated that an even-odd distinction led to a particular ballot being miscast.

For the remaining ballots, Plaintiffs ask this Court to conclude that simply because a voter lived on the even side of the street and voted in the odd side of the street (or vice versa) those ballots should be counted. Plaintiffs assume without any evidence that the physical locations of the voter's residence resulted in a wrong precinct ballot. This is a de facto attack on Ohio's precinct based voting system. The law in Ohio is that poll workers are presumed to have followed the law in performing

their duties. See *Skaggs,* 120 Ohio St.3d 506. If it can be said that simply because a voter lives on one of these physical boundaries that it was the poll workers' error that he or she voted in the wrong precinct, then precincts are rendered obsolete.

As established by Sally Krisel, the Board has no control over where precinct lines are drawn. Precinct boundaries are determined by using geographical units used by the United States Department of Commerce, Bureau of the Census. Testimony of Krisel, TR at 11-224; R.C. 3501.18. The U.S. Census Bureau uses physical characteristics such as streets to define boundary lines. Therefore, most precincts in the State have boundary lines that run through the middle of the street and create even-odd splits. This is a common occurrence and is not evidence of poll worker error. These 183 ballots should not be counted.

**D.      Table D – 141 Wrong Precinct and Pass Through**

Plaintiffs have failed to prove that because a voter lives on a pass-through street their ballot should be counted for the same reasons that even-odd ballots fail. To conclude that a wrong precinct ballot should be counted merely that because a voters lives on a pass-through street is an attack on the precinct based voting system. These 141 ballots should not be counted.

**E.      Table E – 183 Wrong Precinct and Old Precinct**

When a voter changes residence from one precinct to another, it is the duty of the voter to report the change by delivering a change of residence form to the state or local office of a designated agency. If the voter fails to submit such form prior to the registration deadline, the voter may vote in that election if the voter appears at the polling place in the precinct in which that registered elector resides or at the board of elections and votes a provisional ballot. R.C. 3503.16. The poll workers complied with their duty of not allowing these registered voters to cast a regular ballot on Election Day.

30

In addition, a voter is informed through various signs posted in the polling locations and on the face of the ballot envelope that he or she must cast a ballot in the precinct where he or she currently resides. JX 1; JX 18. If a voter goes to their old precinct to vote knowing that they have moved, they have constructive knowledge of the fact that they are at the wrong precinct. These 183 ballots should not be counted.

**F.      Table F – 145 Wrong Precinct and Provisional Judge Didn't Look Up Address**

The fact that the provisional judge, as opposed to another poll worker, did not look up a voter's address is not evidence that a ballot was miscast due to poll worker error. Plaintiffs did not establish that no other poll worker looked up the voters' address. In addition, an alleged failure by poll worker(s) to look up an address does not obviate the voter's responsibility to vote in the correct precinct.

**G.      Table G – 66 Wrong Precinct and Not Signed by Provisional Judge**

Of the 66 envelopes listed in Table G, 61 were signed by the poll worker on the back of the envelope. Failure of a poll worker to sign the provisional ballot envelope is not a reason for the Board to reject a ballot pursuant to Ohio law. The fact that the poll worker did not sign the ballot provides the Court with no indication that poll worker error resulted in a wrong precinct ballot being cast, and to conclude otherwise destroys the presumption that poll workers are presumed to have lawfully performed their duties.

**H.      Table H – 206 Wrong Precinct and Not Warned by Provisional Judge**

The fact that any provisional judge testified that he or she did not warn the voter does not eliminate the possibility that another poll worker did so. There is conclusive evidence, however, that all voters were warned that their ballot would only count if they voted in the precinct in which they currently lived. Voters were warned on the face of the ballot envelope that they must vote in the precinct in which they currently live. JX 1. Voters also completed the affirmation statement in which

31

they swear or affirm that "I am a registered voter in the precinct in which I am voting." Provisional Ballot Envelope, Step 1, JX 1. Voters were further warned by the signs posted in each polling location. JX 18.

**I.     Table I – 261 Wrong Precinct and Testimony at Trial or at BOE**

Clear and convincing evidence that poll worker error resulted in a wrong precinct ballot being cast does not exist for any of these ballots. Absent that evidence, this Court is asked to rely on improper inferences and unreliable statistics. As explained by Dr. Tuchfarber, no logic exists that would avoid "false positive [counting ballots that should not be counted]" or "false negatives [not counting ballots that should be counted". DX 1005, p. 31; Testimony of Dr. Tuchfarber, 8/1/11, TR 10-92 – 10-94. A "logical leap" is not warranted by the evidence. Id.

**J.     Table J- 26 NEOCH Consent Decree Ballots**

Regarding the 10 envelopes Plaintiffs allege are NEOCH ballots that contain incomplete affirmations:

- 5 of the affirmations indicate that another ID was shown in addition to a social security number and therefore do not fall under the NEOCH consent decree ("for persons without identification other than a social security number): P10267, P10311, P10378, P10262, and P10379
- 1 provided a social security number that was found to be invalid by BMV/SSA and therefore is not subject to the NEOCH consent decree (last four digits of the voter's social security number which is not found to be invalid): P10352
- 5 have valid driver license data on file with the board of elections and therefore would not fall subject to the NEOCH consent decree ("for persons without identification other than a social security number): P10267, P10311, P10378, P10261, and P10379
- All 10 – no evidence that the voter did not complete for reasons attributable to poll worker error: P10375, P10267, P10311, P10378, P10262, P10261, P10308, P10379, P10352, and P10377.

