IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

TRACIE HUNTER, *et al.,*           :
                                   :     Case No. 1:10cv820
            Plaintiffs,            :
                                   :     Chief Judge Susan J. Dlott
      v.                           :
                                   :     ORDER ON MOTION FOR
HAMILTON COUNTY BOARD OF           :     ATTORNEY FEES
ELECTIONS, *et al.,*               :
                                   :
            Defendants.            :


      The right to have one's vote counted is a tenet of representative democracy.  This lawsuit

brought to light the fact that poll worker error resulted in otherwise valid votes being uncounted

in the 2010 general election.  This lawsuit revealed that the Hamilton County Board of Elections

failed to take all of the steps required to ensure the proper counting of certain provisional ballots.

This case, while captioned for an individual candidate, was about these things—in essence, the

preservation and maintenance of voters' rights.  The facts adduced through the prosecution of

this lawsuit laid the groundwork for a significant adjustment to provisional voting statewide.  For

these reasons, the Court will GRANT, with modification, Plaintiffs' motion for attorney fees

pursuant to 42 U.S.C. § 1988 (Doc. 210).

## I.      BACKGROUND

      Following the 2010 general election, on the evening of November 19, 2010, the Hamilton

County Board of Elections, through its members Alex Triantafilou, Timothy Burke, Caleb Faux,

and Charles Gerhardt, III (collectively "the Board" or "Defendants" herein), announced election

1

results for the Hamilton County Juvenile Court Judge race.  Out of 289,791 ballots cast, Juvenile

Court Judge candidate Tracie Hunter trailed her opponent John Williams by twenty-three votes.

The Board arrived at this result after counting the regular election-day ballots, absentee ballots,

and provisional ballots it deemed eligible to be counted under Ohio law.  Among the provisional

ballots the Board counted were wrong-precinct ballots cast at the Board of Elections office on

election day.  Despite a state law prohibiting the counting of wrong-precinct ballots, the Board

counted these ballots after deciding that they had been cast in the wrong precinct due to an error

on the part of Board of Elections workers.  The Board, however, did not count 849 wrong-

precinct ballots cast at polling places on election day, and it did not attempt to determine if those

ballots were cast in the wrong precinct due to poll worker error.  The Board was poised to certify

these election results to the Ohio Secretary of State on November 23, 2010, the certification

deadline.

On November 21, 2010, Hunter initiated this lawsuit against the Board and its members

in their official capacities by filing a complaint and an emergency motion for a temporary

restraining order and preliminary injunction.  Her lawsuit claimed that the Board acted arbitrarily

when it decided that poll worker error justified the counting of wrong-precinct provisional

ballots cast at the Board of Elections office but not wrong-precinct provisional ballots cast at

polling places.  She claimed that this arbitrary process for counting provisional ballots violated

the principles of due process and equal protection and denied her the right to have all eligible

votes cast in her race counted.  In her motion for a temporary restraining order and preliminary

injunction, Hunter asked the Court to enjoin the Board from certifying the results of the election

to the office of juvenile court judge, declare the Board's rejection of provisional votes due to poll

2

worker error was unconstitutional, order the Board to determine if the rejected provisional ballots were due to poll worker error, and order the Board to count rejected provisional ballots if the rejection was due to poll worker error.

The Court held a hearing on Hunter's motion the following day, November 22, 2010. At the outset of the hearing, the Court granted two motions to intervene in the action: the motion of John Williams to intervene as a defendant, and the motion of the Northeast Ohio Coalition for the Homeless (NEOCH) and the Ohio Democratic Party (ODP) to intervene as plaintiffs. NEOCH and the ODP asserted in their motion to intervene that some of the 849 challenged ballots appeared to fall within the provisions of a consent decree entered the prior April in the case of *Northeast Ohio Coalition for the Homeless v. Brunner*, Case No. 2:06-cv-896 (S.D. Ohio) (Marbley, J.) (hereinafter the "NEOCH Consent Decree"). Both NEOCH and the ODP are parties to the Consent Decree and claimed an interest in monitoring and enforcing its provisions. In relevant part, the NEOCH Consent Decree prohibits county boards of elections from rejecting a provisional ballot cast by a voter who used only the last four digits of his or her Social Security number as identification if the voter cast his or her provisional ballot in the wrong precinct, but in the correct polling place, for reasons attributable to poll worker error.

Following the preliminary injunction hearing, the District Court issued an order granting in part Plaintiffs' motion. The Court denied Plaintiffs' request for an order prohibiting Defendants from certifying the election results on November 23, 2010. However, it granted the motion insofar as it sought an order commanding the Board to investigate whether poll worker error contributed to the rejection of 849 provisional ballots cast at polling locations on election

day and include in the recount of the race for Hamilton County Juvenile Court Judge any

provisional ballots improperly cast for reasons attributable to poll worker error.

Defendants appealed the order to the Sixth Circuit Court of Appeals and moved for a stay

pending the appeal.  The Sixth Circuit granted a temporary stay on November 26, 2010 but

dissolved it on December 2, 2010.  Notwithstanding the dissolution of the stay, the Board did not

proceed with an investigation into poll worker error, and on December 9 Hunter filed an

emergency motion in this Court to enforce the injunction.  That same day, the Ohio Secretary of

State issued Directive 2010-80 instructing the Board to contact and question poll workers in all

precincts and polling places in which any provisional ballot was cast in the wrong precinct.

Pursuant to that directive, the Board began to investigate poll worker error by subpoenaing poll

workers for questioning.  On December 17, the Secretary of State issued Directive 2010-87

directing the Board to send questionnaires to poll workers and give them an opportunity to

answer the questionnaire in lieu of responding to the subpoena.  The Secretary ordered the Board

to conclude its investigation by December 28, 2010.

On December 22, Williams and a Hamilton County voter, as relators, filed an original

action in mandamus in the Ohio Supreme Court against the Secretary of State.  In that action,

*Painter v. Brunner*, the relators challenged the post-election directives issued by the Secretary to

aid the Board in complying with this Court's November 22 order.  Claiming that Directives

2010-80 and 2010-87 were contrary to Ohio law, the relators asked the Ohio Court to compel the

Secretary to rescind them and order the Board to stop investigating instances of poll worker

error.  In a simultaneously filed motion for injunctive relief, the relators asked the Ohio Supreme

4

Court to enjoin the Board from opening any additional provisional ballots. All three Plaintiffs intervened in *Painter* to protect their interests in the Secretary of State's directives.

After the matter was fully briefed, on January 7, 2011, the Ohio Supreme Court granted the writ of mandamus and held that Ohio statutes did not authorize an exception based on poll worker error to the requirement that ballots be cast in the proper precinct in order to be counted. The Ohio Supreme Court further held that the Secretary of State's post election directives instructing the Board how to investigate the 849 wrong precinct ballots were erroneous under state law. *Painter v. Brunner*, 128 Ohio St. 3d 17, 941 N.E.2d 782 (Ohio 2011). Additionally, Ohio's new Secretary of State issued Directive 2011-4, which ordered the Board not to count any additional provisional ballots, including those which the Board had determined were miscast due to poll worker error.

Fearing that the *Painter* decision and Directive 2011-4 would effectively nullify this Court's preliminary injunction, Plaintiffs moved this Court to enforce its November 22, 2010 preliminary injunction and enjoin the Board from complying with Directive 2011-4. Doc. 38. On January 12, 2011, this Court granted in part and denied in part Plaintiffs' motion to enforce the November 22, 2010 preliminary injunction. Doc. 39. In that order, the Court enjoined the Board from complying with Directive 2011-4, ordered the Board to count provisional ballots found to have been cast in the wrong precinct due poll worker error and those cast in the correct precinct but wrongly rejected by Board staff, and ordered the Board to investigate all ballots subject to the NEOCH Consent Decree for poll worker error and count those ballots as required by the Decree. *Id.* Williams and the Board appealed.

The Sixth Circuit consolidated Defendants' appeal of the November 22, 2010 order granting a preliminary injunction ordering the Board to investigate whether provisional ballots cast in the correct polling location but wrong precinct were improperly cast because of poll worker error, and the January 12, 2011 order which ordered the Board to count certain disputed ballots and investigate and count certain other ballots. The Sixth Circuit affirmed the District Court's November 22, 2010 order and affirmed in part and vacated in part its January 12, 2011 order. *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219 (6th Cir. 2011). The Sixth Circuit found that the District Court did not abuse its discretion when it ordered the Board to investigate whether poll worker error contributed to the rejection of 849 provisional ballots and include in the recount for the race of Hamilton County Juvenile Court Judge any provisional ballots improperly cast for reasons attributable to poll worker error. However, it also found that it was premature for the District Court to identify which ballots were miscast due to poll worker error, and it remanded the case for further proceedings regarding the processing of the disputed provisional ballots. With respect to the NEOCH Consent Decree, the Sixth Circuit observed that "all parties agree that the consent decree remains and should be followed," and it affirmed this Court's order that the Board investigate all ballots subject to the Consent Decree for poll worker error and count those ballots as required by the Decree. *Id*. at 247.

Following the remand, Plaintiffs requested that the District Court conduct a hearing only on the issues involved in the remand from the Sixth Circuit. Defendants, on the other hand, wanted the hearing to be the full and final permanent injunction hearing. Ultimately, Plaintiffs agreed with Defendants, and the Court scheduled a permanent injunction hearing to begin on July 18, 2011. Doc. 65. On July 6, 2011, the day before the scheduled final pretrial conference,

Defendants filed a motion for summary judgment claiming that it was immune from suit under the Eleventh Amendment and that all the Plaintiffs lacked standing. Doc. 94. During the final pretrial conference, the Court stated it would not rule on the summary judgment motion before trial. Defendants asserted that the Court's "refusal to rule" on its summary judgment motion was a denial of Eleventh Amendment immunity and filed an interlocutory appeal to the Sixth Circuit. This Court stayed the case pending resolution of the appeal and vacated the July 18, 2011 trial date. Plaintiffs moved to dismiss the appeal, which motion the Sixth Circuit granted on July 14, 2011. The appeal having been dismissed, the District Court was able to proceed with the permanent injunction hearing as originally scheduled on July 18.