Regarding the 16 envelopes Plaintiffs allege were voted at the right location and subject to NEOCH consent decree:

- 1 voter provided an invalid address: P10497.  BOE cannot determine voter's correct precinct and therefore cannot determine if voter voted in the correction location.  Furthermore, if

32

BOE is ordered to count ballot, the BOE cannot determine which precinct to count the ballot in.

- 6 of the affirmations indicate that another ID was shown in addition to a social security number and therefore do not fall under the NEOCH consent decree ("for persons without identification other than a social security number): P9397, P9398, P9471, P9472, P9580, and P9664

- All 16 – no evidence that the voter voted in the wrong precinct for reasons attributable to poll worker error.

K.      **Table K – 154 Ballots Due Process**

Plaintiffs ask that 154 voters be afforded due process rights of a hearing. Ohio law does not allow for such a hearing for provisional voters or any other voter, except for an election contest action. Since Ohio law does not permit a post-deprivation hearing, Plaintiffs again mount a challenge to Ohio law by seeking a post-deprivation hearing for these 154 voters. This is not an available remedy because the State of Ohio is not a party to this case. In addition, Plaintiffs chose not to present evidence for these ballots and any further hearing would constitute disparate treatment for these 154 voters. This Court should not order a remedy that affords some voters greater due process rights than other voters.

**XI.    IMPACT OF COUNTING ONLY JUVENILE COURT JUDGE RACE**

It is unclear whether Plaintiffs seek an order to count the provisional ballot entirely remade into the correct precinct or only, as discussed by the 6th Circuit, the race for Juvenile Court Judge remade and counted. See *Hunter* at 32 (counting ballots in the local judgeship race does not impact other races). An order by this Court to count additional provisional ballots may have an impact on other mandatory recounts and will have an impact on a variety of election matters for future elections. "It is imperative that boards of elections without fail apply R.C. 3505.183(D) which provides that no provisional ballots may be counted in a particular county until the board of elections for that county determines the eligibility of ALL provisional ballots cast in that county to be counted, pursuant to R.C. 3505.183 and this directive." Directive 2010-74, p. 3.

Any order to count votes only for the Juvenile Court Judge race, and not for any of the other races or issues on the ballot, will result inaccurate voting results for the entire County. If the Board is required to remake any wrong precinct ballots into the correct precinct for counting, the Board will have to falsely report undervotes for all other races for which the voter was permitted to cast a ballot. R.C. 3515.04; R.C. 3515.05.

The race for Hamilton County Juvenile Court Judge is not the only race subject to a mandatory recount. R.C. 3515.011. There were two local liquor options on the ballot that fell within the mandatory recount guideline. Id. Also, a candidate for the 28th House District has requested a recount for his race. R.C. 3515.01; R.C. 3515.27. All of these recounts will be affected by the outcome of this case. Other than affecting the outcome of those recounts, an accurate count of the total number of votes cast for Governor in the November 2, 2010 Election is necessary because it affects various election procedures. See e.g. R.C. 3501.22; R.C. 3515.27; R.C. 504.14, R.C. 505.75; R.C. 731.28; R.C. 731.29; R.C. 303.12(H); R.C. 519.12(H); R.C. 4301.33; R.C. 707.30.

## XII.  CONCLUSION

For the reasons stated herein, Plaintiffs are not entitled to the relief sought. The evidence showed that the Board complied with Ohio law in its review and approval of provisional ballots cast in the November 2 general election in Hamilton County. Further, the Board complied with equal protection and due process in its review and approval of provisional ballots both prior to the filing of this case and during its investigation ordered by the Court.

The Board seeks a final resolution of the November 2 election. It is also concerned about the precedential impact of this case on further elections. The Board urges the Court to consider the time and resource limitations that prevent it from conducting exhaustive and repetitive reviews of provisional ballots notwithstanding the law in Ohio, which directs that wrong precinct ballots are not to be counted.

Respectfully submitted,

JOSEPH T. DETERS
PROSECUTING ATTORNEY
HAMILTON COUNTY, OHIO
BY:

/s/ David T. Stevenson
James W. Harper
David T. Stevenson
Thomas Grossmann
Colleen McCafferty
Assistant Prosecuting Attorneys
Hamilton County, Ohio
230 E. Ninth Street, Suite 4000
Cincinnati, OH 45202
ddn:     (513) 946-3159 (Harper)
         (513) 946-3120 (Stevenson)
         (513) 946-3058 (Grossmann)
         (513) 946- 3133 (McCafferty)
Fax:     (513) 946-3018
james.harper@hcpros.org
dave.stevenson@hcpros.org
tom.grossmann@hcpros.org
colleen.mccafferty@hcpros.org
*Attorneys for Hamilton County Board of Elections*


## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was filed on August 26, 2011 using the Court's CM/ECF

system, which will transmit notice of the filing to all counsel of record in this case.


/s/ David T. Stevenson
David T. Stevenson

379606

35