The Court took testimony from Board employees, poll workers, and voters over the next several weeks. The evidence produced at the hearing revealed that there were serious problems related to provisional voting at the county's multiple-precinct polling locations during the November 2010 election. One-hundred sixty-nine of Hamilton County's 438 polling locations on November 2, 2010 were multiple-precinct voting locations. The evidence showed that some poll workers at those multiple-precinct locations failed in their statutory duty to direct voters to the correct precinct tables within the location. As a result, certain voters were given provisional ballots that were not associated with the voter's precinct. Among the reasons why poll workers gave voters wrong-precinct ballots were that the poll workers failed to recognize the importance of having voters obtain their ballot from the correct precinct table and did not understand how to process a voter whose name did not appear in the signature pollbook. Some poll workers did not attempt to determine whether the voter was at the correct precinct table. *See Hunter v. Hamilton Cnty. Bd. of Elections*, 850 F. Supp. 2d 795, 818–19 (S.D. Ohio 2012). Other poll workers

made mistakes when attempting to ascertain whether the voter was at the correct precinct table—a determination made by looking up the voter's address in the precinct voting location guide. For example, many Hamilton County voters live on streets that are divided into different precincts based upon whether their house number is even or odd, yet one poll worker's testimony revealed that she did not know how to distinguish an odd number from an even number and, thus, was unable to correctly determine a voter's precinct based on the voter's address. *Id.* at 819–20.

> In sum, the testimony revealed a chaotic process in which, despite their training, some poll workers did not know that a ballot cast in the wrong precinct would not be counted, some poll workers understood that voters had to cast their ballot in the correct precinct but failed to confirm that the voter was in the right precinct before giving the voter a provisional ballot, and some poll workers did not direct voters to the correct precinct because they made mistakes when using the complicated precinct voting location guide. Voters generally did what poll workers told them to do. There was no evidence that any poll worker ever instructed a voter to go to a different precinct table within a location to cast a ballot and the voter refused.

*Id.* at 821–22. The Board of Elections would later vote to reject 1,537 of the approximately 10,500 provisional ballots cast on election day. The majority of the rejected provisional ballots (849 of them) were rejected because they had been voted in the wrong precinct.

The testimony from the preliminary injunction hearing also revealed that the Hamilton County Board of Elections did not adhere to the requirements of the NEOCH Consent Decree and related directives from the Secretary of State with respect to provisional ballots cast by individuals who used only the last four digits of their Social Security number as identification on election day. Despite knowing that all "NEOCH" ballots required additional scrutiny, the Board staff did not separate out all such ballots for additional review. *See id.* at 823–24. Additionally,

8

although Board of Elections staff knew that Directive 2010-74 instructed, "if a board of elections finds multiple provisional ballots voted *in the correct polling location but wrong precinct*, it should, either in writing . . . or in a public meeting of the board, question the poll workers in that polling location to determine whether they followed the board's instructions for ensuring that voters were directed to the correct precinct," the staff did not create a category of right location-wrong precinct ballots and made no attempt to question the poll workers in those locations. *Id*. at 824–26 (emphasis added). Also, Board of Elections staff did no further review of provisional ballots that failed the verification process because of "no signature" or "no printed name," even though the NEOCH Consent Decree and related Directives prohibited the rejection of ballots cast by voters using the last four digits of their social security number as identification if the voter failed to properly complete the affirmation statement for reasons attributable to poll-worker error. *Id*. at 824.

Finally, the evidence produced at the permanent injunction hearing demonstrated that, when they voted whether to accept or reject the provisional ballots, the Board members voted to disqualify the 849 wrong-precinct provisional ballots that were cast at polling places (including those cast in the correct location) but to count the 27 wrong-precinct provisional ballots that were cast at the Board of Elections' downtown office. *Id*. at 826. The Board so voted because it presumed that poll-worker error caused the ballots to be cast in the wrong precinct at the Board of Elections' office, but it did not make the same presumption regarding ballots cast at polling places. *Id*.

> Ironically, while failing to consider poll-worker error in the instances in which it was required to do so by the NEOCH Consent Decree, the Board did consider poll-worker error in circumstances that did not involve voters who used the last four digits of their

> social security number as identification . . . [such as] with the
> group of wrong-precinct ballots cast at the Board office.  In other
> words, the Board conscripted the concept of poll-worker error
> from the NEOCH Consent Decree and applied it to ballots that
> were not subject to that Decree.

*Id*. at 828.

Following the permanent injunction hearing, the District Court issued a judgment and order in which it held that the Hamilton County Board of Elections had violated provisional voters' right to equal protection under the law when it did not apply a uniform standard in determining what evidence demonstrated poll-worker error during the November 2010 election. Specifically, the Board treated wrong-precinct provisional ballots cast at the Board of Elections office differently than wrong-precinct provisional ballots cast at the correct polling location, despite the substantial similarities between the two.  The Court ordered the Board to remedy this equal protection violation by counting all otherwise valid provisional ballots cast in the correct location but the wrong precinct.  *Id*. at 847.

The Court also held that the Board of Elections had failed to comply with the NEOCH Consent Decree.  The Court ordered the Board to undertake an investigation of additional ballots subject to the Decree because they lacked complete affirmation statements.

Finally, the Court determined that

> Ohio's precinct-based voting system that delegates to poll workers
> the duty to ensure that voters are directed to the correct precinct
> but which provides that provisional ballots cast in the wrong
> precinct shall not be counted under any circumstance, even where
> the ballot is miscast due to poll-worker error, is fundamentally
> unfair and abrogates the Fourteenth Amendment's guarantee of
> due process of law.

*Id*. at 847. However, because Plaintiffs had not facially challenged the constitutionality of Ohio's election statutes, the Court was without jurisdiction to order a remedy on that issue.

In total, based on the Court's February 2012 judgment and order, the Board of Elections counted 286 additional provisional ballots, including thirteen ballots subject to the NEOCH Consent Decree, that the Board should have, but did not, count when it first compiled the 2010 election results. *See* April 25, 2012 Board Meeting Minutes, Doc. 214-2, Page ID 6515–17. After the Board counted these 286 ballots and conducted the mandatory recount, Hunter was certified the winner of the election.

Plaintiffs now ask the Court for an award of attorney fees under 42 U.S.C. § 1988, which provides that the Court may award a reasonable attorney's fee to prevailing parties as part of costs in an action brought under 42 U.S.C. § 1983. Plaintiffs request an award of $1,434,424 for attorney's fees (comprised of a lodestar[1] amount of $819,647 and a multiplier of 1.75) and $30,737.82 in expenses for a total of $1,465,161.80 for the work done on all claims in this case. Defendants oppose Plaintiffs' request for an award of attorney's fees on multiple grounds, each of which will be considered below.[2]

## II.    ANALYSIS

---

[1]  The "lodestar" is the number of hours reasonably expended on the limitation multiplied by a reasonable hourly rate.

[2]  Defendants requested an oral argument and hearing on the issues presented in Plaintiffs' Motion for Attorney Fees, pursuant to Southern District of Ohio Civil Rule 7.1(b)(2). That Rule permits counsel to apply for argument if they deem argument "essential to the fair resolution of the case because of its public importance or the complexity of the factual or legal issues presented." The Court has determined that argument or a conference is unlikely to be helpful and, accordingly, resolves the issues on the briefs.

Section 1983 is derived from the Civil Rights Act of 1871. Under Section 1983, every person who, under color of law, deprives persons of federal rights is liable for such deprivation. Plaintiffs' § 1983 claims in this case were brought to enforce the federal rights of equal protection and due process of law, rights that derive from the Fourteenth Amendment of the U.S. Constitution. To encourage private enforcement of federal rights like these, Congress enacted the Civil Rights Attorney's Fees Awards Act, 42 U.S.C. § 1988. *Perdue v. Kenny A.*, 559 U.S. 542, 550 (2010). That Act provides that "[i]n any action or proceeding to enforce a provision of [§] 1983 . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b). Thus, although the general rule in our legal system is that each party must pay its own attorney's fees and expenses, Congress made an exception to this rule to "ensure 'effective access to the judicial process' for persons with civil rights grievances." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983).

### A.    Judicial Capacity

Defendants first argue that Plaintiffs are not entitled to attorney's fees under § 1988 because the Board acted in a judicial capacity. District courts are authorized to award a reasonable attorney's fee to prevailing parties in civil rights litigation "*except* that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity such officer shall not be held liable for any costs, including attorney's fees, unless such action was clearly in excess of such officer's jurisdiction." 42 U.S.C. § 1988(b) (emphasis added). Although the Board members are not judicial officers, they claim that their actions in this case were adjudicatory in nature and, therefore, they are entitled to absolute quasi-judicial immunity.

Courts use a "functional approach" to assess whether quasi-judicial immunity applies to the acts of government officials.  Under this functional approach, courts "examine the nature of the functions with which a particular official or class of officials has been lawfully entrusted, and [they] seek to evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions."  *Forrester v. White*, 484 U.S. 219, 224 (1988).

However, "quasi-judicial immunity only extends to claims against defendants sued in their individual—not official— capacities."  *VanHorn v. Oelschlager*, 502 F.3d 775, 779 (8th Cir. 2007); *see also Forrester*, 484 U.S. at 224 ("Officials who seek exemption from *personal liability* have the burden of showing that such an exception is justified by overriding considerations of public policy.") (emphasis added); *Turner v. Houma Mun. Fire & Police Civil Serv. Bd.*, 229 F.3d 478, 483 (5th Cir. 2000) (rejecting municipal fire and police service board members' argument that the district court erred in not holding that the board and its members were entitled to absolute, quasi-judicial immunity in their "official capacities" because such an argument "misconstrues the distinction between immunities available for 'individual-capacity' and 'official capacity' suits under § 1983").

The Sixth Circuit agrees that absolute, quasi-judicial immunity only extends to claims against defendants sued in their individual—not official—capacities.  *See Alkire v. Irving*, 330 F.3d 802, 810–11 (6th Cir. 2003) (holding that "as a result of being sued only in their official capacities, Sheriff Zimmerly and Judge Irving cannot claim any personal immunities, such as quasi-judicial or qualified immunity, to which they might be entitled if sued in their individual or personal capacities."); *Denton v. Bedinghaus*, 40 F. App'x 974, 979 (6th Cir. 2002) ("Of critical importance here is that plaintiffs sue defendants in only their official capacities.  Yet, immunity

13

defenses apply to individual capacity suits and they do not shield municipalities from § 1983 liability.")

All Defendants in this case have been sued in their official capacities only, and none have been sued for damages. A suit against officials in their official capacities is "only another way of pleading an action against an entity of which an officer is an agent." *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). "As long as the governmental entity receives notice and an opportunity to respond, an official capacity suit 'imposes liability on the entity that he represents.'" *Alkire*, 330 F.3d at 810 (quoting *Brandon v. Holt*, 469 U.S. 464, 471–72 (1985)). Because absolute quasi-judicial immunity applies only to exempt officials from personal liability, and because the Board members were sued in their official, not individual, capacities, quasi-judicial immunity is not applicable in this case.

### B.    Prevailing Party

To be a prevailing party in a civil rights action and, thus, be entitled to attorney's fees and costs pursuant to § 1988, "a party must 'succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.'" *Phelan v. Bell*, 8 F.3d 369, 373 (6th Cir. 1993) (quoting *Hensley*, 461 U.S. at 433). "A plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Farrar v. Hobby*, 506 U.S. 103, 111–12 (1992).

Defendants do not dispute that Hunter is a prevailing party in this lawsuit. Thus, no discussion on that topic is warranted. However, Defendants assert that NEOCH and ODP are not prevailing parties under 42 U.S.C. § 1988. In their Complaint, NEOCH and ODP sought two

14

remedies: (1) an order requiring Defendants to count provisional ballots of registered voters who voted at the wrong precinct in Hamilton County due solely to poll worker error, and (2) an order requiring Defendants to comply with the terms of the Consent Decree entered on April 19, 2010 in the case of *Northeast Ohio Coalition for the Homeless v. Brunner*, Case No. 06-cv-896 (S.D. Ohio) and Secretary of State Directive 2010-74.  Doc. 98, at Page ID 1831.

Despite this Court's judgment that the Board of Elections violated provisional voters' right to equal protection and failed to comply with the Consent Decree and Directive 2010-74, Defendants assert that NEOCH and ODP are not entitled to fees under § 1988.  Defendants advance three theories to support their position: (1) this Court's judgment that Defendants violated voters' right to equal protection did not extend to NEOCH and ODP because their interest was limited to monitoring and enforcing the Consent Decree; (2) the judgment did not alter the legal relationship between Plaintiffs NEOCH and ODP, and the Board; and (3) NEOCH and ODP obtained only nominal relief.  The Court finds these theories unpersuasive.

In their first argument, Defendants state that fee awards under § 1988 are limited to actions to enforce a provision of, among others, § 1983, and that this Court's equal protection judgment under § 1983 pertained specifically to Plaintiff Hunter and did not extend to NEOCH and ODP.  According to Defendants, because NEOCH and ODP's victory in this case was a judgment that the Board violated the Consent Decree, the overall success on the § 1983 claim does not apply to NEOCH and ODP.

Defendants are incorrect that this Court's final judgment did not extend to NEOCH and ODP.  First, even if the Court were to parse the judgment in this case into assignable pieces, NEOCH and ODP's success in obtaining an injunction that required the Board to comply with

15

the Consent Decree makes them prevailing parties in an action to enforce a provision of § 1983. Recalling the impetus of the Consent Decree brings this fact into focus. The NEOCH Consent Decree was entered by District Judge Marbley to resolve NEOCH and ODP's § 1983 claim that Ohio's provisional ballot laws had been applied differently and unequally by Ohio's county boards of elections, resulting in a deprivation of plaintiffs' rights to equal protection of the laws and due process. The purpose of the Decree was to rectify these claimed civil rights violations. Pursing this action against the Hamilton County Board of Elections and seeking an order compelling them to abide by the Decree and the related directives issued by the Secretary of State was, accordingly, an action to enforce § 1983.

This conclusion is consistent with Supreme Court and Sixth Circuit precedents that hold that plaintiffs may rely on their prevailing party status from earlier § 1983 litigation resulting in a consent decree as a basis for a fee award for work performed defending that decree. *See Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 549 (1986) (upholding fee award for work done monitoring compliance of a consent decree because counsel's work after the decree was "as necessary to the attainment of adequate relief for their client as was all of their earlier work in the courtroom which secured [plaintiffs'] initial success in obtaining the consent decree."); *Hadix v. Johnson*, 143 F.3d 246, 256 (6th Cir. 1998) (affirming that "when plaintiffs seek fees for compliance monitoring, plaintiffs are not required to again establish prevailing party status."), *rev'd in part on other grounds*, 527 U.S. 343 (1999); *Binta v. Gordon*, 710 F.3d 608, 625 (6th Cir. 2013) (concluding that "an earlier judicially sanctioned change in the parties' legal relationship through a consent decree can be the basis of a plaintiff's prevailing party status for purposes of § 1988.").

16

Furthermore, the Court's judgment that Defendants violated voters' right to equal protection applied equally to all Plaintiffs in this action. In their Complaint, NEOCH and ODP joined Plaintiff Hunter in seeking a remedy to the alleged equal rights violations. Counsel for NEOCH and ODP provided substantial assistance and support to Hunter's attorneys in their pursuit of success on the equal protection claim, and Plaintiffs' counsel divided work relating to the claims.[3] For example, during the permanent injunction hearing, counsel for NEOCH examined Board members and poll workers whose testimony was part of the comprehensive body of evidence upon which the Court relied to adjudicate the equal protection claim.

Arguably, the favorable judgment on Plaintiffs' equal protection claim would not have been possible absent the 2010 NEOCH Consent Decree. Prior to the entry of that Decree and the issuance of Directive 2010-74, Ohio's boards of elections were not permitted to consider whether poll worker error caused the disqualification of a provisional ballot. The Board's decision to consider poll-worker error in some, but not in other substantially similar, instances of wrong-precinct provisional voting constituted the equal protection violation the Court found in this case.[4] Additionally, the concept of separating out right-location, wrong-precinct provisional

_____

[3] As NEOCH and ODP's responses to the Board's fee-related discovery specified, "[s]oon after the temporary restraining order was granted on November 22, 2010, counsel for Hunter agreed with counsel for NEOCH and DOP to divide work relating to the plaintiffs' claims." Response to Interrogatory 1, Doc. 214-1 at Page ID 6499.

[4] Defendants dispute that the Consent Decree was in any way related to its decision to count wrong-precinct provisional ballots that were not subject to the Decree, saying that this Court's "finding that the Board 'conscripted the concept of poll-worker error from the [Consent Decree] and applied it' to other ballots is mere conjecture." Doc. 213, at Page ID 6430. The transcript of the Board's November 16, 2010 meeting to count provisional ballots indicates otherwise. Specifically, when the Board was considering whether to accept a group of provisional ballots on which poll workers had provided contradictory information on the ballot envelope *but which were not subject to the Consent Decree or Directive 2010-74*, the Board unanimously voted to accept the ballots after being advised by legal counsel that the ballots

ballots and examining them for potential poll worker error arose out of that Decree.  The

boundary of the relief ordered by this Court to remedy the equal protection violation—that the

Board count otherwise valid right-location, wrong-precinct provisional ballots—originated in the

Decree.

The Court will consider Defendants' second and third arguments on this topic

collectively: that the judgment did not alter the legal relationship between Plaintiffs NEOCH and

ODP, and the Board; and that NEOCH and ODP obtained only nominal relief.  Critical to this

discussion is the fact that Defendants do not dispute that NEOCH and ODP achieved precisely

what they set out to achieve when they intervened in this lawsuit—an order requiring the Board

to comply with the NEOCH Consent Decree.  Defendants claim NEOCH and ODP are not

prevailing parties, despite their success, because the legal relationship between the Board and

those Plaintiffs did not change.  In Defendants' words, "[t]he Board at most merely violated

Ohio election law that requires it to follow the Secretary of State's directives."  Doc. 213, at

Page ID 6432.

Defendants' view on this issue is too narrow.  Yes, the Board violated Ohio election law

when it did not follow the Secretary of State's directives.  But that was not the focus of the

inquiry undertaken by the Court in this lawsuit.  The Court, guided as it should have been by

Plaintiffs' Complaints, undertook to determine whether the Board had violated Plaintiffs' rights

to due process and equal protection and whether it failed to comply with the requirements of a

consent decree entered in the case that bore NEOCH's name.  This Court held in its February 8,

2012 judgment that the Board had violated the NEOCH Consent Decree and ordered the Board

---

"f[ell] within demonstrated pollworker error under Secretary of State Brunner's directive
regarding that issue."  Permanent Inj. Hrg. JX 28 at 32.

to comply with it by counting certain NEOCH ballots that had previously been rejected and by investigating others.

At no time have Defendants asserted that they were not obligated to comply with the directives issued by the Secretary of State.  The Board is, in fact, required to do so pursuant to Ohio Revised Code § 3501.11(P) (stating that the board must perform "duties as prescribed by law or the rules, directives, or advisories of the secretary of  state.").  Thus, while the Secretary of State and the State of Ohio were the governmental parties to the Consent Decree, the specific actions required under the Decree with respect to the counting of provisional ballots were necessarily undertaken by county boards of elections.  The Secretary of State works through the boards of elections and cannot undertake the process of counting ballots following an election. Furthermore, the Decree itself states that it is "binding upon the Defendants [the Secretary of State and the State of Ohio] and their employees, agents and representatives" and orders the Secretary of State to "issue Directives to the Boards of Elections to follow this Decree." Consent Decree ¶ 2,Case No. 2:06-cv-896, Doc. 210.  It is disingenuous to argue that the Decree and its resultant directives were not binding on the Board.

Because the Board operates at the behest of the Secretary of State pursuant to her directives, it was the Board's responsibility to ensure post-election day compliance with the NEOCH Consent Decree.  The Board failed to do so, as the facts in this case proved.  Were it not for this lawsuit, the Board would not have complied with the Consent Decree after the 2010 general election.  The Board's argument that NEOCH and ODP are not prevailing parties because this Court's judgment did not alter the legal relationship between them begs a question that Defendants do not answer:  If NEOCH and ODP are not prevailing parties in this action in

19

which they achieved their stated goals—getting the Board to comply with its express obligations under the NEOCH Consent Decree and Ohio law and to count provisional ballots cast in the wrong precinct due to poll worker error—who could be a prevailing party in such a suit? Presumably the Board would say the answer is "no one." The policy behind permitting an award of attorney fees to prevailing parties in civil rights lawsuits brought under § 1983 forbids such a conclusion. For these reasons, the Court rejects Defendants' argument that NEOCH and ODP are not entitled to an award of attorney's fees under 42 U.S.C. § 1988(b).

### C. Fees Associated with *State ex rel. Painter*

Defendants assert that Plaintiffs should not be entitled to recover a fee for the time spent for *State ex rel. Painter v. Brunner*, the mandamus action brought by Painter and Williams in the Supreme Court of Ohio. They advance three arguments in support of this assertion: (1) Plaintiffs did not prevail in that case, (2) the Board's position was not adversarial to Plaintiffs, and (3) Plaintiffs are not entitled to recover fees for work performed on matters tangentially related to this lawsuit. The Court need not explore the merits of each of Defendants' contentions because one legal premise resolves the issue: "[F]ees under § 1988 are not recoverable for work performed in a completely separate case" unless that work is "necessary" to secure the final result obtained. *Binta*, 710 F.3d at 630.

As has been discussed earlier in this Order, the Supreme Court has held that work spent defending a prior consent decree is compensable under § 1988. *See Delaware Valley*, 478 U.S. at 561. However, dictating the result in that case was the fact that counsel's work defending the consent decree was "'useful and of a type ordinarily necessary' to secure the final result obtained from the litigation." *Id*. (quoting *Webb v. Bd. of Educ. of Dyer Cnty., Tenn.*, 471 U.S. 234, 243

(1985)).  The Supreme Court reasoned that counsel's participation in the administrative proceedings for which counsel sought fees "was crucial to the vindication of [the plaintiff's] rights under the consent decree."  *Id*. at 561.

Interpreting *Delaware Valley*, the Sixth Circuit has held that even if work performed by counsel in a separate case is "useful and of the type ordinarily necessary to advance" the litigation, work performed in a completely separate case is not compensable under § 1988 unless the work is to defend a collateral attack on a consent decree.  *Binta*, 710 F.3d at 631.  "Moreover," the Sixth Circuit noted, "we are troubled by the idea of ever permitting plaintiffs' counsel to receive fees for work performed in a completely separate case.  Doing so could lead to all sorts of oddities."  *Id*.

Relators would not have filed the *State ex rel. Painter v. Brunner* lawsuit absent this Court's preliminary injunction order directing the Board of Elections to investigate whether provisional ballots were cast in the wrong precinct because of poll worker error: After this Court ordered the Board to undertake the investigation, Ohio's Secretary of State issued Directives 2010-80 and 2010-87 to assist the Board in conducting the required investigation; and the goal of relators in *Painter* was to have those directives rescinded.  *State ex rel. Painter v. Brunner*, 128 Ohio St. 3d 17, 24 (Ohio 2011).  The relators succeeded in convincing the Ohio Supreme Court that the Secretary of State had exceeded her authority when she issued the directives.  *Id.* at 26.  The Ohio Supreme Court granted relators a writ of mandamus to compel the Secretary of State to rescind the directives and instead to compel the Board to review the 850 provisional ballots that

were the subject of this Court's preliminary injunction order with the same procedures it had

applied to provisional ballots during its initial (pre-*Hunter* lawsuit) review. *Id.* at 33.[5]

It is understandable that Plaintiffs in this case would have believed that their intervention

in *Painter* was "necessary" to advance the *Hunter* litigation and "crucial to the vindication of

[their] rights." *Delaware Valley*, 478 U.S. at 561. After all, the directives that the *Painter*

relators attacked were issued by the Secretary of State as a means of effectuating this Court's

preliminary injunction. However, the argument advanced by Plaintiffs in *Painter* was

unsuccessful, so they were not prevailing parties with respect to their work done in that case.

*See*, *e.g.*, *NEOCH v. Brunner*, 652 F. Supp. 2d 871, 884 (S.D. Ohio 2009) (reducing Plaintiffs'

fee award to the extent it included work on *Ohio ex rel. Skaggs v. Brunner*, 549 F.3d 468 (6th

Cir. 2008) because, inter alia, "the position advocated by Plaintiffs in *Skaggs* was rejected . . .

[t]hus, Plaintiffs received no relief with respect to their work on *Skaggs* and cannot be

considered prevailing parties with respect to that work.").

Ultimately, Plaintiffs' participation in *Painter* was neither necessary to secure the final

result obtained in this litigation nor crucial to the vindication of their rights in this case.[6]

Following the issuance of the *Painter* decision, Plaintiffs filed a motion in this Court seeking an

order to enforce the earlier-issued preliminary injunction. This Court granted that motion in part

---

[5] Relators in *Painter* did not challenge Directives 2010-74 and 2010-79, which stemmed directly from the NEOCH Consent Decree. *Painter*, 128 Ohio St. 3d at 25.

[6] Plaintiffs urged the Ohio Supreme Court in *Painter* not to attack collaterally this Court's order granting Plaintiff's motion for a preliminary injunction, and in fact the *Painter* Court's ruling did not conflict with this Court's order. Specifically, the court held that "the two federal court orders [in *Hunter* and *NEOCH*] do not resolve the issues here." *Painter*, 128 Ohio St. 3d at 31. That fact notwithstanding, this Court cannot say that Plaintiffs' work spent in *Painter* was "useful and of a type ordinarily necessary" to secure the final result obtained in this case. *Webb*, 471 U.S. at 561.

22

and ordered the Board to count certain categories of ballots and investigate all ballots subject to
the NEOCH Consent Decree.  In other words, the existence or non-existence of the directives
rescinded because of *Painter* was not material to the Board's compliance with this Court's
preliminary injunction.

Importantly, Plaintiffs' motion in this Court to enforce the preliminary injunction *was*
crucial to the vindication of their rights in this case.  Absent that motion, and this Court's
January 12, 2011 Order granting that motion in part, the Board of Elections likely would not
have undertaken any investigation of the ballots in question—given that it had been left with a
directive that essentially told it to do nothing.[7]

 The "relevant question" in determining whether work performed in a separate case is
compensable under § 1988 is whether the work was "necessary to enforce" a prior decree or
order and resulted in an order "that at the very least 'secured [plaintiffs] initial success.'" *Binta*,
710 F.3d at 633 (quoting *Delaware Valley*, 478 U.S. at 558).  Although the events that transpired
between December 21, 2010, when Painter filed his complaint for a writ of mandamus, and
January 7, 2011, when the Ohio Supreme Court issued the writ, were rapidly evolving and
understandably compelled Plaintiffs in this case to react and respond, the work undertaken in
that case ultimately was not necessary to secure the Plaintiffs' success in this case.

Accordingly, the Court will deduct from the award of attorney's fees in this case the fees
associated with the Ohio Supreme Court case of *State ex rel. Painter v. Brunner*.  The Court will
*not* deduct fees associated with the work undertaken by Plaintiffs' counsel in bringing the

---

[7] Following the decision in *Painter*, Ohio Secretary of State Jon Husted issued Directive
2011-04 which ordered the Board not to count any of the 850 provisional ballots that were the
subject of this Court's preliminary injunction order.  *See* Doc. 38-1.

*Painter* matter to this Court's attention or to enforce this Court's preliminary injunction order following the issuance of the *Painter* decision.  Plaintiffs are hereby ordered to submit revised declarations and time sheets delineating the total of excluded hours necessitated by this decision.

### D.  Responsible Party

Defendants next argue that the Ohio Secretary of State, not the Board, is the responsible party in this case.  In this argument, Defendants attempt to characterize the remedy ordered by this Court as being predicated on due process concerns, not equal protection.  In their words, "[t]he Board should not be responsible for attorney's fees when the relief given Plaintiffs is really a direct result of the failings of State law, which the Board had no power to amend and was legally bound to follow.  Put simply, this is not really an equal protection case but actually a due process case."  Doc. 213, at Page ID 6438.  According to Defendants, because this case "really" was about the fact that Ohio's election laws violated due process, and because the Secretary of State is responsible for enforcing those laws, the secretary is the proper party to pay the attorney fees.

Separately, Defendants argue that the Secretary of State is responsible for attorney fees accrued by NEOCH and ODP in their efforts to enforce the NEOCH Consent Decree.  They assert that the Consent Decree gave NEOCH and ODP the power of enforcement solely over the Secretary (as the only party directly bound by the Decree), therefore the Secretary is the only party with a legal relationship necessary for an award of fees to the prevailing party in decree enforcement litigation.

Defendants' arguments are unpersuasive.  The acts challenged as unconstitutional in this case were undertaken by the Board.  The judgment in this case was against the Board.

"'[L]iability on the merits and responsibility for fees go hand in hand; where a defendant has not been prevailed against, either because of legal immunity or on the merits, § 1988 does not authorize a fee award against that defendant.'" *Farrar*, 506 U.S. at 109 (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). The Ohio Secretary of State is not a defendant in this case and has not been found liable on any claim. The Board is liable on the merits and is the responsible party for fees under § 1988.

### C.  Amount of Attorney's Fees and Costs

Having concluded that Plaintiffs are prevailing parties and that Defendants are the responsible parties, the Court must compute the award. Under *Hensley v. Eckerhart*, calculation of a fee award involves two steps. 461 U.S. 424, 433 (1983). First, the court determines the number of hours reasonably expended on the limitation multiplied by a reasonable hourly rate, the "lodestar," as an objective starting point. *Phelan v. Bell*, 8 F.3d 369, 374 (6th Cir. 1993). The result of this calculation "produces an award that *roughly* approximates the fee that the prevailing party would have received if he or she had been representing a paying client who was billed by the hour in a comparable case." *Perdue v. Kenny A.*, 559 U.S. 542, 551 (2010) (emphasis in the original). The lodestar usually is strongly presumed to yield a reasonable fee. *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992). A reasonable fee is one which is adequate to attract competent counsel, but does not produce a windfall to attorneys. *See Gonter v. Hunt Valve Co., Inc.*, 510 F.3d 610, 616 (6th Cir. 2007).

The lodestar method is readily administrable and is objective, thus permitting meaningful judicial review. *Perdue*, 559 U.S. at 551–51. However, "the lodestar method was never intended to be conclusive in all circumstances." *Id*. at 553. Thus, after calculating the lodestar,

the Court may adjust the award up because of superior attorney performance or down because of partial success on the merits.

### 1. Lodestar Calculation

Defendants do not take issue with the calculation of the objective lodestar proposed by Plaintiffs: They do not challenge the reasonableness of the hourly rates sought, nor do they specifically critique the number of hours expended on the litigation. Rather, Defendants claim that a lodestar award would be unreasonable and excessive in this case. Thus, their arguments are best considered in terms of whether a downward adjustment to the lodestar is appropriate. Nonetheless, the Court will examine whether Plaintiffs adequately have presented their argument regarding the number of hours counsel reasonably expended in the litigation and their reasonable hourly rates.

### a. Hours Reasonably Expended

Attorneys who seek fees have an obligation "to maintain billing time records that are sufficiently detailed to enable courts to review the reasonableness of the hours expended" on the case. *Wooldridge v. Marlene Indus. Corp.*, 898 F.2d 1169, 1177 (6th Cir. 1990), *abrogated on other grounds by Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598 (2001). The Sixth Circuit has explained that "'[in] obtaining the number of hours expended on the case, the district court must conclude that the party seeking the award has sufficiently documented its claim.'" *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 552 (6th Cir. 2008) (quoting *United Slate, Local 307 v. G & M Roofing & Sheet Metal Co.*, 732 F.2d 495, 502 (6th Cir. 1984)).

The Court finds that Plaintiffs have submitted documentation of sufficient detail and probative value to enable it to determine that the hours recorded were actually and reasonably expended in this action.  Plaintiffs submitted, and the Court has reviewed, the time sheets for the firm of Gerhardstein & Branch, Plaintiff Hunter's counsel, for work done on this case.  *See* Doc. 210-1, Page ID 6299–325.  Gerhardstein & Branch billed a total of 1,803.66 hours on this matter.  Branch Decl., Doc. 210-1 at Page ID 6278.  Attorney Jennifer Branch stated in her declaration that she reviewed each entry and made a good faith effort to exclude hours that were excessive, redundant, or otherwise unnecessary, and the firm is not seeing compensation for all the work performed on the case.  *Id.*

Plaintiffs also submitted, and the Court has reviewed, the time sheets for the firms of Porter, Wright, Morris & Arthur, LLP, and The Chandra Law Firm, LLC, counsel to NEOCH.  Doc. 210-2, Page ID 6337–51; Doc. 210-4, Page ID 6394–6404.  Porter Wright keeps track of legal services rendered through a computerized time entry system whereby attorneys and paralegals keep daily records of their legal services.  Porter Wright billed a total of 1,072.25 hours on this case.  *See* Doc. 210-2 at Page ID 6331.  Attorney Caroline Gentry, a partner at Porter Wright, stated in her declaration that she had reviewed all the time entries in this matter to ensure that the time was reasonably and appropriately spent.  To that end, Gentry deleted certain entries in the exercise of billing judgment.  Attorney Subdoh Chandra billed a total of 22.5 hours on this matter, and he also excluded certain hours worked in the exercise of billing discretion.  *See* Doc. 210-4, Page ID 6404, 6389.

Finally, Plaintiffs provided, and the Court has reviewed, the time sheets for McTigue & McGinnis LLC, counsel to ODP.  Doc. 210-3, Page ID 6360–85.  McTigue & McGinnis billed

27

168.6 hours on this case. Attorney Donald McTigue states in his declaration accompanying the time sheets that he sought to avoid the performance of any unnecessary or duplicative work and that, in the exercise of billing judgment, he reduced time recorded for various work performed in the case. Doc. 210-3, Page ID 6357. All counsel stated in their declarations that their time records were maintained contemporaneous with the performance of the work.

In determining the number of hours reasonably expended, the "[t]he question is not whether a party prevailed on a particular motion or whether in hindsight the time expenditure was strictly necessary to obtain the relief achieved. Rather, the standard is whether a reasonable attorney would have believed the work to be reasonably expended in pursuit of success at the point in time when the work was performed. *Wooldridge*, 898 F.2d at 1177.

Having reviewed Plaintiffs' counsel's declarations and time records, the Court finds that there was no unnecessary duplication and that the time spent was reasonable. Plaintiffs' counsel conducted extensive discovery to ascertain what happened at the Board of Elections Office and at polling places on election day; identified witnesses for trial; created thousands of pages of trial exhibits including summaries of rejected provisional ballots, ballot envelopes, poll book notes, Board meeting minutes, and other election day materials; examined nearly seventy witnesses during a twelve-day permanent injunction hearing; and drafted or responded to numerous pre- and post-hearing motions. The Court finds no evidence of unnecessary duplication and concludes that the time spent was reasonable.

However, as discussed earlier, Plaintiffs' counsel are not entitled to fees incurred for their work in the *Painter* litigation, a separate proceeding. The Court orders Plaintiffs' counsel to

resubmit their time sheets with time spent on the *Painter* litigation deducted.[8]  The Court will

issue a final order on fees after receiving and reviewing those time sheets.

### b.  Reasonable Hourly Rates

A reasonable hourly rate is usually the prevailing market rate, defined as the rate that

lawyers of comparable skill and experience can reasonably expect to command within the venue

of the court of record.  *Geier v. Sundquist*, 372 F.3d 784, 791 (6th Cir. 2004).  "In determining

the reasonable rate, the Court has the discretionary authority to consider a party's submissions,

awards in analogous cases, and its own knowledge and experience from handling similar

requests for fees."  *Ne. Coal. for the Homeless v. Brunner*, No. 2:06cv896, 2010 WL 4939946, at

*7 (S.D. Ohio Nov. 30, 2010) (citations omitted).  However, "the determination of a reasonable

rate is difficult given wide variations in lawyers' experience, skill and reputation, so an

attorney's customary client billing rate is one reliable indicia of that attorney's prevailing market

rate."  *West v. AK Steel Corp. Ret. Acc. Pension Plan*, 657 F. Supp. 2d 914, 932 (S.D. Ohio

2009) (citing *Hadix v. Johnson*, 65 F.3d 532, 536 (6th Cir. 1995)).

Attorney Jennifer Branch provided the Court with a declaration in which she described

her educational background, professional experience, and customary billing rate and that of

Attorney Al Gerhadstein and the paralegals at Gerhardstein & Branch Co. LPA who worked on

this case.  Doc. 210-1.  Likewise, Caroline Gentry provided a declaration and similar information

for herself and the Porter Wright attorneys and paralegal who performed work for NEOCH in

---

[8]  Based on the Court's review of the provided time sheets, subtracting time spent on
*Painter* will reduce Gerhardstein & Branch's time by approximately 81 hours, Porter Wright's
by approximately 81 hours, McTigue & McGinnis LLC's by approximately 12 hours, and
Chandra's by approximately 1.6 hours.  However, counsel are better equipped to precisely excise
work done on *Painter* from their time sheets than is the Court.

this case.  Doc. 210-2.  The hourly rates requested by the Porter Wright attorneys for this case
are at or below their actual hourly rates in 2011, when the majority of time was billed in this
matter.  *See* Doc. 210-2 at Page ID 6332.  Finally, Attorney Subdoh Chandra provided the Court
with a declaration in which he described his educational and professional background and billing
rate.  *See* Doc. 210-4.  The hourly rates requested by these attorneys range from $195 to $410
per hour.

As a point of comparison, Plaintiffs' counsel refer to the 1983 Rubin Committee rates.[9]
Judges in the Southern District of Ohio often refer to the Rubin Committee rates and apply a 4%
annual cost-of-living allowance to measure the reasonableness of fees requested.  *Georgia-
Pacific LLC v. Am. Intern. Specialty Lines Ins. Co.*, 278 F.R.D. 187, 192 (S.D. Ohio 2010)
(citing *West*, 657 F. Supp. 2d at 932).

The following chart summarizes the requested hourly rates, year admitted to the bar,
years in practice, and Rubin Committee rates for the attorneys requesting fees in this case:

| Plaintiff | Attorney | Requested Hourly Rate | Year Admitted | Years in Practice | Rubin Rate as of 2011 | Rubin Rate as of 2012 |
|---|---|---|---|---|---|---|
| Tracie Hunter | Al Gerhardstein | $400 | 1976 | 35 | $383.74 | $399.14 |
| Tracie Hunter | Jennifer Branch | $300 | 1987 | 24 | $383.74 | $399.14 |

---

[9]  That committee arrived at the following categories and hourly rates for 1983:
Paralegals—$37.91/hour; Law Clerks—$23.96/hour; Young Associates (2 years of experience
or less)—$61.77/hour; Intermediate Associates (2 to 4 years of experience)—$71.62/hour;
Senior Associates (4 to 5 years of experience)—$82.81/hour; Young Partners (6 to 10 years of
experience)—$96.39/hour; Intermediate Partners (11 to 20 years of experience)—$113.43/hour;
and Senior Partners (21 or more years of experience)—$128.34/hour.  *West*, 657 F. Supp. 2d 914
at 932 n.4.

| ODP | Donald McTigue | $400 | 1979 | 32 | $383.74 | $399.14 |
|---|---|---|---|---|---|---|
| ODP | Mark McGinnis | $250 | 2003 | 8 | $288.21 | $299.77 |
| ODP | J. Corey Colombo | $250 | 2000 | 12 | $339.16 | $352.77 |
| NEOCH | Subodh Chandra | $410[10] $400 | 1995 | 17 | $339.16 | $352.77 |
| NEOCH | Paul Hallinan | $390 | 1980 | 31 | $383.74 | $399.14 |
| NEOCH | Eric Gallon | $335 | 1999 | 12 | $339.16 | $352.77 |
| NEOCH | Caroline Gentry | $330 | 1996 | 15 | $339.16 | $352.77 |
| NEOCH | Brad Hughes | $315 | 1999 | 12 | $339.16 | $352.77 |
| NEOCH | Dan Miller | $240 | 2006 | 5 | $247.60 | $257.54 |
| NEOCH | Sheena Little | $220 | 2008 | 3 | $214.14 | $227.74 |
| NEOCH | Sara Cooperrider | $195 | 2010 | 1 | $184.69 | $192.10 |

*See* Doc. 210, Page ID 6264.

The rates sought by Plaintiffs' counsel (except Chandra) are approximately at or below the Rubin Committee rate.[11] Further, the rates sought by all Plaintiffs' counsel are below the rates awarded to other plaintiff's attorneys in Ohio with similar years of experience. For example, in 2010, this Court awarded fees to the following attorneys at the following rates: Jim Helmer (admitted 1975) — $498 per hour; Frederick Morgan, Jr. (admitted 1983) —$500 per

---

[10] Mr. Chandra's standard hourly billing rate was $400 per hour in 2010 and $410 per hour in 2011.

[11] This is not to say that the rate requested by Chandra is in any way unreasonable. In 2010, District Judge Marbley granted a motion for attorneys' fees in which he awarded Subdoh Chandra his requested hourly rate of $400 her hour. *Ne. Coal. for the Homeless v. Brunner*, 2010 WL 4939946, at *7 (S.D. Ohio Nov. 30, 2010), *aff'd*, 695 F.3d 563 (6th Cir. 2012).

31

hour; Julie Popham (admitted 1992)—$425 per hour; and Jennifer Verkamp (admitted 1996)—$450 per hour. *U.S. ex rel. Ellison v. Visiting Physicians Ass'n, P.C.*, No. 1:04–cv–220, 2010 WL 2854137 (S.D. Ohio July 19, 2010). The prior year, the District Court approved experienced counsel rates ranging from $351 to $497 per hour in an ERISA matter. *West*, 657 F. Supp. 2d at 934. And in 2009, the District Court awarded fees to Mr. McTigue at $400 per hour and Mr. McGinnis at $250 per hour. *Project Vote v. Blackwell*, No. 1:06cv1682, 2009 WL 917737 (N.D. Ohio March 31, 2009). And the Sixth Circuit recently affirmed a decision from the Northern District of Ohio in which the court approved rates ranging from $250 to $450 per hour, depending on each attorney's experience. *Van Horn v. Nationwide Prop. and Cas. Ins. Co.*, 436 F. App'x 496, 499 (6th Cir. 2011).

In consideration of the party's submissions, awards in analogous cases, its own knowledge and experience from handling similar requests for fees, and the experience level of counsel, the Court finds that the hourly rates requested by Plaintiffs' counsel in this case are at or below the prevailing market rate and are reasonable. This conclusion is further bolstered by the fact that Defendants do not challenge the requested hourly rates.

There is one exception to the Court's conclusion on this topic, namely, the reasonableness of the hourly fee requested by Attorney Branch. The Court's analysis of the hourly rates charged by attorneys of similar skill and experience in Cincinnati, Ohio reveals that $300 per hour is well below the prevailing market rate and does not adequately measure Branch's true market value.

Branch, whose work on this case began with her attendance at the Board of Elections meeting on November 16, 2010 and continued through the last round of appeals, was admitted to

practice in 1987.  She is an experienced attorney who has spent her legal career developing an

expertise in civil rights matters.  She has represented plaintiffs in a broad variety of

discrimination cases and litigates prisoner civil rights and police misconduct cases with notable

success.  *See* Branch CV, Doc. 210-1 at Page ID 6279–84.  In addition to winning numerous jury

verdicts, she has facilitated substantial settlements from public defendants—no small feat given

that judgments and settlements against public defendants are paid out of limited budgets.

"The appropriate rate . .  is not necessarily the exact value sought by a particular firm, but

is rather the market rate in the venue sufficient to encourage competent representation."  *Gonter*

*v. Hunt Valve Co., Inc.*, 510 F.3d 610, 618 (6th Cir. 2007).  The Rubin Committee rate for an

attorney with twenty-four years experience in 2011 is $383.74 and $399.14 in 2012.  This Court

recently awarded fees ranging from $425 to $500 per hour to attorneys with between eighteen

and twenty-seven years experience.  *U.S. ex rel. Ellison*, 2010 WL 2854137, at *2.  Given this

evidence, the Court finds that the prevailing market rate for an attorney of Branch's skill and

experience in Cincinnati in 2011–12 is $385 per hour and that this rate is a reasonable measure

of Branch's true market value.  Her compensable hours in this case shall be paid at that rate.

Based on the foregoing, the objective lodestar amount will be the number of hours

submitted by Plaintiffs' counsel, minus time spent on *Painter*, multiplied by the hourly rates they

requested except for Attorney Branch, whose hours shall be paid at a rate of $385 per hour.

### 2.    Reasonableness of Lodestar

"A 'reasonable' fee is a fee that is sufficient to induce a capable attorney to undertake the

representation fo a meritorious civil rights case . . . [and] the lodestar method yields a fee that is

presumptively sufficient to achieve this objective."  *Perdue v. Kenny A.*, 559 U.S. 542, 552

(2010). Defendants assert that, contrary to the presumption, the lodestar calculation is unreasonable and excessive in this case. Defendants believe a reduction in the amount of fees awarded in this case is required for the following reasons: (1) Hunter achieved only limited success in this case; (2) Plaintiffs' decision to pursue a due process claim without serving the Ohio Attorney General with notice resulted in a waste of time; (3) Plaintiffs should not receive fees for work done after the Court's November 22, 2010 Order because all such work was unreasonable, excessive, redundant, and unnecessary; and (4) attorney fees should be reduced because four separate law firms worked on the case, resulting in redundant time.

Plaintiffs respond that their fee request should not be reduced on any of the grounds raised by Defendants. They claim that their success was substantial, that although Hunter did not prevail on her due process claim she did not forfeit it; that time spent after the Court's November 22, 2010 order was necessary for them to achieve their goal of getting additional provisional ballots counted; and that the time spent by counsel on this case was not redundant. For the reasons below, the Court finds that none of Defendants' arguments supporting their request for a percentage reduction of the lodestar is compelling.

### a.    Limited Success

Defendants ask the Court to reduce the lodestar amount by thirty-five percent to reflect the limited success obtained by Plaintiffs. "Where the plaintiff's claims are based on different facts and legal theories, and the plaintiff has prevailed on only some of those claims, . . . the congressional intent to limit [fee] awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim." *Tex. State Teachers Ass'n v. Garland Ind. Sch.*

*Dist.*, 489 U.S. 782, 789 (1989) (internal quotation and citation omitted). However, where the

plaintiff's claims are based on the same facts and involve related legal theories, the analysis is

more complex:

> [W]here the plaintiff's claims arise out of a common core of facts, and involve
> related legal theories . . . the most critical factor is the degree of success
> obtained . . . [and] the district courts should exercise their equitable discretion in
> such cases to arrive at a reasonable fee award, either by attempting to identify
> specific hours that should be eliminated or by simply reducing the award to
> account for the limited success of the plaintiff.

*Id.* at 789-90 (internal quotation and citations omitted). The district court may focus on the

plaintiff's overall success where the claims are related and not examine the plaintiff's success on

a strict claim-by-claim basis. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 555 (6th Cir.

2008) (citing *DiLaura v. Twp. of Ann Arbor*, 471 F.3d 666, 673 (6th Cir. 2006)). Furthermore,

while "[l]imited success may justify the reduction of the objective amount,. . . the court may not

reduce the initial figure by 'comparing the total number of issues in the case with those actually

prevailed upon.'" *Phelan v. Bell*, 8 F.3d 369, 374 (6th Cir. 1993) (holding that the district court

erred when it awarded plaintiff twenty-five percent of her attorney's fees because she technically

succeeded on only one of four issues) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 435 n.11

(1983)).

     In her complaint, Hunter raised both due process and equal protection claims. She sought

the same relief under both claims—an order requiring the Board to count ballots cast in the

wrong precinct due to poll worker error. After eighteen months of litigation, Hunter obtained a

declaratory judgment that Defendants had violated the equal protection rights of provisional

voters and a permanent injunction prohibiting Defendants from rejecting the provisional ballots

of voters who had cast their ballots in the correct location but in the wrong precinct due to poll

worker error.  Once these ballots were counted, Hunter was determined to be the winner of the race for Juvenile Court Judge.  To say that Hunter obtained only limited success is, therefore, a misstatement: She not only succeeded in preserving provisional voters' right to have their ballots counted, she obtained a seat on the Juvenile Court bench.

It is true that Plaintiffs did not obtain precisely the results they wanted.  They sought an order enjoining Defendants from rejecting *all* wrong-precinct provisional ballots, regardless of the location where they were cast.  After hearing the evidence, the Court concluded that only a portion of those provisional ballots should be counted—those cast in the wrong precinct *but in the correct location*.  Therefore, while Hunter sought to have an additional 849 wrong-precinct provisional ballots counted, this Court's order resulted in 269 additional provisional ballots being counted.  However, the fact that Plaintiffs did not obtain precisely the result that they sought does not mean that they did not succeed.  Plaintiffs were altogether successful in vindicating the equal protection rights of Hamilton County provisional voters in the 2010 election.

Although the Court found Defendants liable on the equal protection claim but not the due process claim, both claims arose out of a common set of facts and turned on the demonstrability of poll worker error.  Further, the relief sought was the same under both cause of action.  A district court is not required to reduce fees because a plaintiff did not prevail on all her claims when the successful and unsuccessful claims are related, that is "when they 'involve a common core of facts,' are 'based on related legal theories," or when counsel's time is 'devoted generally to the litigation as a whole, making it difficult to divide the hours expended." *Barnes v. Cincinnati*, 401 F.3d 729, 745 (6th Cir. 2005) (affirming decision of the district court to not

reduce fees based on plaintiff litigating unsuccessful claims); *see also Dambrot v. Central Mich. Univ.*, 55 F.3d 1177, 1193 (6th Cir. 1995) (affirming district court's decision declining to reduce the fee award to reflect the unsuccessful claim). "So long as the plaintiffs' lawyers' activities are factually related to issues on which the plaintiffs have achieved . . . relief and the work was reasonably calculated to result in relief," the district court may grant fees for the work. *Gautreaux v. Chicago Hous. Auth.*, 491 F.3d 649, 661–62 (7th Cir. 2007). In this case, Plaintiffs' counsel's work was done on issues related to their ultimate achievement—the counting of ballots that the Board had disqualified even though the problem with the ballot was caused by poll worker error. Because the work done on the successful equal protection claim and the unsuccessful due process claim involved a common core of facts and counsel's time was devoted to the litigation as a whole, the Court declines to apply an across-the-board reduction for the work done on the unsuccessful claim.

### b.    Due Process Claim

In a separate but related argument, Defendants ask the Court to reduce the lodestar by an additional thirty-three percent, arguing that this is an appropriate penalty for Plaintiffs' decision to pursue a due process claim without serving notice on the Ohio Attorney General. The Court disagrees that a reduction is appropriate on those grounds.

The issue of whether Plaintiffs' due process claim was a challenge to the constitutionality of state law such that notice to the Ohio Attorney General was required under Federal Civil Rule 5.1 was discussed at the conference that preceded the permanent injunction hearing. At that time, Plaintiffs stated that they were not seeking to have this Court hold any Ohio statute unconstitutional. Rather, they challenged the Board's application of state law, not state law

itself.  Accordingly, the Court allowed Plaintiffs to submit evidence on the due process challenge at the permanent injunction hearing.

It was only after reviewing the evidence submitted at the permanent injunction hearing that the Court determined it could not render a judgment on the due process claim without ruling on the constitutionality of certain Ohio election laws.  Thus, Hunter's failure to give notice to the Ohio Attorney General of the due process claim at the outset of the litigation is not grounds for the across-the-board reduction that Defendants request.

### c.    Work Done After November 22, 2010

Defendants next argue that Plaintiffs should not receive fees for work done after the Court's November 22, 2010 order.  They base this argument on the fact that, in its final judgment, this Court found that the additional investigation into instances of poll-worker error undertaken by the Board after that date "was not necessary to support a conclusion that equal protection demanded that the Board consider right-location, wrong-precinct ballots on the same terms as ballots cast at the Board office."  *Hunter*, 850 F. Supp. 2d at 840.

The suggestion that months of litigation were unnecessary merely because the Court's decision did not ultimately depend on certain evidence is confounding.  In its final judgment, the Court simply observed that if the Board of Elections had applied uniform standards on November 16, 2010 when deciding whether to accept or reject provisional ballots, it would have counted the right-location, wrong-precinct provisional ballots without the need for additional investigation.  This lawsuit—and all the work done on it—was necessary *because* the Board failed to apply uniform standards on that date.

38

It also bears noting that a significant amount of work done after November 22, 2010 was necessitated by Defendants' appeals. Defendants literally filed appeals at every turn of this litigation, and Plaintiffs prevailed in each of them. Plaintiffs successfully defended this Court's November 22, 2010 preliminary injunction. *Hunter*, 635 F.3d 219 (6th Cir. 2011). Plaintiffs successfully obtained a dismissal of Defendants' second interlocutory appeal on sovereign immunity days before trial. *Hunter*, No. 11-3738, slip op. (6th Cir. July 14, 2011). And Plaintiffs successfully obtained a denial of Defendants' motion for a stay pending appeal both in this Court and in the Sixth Circuit. In short, Plaintiffs were required to continue litigating the matter well beyond November 22, 2010 in order to preserve the decisions rendered in their favor. The work performed by Plaintiffs throughout this litigation was entirely necessary, and there is no basis for a finding that work performed after November 22, 2010 should not be compensated.

### d.    Redundancies

Finally, Defendants argue that the lodestar is excessive because four different law offices worked on the case, causing redundancies. As proof, they note that seven attorneys appeared on Plaintiffs' behalf at the final pretrial conference on July 7, 2011, and that there are multiple entries of "communications with co-counsel" on the submitted time sheets. Defendants ask the Court to reduce attorney's fees by twenty-five to fifty percent to account for these redundancies.

As a point of reference, the Court notes that Defendants in this case, including Intervenor Defendants Williams and the Ohio Republican Party, were represented by more than eleven attorneys from two private law firms and the Hamilton County Prosecutor's Office. At the preliminary injunction hearing, where only Attorney Branch represented Plaintiff Hunter, six

defense attorneys appeared and argued.  Further, during most days of the permanent injunction hearing, six defense attorneys defended the case while three attorneys represented Plaintiffs.

When multiple firms and multiple attorneys represent multiple plaintiffs, the time they spend planning and coordinating efforts is compensable unless it is excessive.  *See Am. Civil Liberties Union of Ky., Inc. v. Grayson Cty.*, No. 4:01cv202, 2008 WL 5101672 (W.D. Ky. Nov. 26, 2008) ("Multiple attorneys may be essential for planning strategy, eliciting testimony or evaluating facts or law.").  Further, the "[u]se of one or more lawyers is a common practice, primarily because it often results in a more efficient distribution of work."  *Gautreaux*, 491 F.3d at 661.  "It allows more experienced, accomplished, and expensive attorneys to handle more complicated matters and less experienced, accomplished, and expensive counsel to handle less complicated ones."  *Id*.  Further, it is not the Court's job to second-guess counsel's judgment when it comes to the necessity of intra-counsel meetings and communications: "There is no hard-and-fast rule as to how many lawyers can be at a meeting or how many hours lawyers can spend discussing a project."  *Id*.

Plaintiffs' counsel in this case stated in their declarations that they already reduced their billing to excise any duplicative or redundant time.  Communications between counsel were specifically documented and were reasonable.  And as for counsel's attendance at the final pretrial conference, their attendance was ordered by this Court.  There being no evidence of unnecessary involvement of counsel, it is it unnecessary for the Court to impose an across-the-board percentage reduction in this case due to the number of Plaintiffs' counsel involved.

      **3.**    **Costs**

In addition to attorney fees, § 1988(b) authorizes the district court to award costs to prevailing parties in civil rights litigation. In their motion for fees, Plaintiffs seek $30,737.82 in expenses. This figure includes filing fees, court reporter fees, copying costs, witness fees, long distance phone charges, legal research, and travel expenses. Defendants do not dispute that Plaintiffs are entitled to their costs for court reporter fees, witnesses fees, photocopying, paralegal expenses, travel, and telephone. However, Defendants claim that the expenses submitted by Porter Wright for legal research ($10,748.42), miscellaneous costs ($68.25), and meals ($286.12) are not compensable.

NEOCH does not object to the Court eliminating the costs associated with Porter Wright attorneys' meals and miscellaneous costs. However, it asserts that legal research is fully compensable under § 1988. The Court agrees with NEOCH.

Although the Sixth Circuit has not addressed the issue in a published opinion, numerous courts within the circuit have held that computerized legal research costs are a recoverable expense for prevailing plaintiffs under § 1988. In *Project Vote v. Blackwell*, the district court discussed cases so holding and observed that the Third, Seventh, Tenth, and District of Columbia Circuit Courts of Appeals have all found computerized legal research costs recoverable. No. 1:06cv1628, 2009 WL 917737, at *19 (N.D. Ohio Mar. 31, 2009) (citing cases).

Furthermore, the Sixth Circuit has stated that, pursuant to § 1988, a court has the "authority to award those reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee-paying client in the course of providing legal services." *Northcross v. Board of Ed. of Memphis City Sch.*, 611 F.2d 624, 639 (6th Cir. 1979) (overruled on other grounds). The "key question," then, "is whether computer-research expenses are 'of a type

41

billed separately to the client, i.e., not absorbed in the attorney's hourly rate as overhead.'"

*Moore v. Menasha Corp.*, No. 1:08cv1167, 2013 WL 308960, at *6 (W.D. Mich. Jan. 25, 2013)

(quoting *Gradisher v. Check Enforcement Unit, Inc.*, No. 1:00cv40, 2003 WL 187416, at *8

(W.D. Mich. Jan. 22, 2003)).  *Moore* and others have concluded that computerized legal research

charges are such an expense.  *Id.*; *see also Project Vote*, 2009 WL 917737, at *20.  Similarly,

this Court concludes that Porter Wright's legal research costs are recoverable.

### D.     Enhancement

Plaintiffs in this case ask the Court to apply an upward adjustment, specifically a

multiplier of 1.75, to the lodestar in recognition of the novelty and difficulty of the equal

protection question in this case and Plaintiffs' superior results.  The Supreme Court recently

considered whether the calculation of an attorney's fee, based on the lodestar, may be increased

due to superior performance and results.  *Perdue v. Kenny A.*, 559 U.S. 542 (2010).  It concluded

that, while an increase is permitted in extraordinary circumstances, "factors subsumed in the

lodestar calculation cannot be used as a ground for increasing an award above the lodestar; and a

party seeking fees has the burden of identifying a factor that the lodestar does not adequately

take into account and proving with specificity that an enhanced fee is justified."  *Id.* at 546.

Plaintiffs claim that the novelty and difficulty of the equal protection question in this case

are grounds for an enhancement.  Attorney Branch identified the equal protection problem while

attending the Board of Elections meeting where provisional ballots were being decided.  Just six

days later, Plaintiffs obtained a preliminary injunction from this Court compelling the Board to

investigate instances of poll worker error.  After three appeals failed to overturn the injunction, a

twelve-day permanent injunction hearing took place.  Plaintiffs prevailed, securing injunctive

relief on equal protection grounds that required the Board to count nearly 300 provisional ballots that it had originally rejected.  Commentary about the District Court and Court of Appeals' decisions noted that the case is the most developed application of the equal protection holding of *Bush v. Gore*, 531 U.S. 98 (2000) in the lower courts.  Thus, claim Plaintiffs, the success on the equal protection claim was novel and exceptional.

Despite this success, the Supreme Court has specified that "the novelty and complexity of a case generally may not be used as a ground for an enhancement because these factors 'presumably [are] fully reflected in the number of billable hours recorded by counsel.'" *Perdue*, 559 U.S. at 553 (quoting *Blum v. Stenson*, 465 U.S. 886, 898 (1984)).  Thus, the Court will not apply a multiplier on this ground.

Plaintiffs' counsel also point to a decision by the Sixth Circuit in *Northeast Ohio Coalition for the Homeless [NEOCH] v. Husted*, 696 F.3d 580 (6th Cir. 2012) and the subsequent entry of a permanent injunction by the district court in *Service Employees International Union [SEIU], Local 1 v. Husted*, Case No. 2:12cv562, 2013 WL 3456756 (S.D. Ohio July 9, 2013) (Marbley, J.) as evidence of the extraordinary results Plaintiffs achieved in this case.  The net result of those cases is that the Ohio Secretary of State and its county boards of elections may no longer disqualify provisional ballots cast in the correct polling location but the wrong precinct.  Specifically, the boards of elections

> may not reject any provisional ballot case by a lawfully registered voter in the correct polling location in any election because the voter cast his or her provisional ballot in the wrong precinct, unless the poll worker who processed the voters' provisional ballot has: (a) determined the correct precinct for the voter; (b) directed the voter to the correct precinct; (c) informed the voter that casting the wrong-precinct ballot would result in all votes on the ballot being

> rejected under Ohio law; and (d) the voter refused to travel to the
> correct precinct and insisted on voting the invalid ballot.

*SEIU, Local 1*, 2013 WL 3456756, at *2.  This permanent injunction prevents

disenfranchisement and advances voters' rights in Ohio because, prior to that order, Ohio did not

count any wrong-precinct provisional ballots regardless of poll worker error (except those

already covered by the NEOCH Consent Decree).

This significant change in the application of Ohio law was made possible, in part, by the

work done by Plaintiffs' counsel in this case.  At the preliminary injunction phase, the district

court in *SEIU* relied on the factual findings established in *Hunter* when concluding that the

plaintiffs had established "a strong likelihood that in the past few statewide elections poll-worker

error has resulted in the disqualification of hundreds—if not thousands—of wrong-precinct

provisional ballots cast by otherwise lawfully-registered voters."  *SEIU, Local 1 v. Husted*, 887

F. Supp. 2d 761, 779–80 (S.D. Ohio 2012) (Marbley, J.) (granting preliminary injunctive relief

and noting that "[m]uch of the factual basis upon which the Court relies for its findings is

uncontested, or has already been established by this Court or the courts in *Hunter*.").  Thus, the

work done by Plaintiffs' counsel in this case helped Judge Marbley reach his decision to require

the Secretary of State to count wrong-precinct provisional ballots unless the state could prove

that the poll worker properly advised the voter to cast the ballot in the correct precinct and the

voter refused.  *Id*. at 798.

The Sixth Circuit upheld Judge Marbley's injunction to the extent it prohibited the

rejection of provisional ballots cast in the wrong precinct but in the correct location.  *NEOCH v.*

*Husted*, 696 F.3d 580 (6th Cir. 2012).  Specifically, the Circuit Court found that the plaintiffs

were likely to succeed on the merits of their right place/wrong precinct equal protection claim as

well as their right-place/wrong precinct due process claim.  *Id*. at 597.  In analyzing the case, the

Sixth Circuit made numerous references to the *Hunter* litigation.  For example, in discussing the

burden on provisional voters, the Sixth Circuit noted that the statewide evidence presented by the

SEIU plaintiffs "amplif[ied] the countywide evidence established in *Hunter*."  *Id*. at 593 n.7.  In

discussing the likely due process violation, the Sixth Circuit noted that it found "sufficient

indicia of purposeful conduct in the State's intent to enforce its strict disqualification rules

without exception, despite the systemic poll-worker error identified in this litigation and others.

*Hunter* shed light on this problem last year, but the State persisted in its position."  *Id*. at 598.

As the above discussion demonstrates, the groundwork laid by Plaintiffs' counsel in

*Hunter* allowed counsel in *SEIU* to succeed in obtaining the type of relief that Plaintiffs sought

in this case but on a much larger basis—that is, prospective, statewide relief prohibiting the

wholesale rejection of right-location, wrong-precinct provisional ballots.  This is a testament to

Plaintiffs' counsel's tenacity, vision, and high caliber work in this case.  That said, the

advancements made in preventing voter disenfranchisement on a statewide basis were achieved

by attorneys who succeeded on different claims in a different case.

The Court is unaware of precedent that would permit it to consider the *SIEU*

success—even based as it was on facts painstakingly developed by Plaintiffs' counsel in this

case— as grounds for an enhancement of attorney's fees in this case.  Furthermore, the

achievement of exceptional results does not necessarily provide grounds for the across-the-board

enhancement that Plaintiffs seek.  "[S]uperior results are relevant only to the extent it can be

shown that they are the result of superior attorney performance," and "the quality of an

attorney's performance generally should not be used to adjust the lodestar '[b]ecause

45

considerations concerning the quality of a prevailing party's counsel's representation normally are reflected in the reasonable hourly rate.'" *Perdue*, 559 U.S. at 554 and 553 (quoting *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 556 (1986)).

The Supreme Court has clarified that enhancements are appropriate only in those rare circumstances in which the lodestar does not adequately take into account a factor that should be considered in determining a reasonable fee, such as when the hourly rate does not adequately measure the attorney's true market value, when the litigation has required an extraordinary outlay of expenses and the litigation is exceptionally protracted, or when there is an exceptional delay in the payment of fees. *Id*. at 554–55. None of these situations is present here. Rather, the objective lodestar calculation in this case, with the adjustment already made by the Court with respect to Branch's rate, takes into account all the factors appropriate for consideration.[12]  For

---

[12]  Prior to the *Perdue* decision, district courts frequently referred to the twelve-factor test set out in *Johnson v. Ga. Highway Express, Inc*., 488 F.2d 714 (5th Cir. 1974) to determine reasonable attorney fees awards in fee-shifting cases. These factors were:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to the acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Hensley v. Eckerhart*, 461 U.S. 424, 430 at n.3 (1983). The Supreme Court observed that the *Johnson* approach provided limited guidance and could lead to arbitrary results, and it stated that the lodestar calculation was the preferred approach. *Perdue*, 559 U.S. at 551–52.

The Sixth Circuit recently discussed the propriety of considering the *Johnson* factors in the wake of *Perdue*. *Bell v. Prefix, Inc.*, No. 11-1508, 2013 WL 323005, at *2 (6th Cir. Jan. 29, 2013). In *Bell*, the court held that the district court did not err in considering the *Johnson* factors

these reasons, the Court will not award an enhancement or multiplier to the lodestar calculation in this case.

## III.    CONCLUSION

For the above reasons, the Court hereby GRANTS Plaintiffs' Motion for Attorney Fees (Doc. 210) with the following modifications: Counsel's request for reasonable attorney's fees is GRANTED to the extent it seeks fees for the work done in the *Hunter* litigation but not in *Painter*. Plaintiffs' counsel will be awarded their fees at their requested rates except that Attorney Branch will be awarded fees at the adjusted rate discussed herein. Plaintiffs will be awarded their costs minus $354.37 in miscellaneous costs and meals. The Court DENIES Plaintiffs' request for a multiplier.

Plaintiffs' motion includes documentation for work performed through April 5, 2012. To the extent Plaintiffs seek fees and costs incurred after that date, they must submit documentation relevant to that request no later than October 18, 2013. Also by October 18, 2013, Plaintiffs are ordered to resubmit their fee request with time spent on the *Painter* litigation removed. A final order that provides the calculation of attorney's fees and expenses based on the findings herein will be issued after that date.

IT IS SO ORDERED.

                                                  ____s/Susan J. Dlott_____
                                                  Chief Judge Susan J. Dlott
                                                  United States District Court

---

because the court had first calculated the lodestar amount, and "[t]he Supreme Court made no comment about such supplemental reliance on the *Johnson* test." *Id.* Thus, while *Bell* leaves open the option of applying the *Johnson* factors as a means of making adjustments to the lodestar, the Court declines to do so in this case.